STUART G. GROSS (#251019)
sgross@gross-law.com
**GROSS LAW**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
t (415) 671-4628
f (415) 480-6688

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **SAN FRANCISCO HERRING ASSOCIATION**, <br><br> Plaintiff, <br><br> **v.** <br><br> **UNITED STATES DEPARTMENT OF THE INTERIOR**; **SALLY JEWELL**, in her official capacity as Secretary of the Interior; **UNITED STATES NATIONAL PARK SERVICE**; **JONATHAN JARVIS**, in his official capacity as Director of the National Park Service; and **FRANK DEAN**, in his official capacity as General Superintendent of the Golden Gate National Recreation Area, <br><br> Defendants. | **Case No. 13-1750 (JST)** <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT** |

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT                1

RELIEF REQUESTED                1

STATEMENT OF ISSUES TO BE DECIDED                1

INTRODUCTION                1

FACTUAL BACKGROUND                2

I.   Legislative History of the GGNRA Enabling Act and its Resulting Structure                2

   A.   Congressional Democratic Proposal – 92 H.R. 9498 & 92 S. 2342                4

   B.   Congressional Republican Proposal – 92 H.R. 10220                5

   C.   Administration's Proposal – 92 H.R. 13060, 92 H.R. 13018, & 92 S. 3174                6

   D.   Compromise Bill – 92 H.R. 16444 -- Passed by Congress and Enacted as GGNRA Enabling Act, P.L. 92-589, Codified at 16 U.S.C. §§ 460bb *et seq.*                8

      1.   GGNRA Enabling Act, Section 3, 16 U.S.C. § 460bb-2– Acquisition                9

      2.   GGNRA, Section 4, 16 U.S.C. § 460bb-3 – Administration                10

II.   History of Ownership Interests Over the Waters in Question                11

   A.   Upon California's Admission to the Union in 1850, Waters of San Francisco Bay, Including Those at Issue Here, and Corresponding Submerged Lands Became the Property of the State of California as Trustee of the Public                12

   B.   On March 9 1897, California Conditionally Transferred Title to Certain Submerged Lands to the U.S. Military but *Not* an Interest Entitling its Holder to Exclude the Public from Fishing or Navigating the Waters Above                13

   C.   On September 9, 1953, California Repealed the 1897 Act, Rescinding its Grant to the U.S. of Title to Certain Submerged Lands                16

   D.   On November 9, 1958, Title to the Submerged Lands Adjacent to Yellow Bluff (aka Fort Baker East) Transferred to the Sausalito School District                16

   E.   On September 29, 1978, the State of California Quitclaimed to the U.S. All Rights, Title and Interests to the Marin Headlands, *Specifically Reserving for Itself* All Adjacent Tideland and Submerged Lands                17

   F.   On July 16, 1987, the State of California Leased Submerged Lands Under the Waters in Question to the NPS, Specifically Excepting the Right to Exclude Persons Wishing to Fish or Navigate the Waters Above                17

G.  On June 1, 2009, the State of California Leased Submerged Lands Under the Waters in Question to the NPS, Specifically Excepting the Right to Exclude Persons Wishing to Fish or Navigate the Waters Above                    18

III.  History of Herring Fishing in the Waters in Question and Continued Operation and Intensive Regulation of the Commercial Roe Fishery by California from 1973 Until the NPS Prohibited its Operation in 2011                    20

ARGUMENT                                                                        22

I.  Legal Standard                                                             22

    A.  Summary Judgment Standard Under Fed. R. Civ. P. 56                     22

    B.  Judicial Review of Agency Actions Claimed to be *Ultra Vires*         22

II.  Congress' Unambiguous Intent was to Limit the NPS' Administrative Jurisdiction to Lands, Waters, and Interests Therein Acquired for the GGNRA- No Evidence in the Record That the NPS Ever Acquired Such an Interest that Would Give it the Administrative Jurisdiction to Prohibit Fishing in the Waters In Question                    23

    A.  After Careful Consideration of Other Alternatives Congress Directly Spoke to the Issue of the NPS' Administrative Jurisdiction, Limiting it to Lands, Waters, and Interests Therein *Acquired* by the DOI for the Recreation Area                    24

    B.  Nothing in Record that DOI Acquired an Interest in the Waters in Question Giving it the Administrative Jurisdiction to Prohibit Fishing in Them                    26

        1.  1897 Act Cannot Form a Basis for Claim by DOI to Have Acquired the Waters in Question                    26

    C.  The DOI Cannot Assert Title Over the Waters in Question Based on Eminent Domain  27

    D.  Any Purported Grant of "Legislative Jurisdiction" by the State of California Over These Waters to the DOI was Ineffective to Give the DOI the Administrative Jurisdiction to Prohibit Fishing in These Waters                    27

    E.  NPS Conduct Subsequent to Enactment of the GGNRA Enabling Act Confirms that Congress Specifically Limited the NPS's Administrative Jurisdiction to Lands, Waters, and Interests therein Acquired and the NPS Has not Acquired the Waters in Question                    29

III.  The Defendants Cannot Avoid the Specific Acquisition Prerequisite Contained in GGNRA Enabling Act § 4 Based on the General Grant of Administrative Jurisdiction Contained in the Earlier Enacted Organic Act 16 U.S.C. § 1a-2(h                    30

IV.  Plaintiff is Not Challenging Congress' Constitutional Power to Enact any Provision of the GGNRA Enabling Act or the Organic Act, but Rather the NPS' Transgression of the Limits to its Administrative Authority Set by Congress; Thus, Defendants' Property Clause and Commerce Clause Argument is Inapposite                    34

CONCLUSION                                                                     35

GROSS LAW
THE EMBARCADERO, PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Cases**

16 U.S..C. §§ 460bb *et seq*................................................................................2, 3

16 U.S.C. § 1a-1 ....................................................................................................32

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................22

*Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445 (9th Cir. 1996)............32

*Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) ...............................23, 33, 34

*Contra United States v. 422978 Square Feet of Land*, 445 F.2d 1180 (9th Cir., 1971) .............27

*Ctr. for Biological Diversity v. DOE*, No. 08-168, 2008 U.S. Dist. LEXIS 110452 (C.D. Cal. Oct. 16, 2008) ...........................................................................................31

*Davis v. Latschar*, 202 F.3d 359 (D.C. Cir. 2000)................................................32

*Davis v. Michigan Dept. of Treasury*, 489 U.S.. 803, 103 L. Ed. 2d 891, 109 S.. Ct. 1500 (1989) ................................................................................................31

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ..............passim

*Illinois R.R. Co. v. Illinois*, 146 U.S. 387 (1892)..........................................13, 14

*Iowa League of Cities v. EPA*, 711 F.3d 844 (8th Cir. 2013) ...............................23

*K Mart Corp. v. Cartier*, 486 U.S. 281 (1988) ....................................................25

*Kleppe v. New Mexico*, 426 U.S. 529 (1976).......................................................35

*Knight v. United States Land Assoc.*, 142 U.S. 161 (1891)............................12, 13

*Kungys v. United States*, 485 U.S. 759 (U.S. 1988) ............................................24

*Lowe v. SEC*, 472 U.S. 181 (1985) ......................................................................24

*Martin v. Wadell*, 16 Pet. (41 U.S.) 410, 10 L. Ed. 997 (1842)...........................13

*Minnesota by Alexander v. Block*, 660 F.2d 1240 (8th Cir. 1981) .......................33

*Morton v. Mancari*, 417 U.S. 535 (1974) ...........................................................31

*National Rifle Asso. v. Potter*, 628 F. Supp. 903 (D.D.C. 1986) .........................32

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 463 F.3d 50 (1st Cir. Mass. 2006)..................................................................................................31

*NW Environmental Advocates v. EPA*, 537 F.3d 1006 (9th Cir. 2008) ...............22

*Organized Fishermen of Florida v. Hodel*, 775 F.2d 1544 (11th Cir. 1985)............33

*People v. California Fish Co.*, 166 Cal. 576 (1913)........................................passim

GROSS LAW
THE EMBARCADERO, PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

iii

*Phillips Petroleum Co. v. Miss.*, 484 U.S. 469 (1988)...................................................14

*Radzanower v. Touche Ross & Co.*, 426 U.S. 148 (1976)...............................................31, 32

*Sierra Club v. Watt*, 487 F. Supp. 443 (D. D.C. 1980)....................................................32

*United States v. Armstrong*, 186 F.3d 1055 (8th Cir. 1999) .........................................33, 34

*United States v. Bohn*, 622 F.3d 1129 (9th Cir. 2010)...................................................35

*United States v. Brown*, 552 F.2d 817 (8th Cir. 1977)..............................................33, 34, 35

*United States v. Rands*, 389 U.S. 121 (1967)...............................................................35

*Wash. Mutual Inc. v. United States*, 636 F.3d 1207 (9th Cir. 2011).............................22

*Wyandotte Transp. Co. v. United States*, 389 U.S. 191 (1967) ....................................35

**Statutes**

16 U.S.C. § 160(f)...............................................................................................34

16 U.S.C. § 460bb-1..............................................................................................9

16 U.S.C. § 460bb-2(a)....................................................................................9, 10, 25, 26

16 U.S.C. § 460bb-3(a).....................................................................................passim

16 U.S.C. § 460bb-5.............................................................................................25

16 U.S.C. §§ 460bb...............................................................................................2

16 U.S.C. §§1 *et seq.*............................................................................................2

16 U.S.C. §460bb-1(a)(3)......................................................................................25

16 USCS § 410b ....................................................................................................33

1897 Cal. Stat. (Ch. 81) 74-75 .......................................................13, 19, 26, 27

1953 Cal. Stat. (Ch. 521) 1761 ..................................................................16, 26

5 U.S.C. § 706(2)(C).....................................................................................2, 22, 23

**Rules**

Fed. R. Civ. P. 56...................................................................................................22

Fed. R. Civ. P. 56(a)..............................................................................................22

**Regulations**

36 C.F.R. § 1.2........................................................................................................34

26 C.F.R. § 2.3(d)(4).....................................................................................22, 28, 35

**Constitutional Provisions**

GROSS LAW
THE EMBARCADERO, PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

iv

Article XV, § 2..............................................................................................15, 16

Cal. Const, Art. X § 4 ............................................................................14, 15, 18, 19

Cal. Const., Art. 1, § 25 ..............................................................................14, 18, 19

U.S. Const., Art. I, § 8, cl. 3.................................................................................35

U.S. Const., Art. IV, § 3, cl. 2.............................................................................34

GROSS LAW
THE EMBARCADERO, PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE that on December 12, 2013 at 9:30 a.m., in Courtroom 9, 19th Floor, in the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, before the Honorable Jon S. Tigar, Plaintiff San Francisco Herring Association ("Plaintiff") will and hereby does move this Court for an order granting summary judgment in favor of Plaintiff on its claim that Defendants prohibition of commercial fishing in the waters adjacent to the shoreline of the Golden Gate National Recreation Area ("GGNRA") is *ultra vires* in violation of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(C). This Motion is based upon this Notice of Motion, Motion, and Memorandum of Points and Authorities, the Administrative Record ("AR"), the Declaration of Stuart G. Gross ("Gross Dec."), the Declaration of Salvatore Papetti ("Papetti Dec."), the Declaration of Frank Henry ("Henry Dec."), the Declaration of Nick Sohrakoff ("Sohrakoff Dec."), the Declaration of Matt Ryan ("Ryan Dec."), Declaration of Jim Baumgart ("Baumgart Dec."), the Declaration of Ernie Koepf ("Koepf Dec."), Declaration of Christopher Cammeron ("Cammeron Dec."), the Declaration of John Mellor ("Mellor Dec."), Declaration of Kevin Marilley ("Marilley Dec.") and attached exhibits submitted therewith; all pleadings and records on file in this case; and such oral argument and evidence allowed by the Court at the hearing.

## RELIEF REQUESTED

Plaintiff seeks judgment in its favor on the issue of the Defendants' jurisdiction to prohibit commercial fishing in the adjacent to shoreline of the GGRNA.

## STATEMENT OF ISSUES TO BE DECIDED

Do Defendants have the administrative jurisdiction to prohibit commercial fishing in the waters adjacent to the shoreline of the GGNRA.

## INTRODUCTION

The question at issue on these cross-motions for summary judgment is whether the Department of the Interior ("DOI") and its delegate agency, the National Park Service ("NPS"),[1] have the administrative jurisdiction to prohibit commercial fishing in the waters

---

[1] References herein to DOI should be understood to include the NPS and vice versa.

adjacent to the shoreline of the GGNRA ("waters in question"). Congress directly spoke to the question of the NPS' administrative jurisdiction, in Section 4(a) of the act that established the GGNRA ("GGNRA Enabling Act"), Pub.L. No. 92-589, 86 Stat. 1299 (1972), codified at 16 U.S..C. §§ 460bb *et seq*. Under the heading "Administration," it states: "The Secretary shall administer the lands, waters and interests therein acquired for the recreation area . . ." 16 U.S..C. § 460bb-3(a). It is thus remarkable (and telling) that absent from Defendants' Motion for Summary Judgment ("Ds MSJ") is any discussion of Section 4 of the GGNRA Enabling Act or the above quoted language. Indeed, no part of the text of Section 4 is quoted, paraphrased, or discussed anywhere in Defendants' brief. The section's only mention comes once, halfway through Defendants' brief, at the end of a string cite. *See* Ds MSJ at 9.

Defendants fail to discuss GGNRA Enabling Act § 4 because there is nothing in the record showing that the NPS ever acquired an interest in the waters in question or the lands below that would satisfy the prerequisite for the NPS to have the administrative jurisdiction necessary to prohibit commercial fishing in the waters in question. As a result, Plaintiff is entitled to summary judgment on its claim that this prohibition is in excess of Defendants' authority in violation of 5 U.S.C. § 706(2)(C). Defendants attempt to avoid this result principally based on the argument that under the Organic Act, 16 U.S.C. §§1 *et seq.*, the NPS can enforce its regulations anywhere within a national park or recreation area, irrespective of ownership. However, while that argument might have weight in the absence of the specific provisions of the GGNRA § 4, in the face of those provisions, they have none. Accordingly, Plaintiff respectfully request that the Court deny Defendant's motion for summary judgment and grant Plaintiff's cross motion for summary judgment.

## FACTUAL BACKGROUND

### I.    Legislative History of the GGNRA Enabling Act and its Resulting Structure

Congress established the GGNRA, on <u>October 27, 1972</u>, by enacting the GGNRA Enabling Act, Pub.L. No. 92-589, 86 Stat. 1299 (1972), subsequently codified at 16 U.S.C. §§ 460bb *et seq. See* Gross Dec., Ex. 20 Pub. L. No. 92-589, 86 Stat. 1299 (1972). The bill – 92 H.R. 16444 – that was ultimately enacted as the GGNRA Enabling Act was a compromise

measure, resulting from *twelve* competing bills introduced in the House of Representatives and Senate to establish what was ultimately named the Golden Gate National Recreation Area.[2]

Among their differences, the competing bills, differed in the following three ways: (1) the extent to which they transferred property rights to the DOI of lands and waters within the boundaries of the recreation area; (2) the extent of the authority they granted the DOI to effect such transfers itself; and (3) the limitations they placed on the DOI's administrative jurisdiction. Ultimately 92 H.R. 16444, and thus the enacted bill, incorporated language contained in the proposed bills of Congressional Republicans and the Nixon Administration concerning these three areas, as opposed than that contained in the Congressional Democrats' proposed bills. Thus, the enacted bill was less expansive in the property interests over lands and waters within the recreation area's boundaries automatically transferred to the DOI, more narrowly limited the DOI's authority to acquire such property interests not automatically transferred, and more narrowly defined the geographic scope of the DOI's administrative jurisdiction. Most relevant for our purposes, 92 H.R. 16444, and thus 16 U.S.C. §§ 460bb *et seq.*: (1) specifically did <u>not</u> transfer to the DOI title to any property of the State of California or its subdivisions that existed within the boundaries of the recreation of the area established by the act, (2) limited the DOI to acquiring such property <u>only</u> by donation; and (3) <u>specifically</u> limited the administrative jurisdiction of the DOI to <u>only</u> those lands, waters, and interests therein that the DOI acquired

---

[2] These bill were, listed chronologically according to their date of introduction: 92 H.R. 866 introduced on <u>Jan. 22, 1971</u> by Representative of California William Malliard (R) on behalf of himself and others (Gross Dec., Ex. 1); 92 H.R. 3238 introduced on <u>Feb. 2, 1971</u> by Representative of California Phil Burton (D) on behalf of himself and others (Gross Dec., Ex. 2); 92 H.R. 4350 introduced by Representative Burton on <u>Feb. 17, 1971</u> (Gross Dec., Ex. 3); 92 H.R. 9498 introduced on <u>June 29, 1971</u> by Representative Burton on behalf of himself and others (Gross Dec., Ex. 4); 92 S. 2342 introduced by Senator Alan Cranston (D) of California on behalf of himself and Senator John Tunney (D) of California (Gross Dec., Ex. 5); 92 H.R. 10220 introduced by Representative Malliard on <u>July 29, 1971</u> (Gross Dec., Ex. 6); 92 H.R. 12994 introduced by Representative of New Jersey Robert Roe (D) on <u>Feb. 7, 1972</u> (Gross Dec., Ex. 8); 92 H.R. 13018, a bill put forward by the Nixon Administration, introduced by Representative of Pennsylvania John Saylor (R) on behalf of himself and others on <u>February 8, 1972</u> (Gross Dec., Ex. 9); 92 H.R. 13060, a bill put forward by the Nixon Administration, introduced by Representative Malliard on behalf of himself and others on <u>February 8, 1972</u> (Gross Dec., Ex. 10); 92 S. 3174 a bill put forward by the Nixon Administration and introduced by Senator Michael Mansfield (D) for Senator Henry Jackson (D) and Senator Gordon Allott (R) on <u>February 15, 1972</u> (Gross Dec., Ex. 11); and 92 H.R. 14946 introduced of Representative of California Donald Clausen (R) on <u>May 11, 1972</u> (Gross Dec., Ex. 12).

within the recreation area's boundaries. While some on the Democratic side of the aisle who had sponsored competing measures "would have personally preferred a stronger bill" ," as put it, in this regard, Gross Dec., Ex. 19 (Congressional Record ("C.R.") – Senate ("S.") (Oct. 18, 1972) at 37287 (floor statement of Senator John Tunney (D)), ultimately the bill passed both the Senate and House, with this more conservative language, and was signed into law by President Nixon.

A. **Congressional Democratic Proposal – 92 H.R. 9498 & 92 S. 2342**

The proposal by Democratic Representative Burton of San Francisco and his Democratic colleagues would have: (a) broadly defined the boundaries of the recreation area, (b) provided for virtually all real property within those boundaries to be automatically transferred to the ownership of the DOI; (c) provided the DOI broad authority to acquire lands and waters not so transferred, including through eminent domain; and (d) would have made the DOI's administrative jurisdiction coextensive with the boundaries of the recreation area established through the law. The bill reflecting this proposal was 92 H.R. 9498, which was introduced by Representative Burton on June 29, 1971. *Id.*, Ex. 4 (92 H.R. 9498, as introduced 6/29/71).[3]

The bill was contained 10 sections organized into four parts, Establishment, Composition, Acquisition, and Administration. The Composition part of 92 H.R. 9498 began:

> The recreation area shall comprise the following land areas ***together with adjacent submerged lands and adjacent water areas not to exceed one-quarter of a mile offshore*** as generally depicted on the map entitled "A Proposed Golden Gate National Recreation Area Boundary Map" . . . :

*Id.*, § 2(a) (emphasis added). The following subsection, Section 2(b), then provided the automatic transfer to the DOI, "without consideration, for inclusion in the recreation area," various "Federal lands," consisting mainly – if not entirely of U.S.. military properties. *Id.*, §

---

[3] Representative Burton had previously introduced two more or less skeletal bills to establish the recreation area. *See* Gross Dec., Ex. 2 (92 H.R. 3238, as introduced 2/2/71), Ex. 3 (92 H.R. 4350, as introduced 2/17/71). Approximately one month after Representative Burton introduced 92 H.R. 9498, on July 26, 1971, Senator Cranston (D) on behalf of himself and Senator Tunney (D) introduced the same bill in the Senate. *See id.*, Ex. 5 (92 S. 2342, as introduced on 7/26/71). For simplicity, references will be made only to sections of 92 H.R. 9498, without cross-references to the corresponding sections of 92 S. 2342.

---

2(b). This part's last section stated: "Real property required to be transferred to the Secretary by this Act includes all right, title, and interest of the United States in and to any land beneath any navigable waters of the United States within or contiguous to such real property." *Id.*, § 7.

The following part, titled "Acquisition," would have effected an automatic grant of large swaths of land and water within the boundaries of the recreation established in the bill's previous part and given the DOI broad authority to acquire what remained. Section 9(b)(1) of the Acquisition part of the bill provided that, with the exception of the real property owned by the State of California or its subdivisions or parcels less than one acre used for residential or agricultural purposes,

> [a]s of the effective date of this Act, there is hereby vested in the United States **all right, title, and interest in, and the right to immediate possession of, all real property within the boundaries of the recreation area**.

*Id.*, § 8(b)(1) (emphasis added). Another section of the acquisition part would have given the DOI the authority "[w]ithin the boundaries of the reaction area, . . . [to] acquire land, water, interests therein by donation, purchase with donated or appropriated funds, exchange, transfer, **or by such other means as he deems in the public interest**." *Id.*, § 8(a) (emphasis added).

Along with these broad grants of property interests to the DOI of lands and waters within the recreation area's boundaries, and the broad grant of authority to the DOI to acquire such property interests not automatically granted to it, 92 H.R. 9498 would have broadly granted to the DOI the jurisdiction to administer "*the recreation area*," without distinction as to whether lands or waters therein had been acquired by the DOI. *Id.*, § 9(a) (emphasis added).

### B. Congressional Republican Proposal – 92 H.R. 10220

On July 29, 1971, almost exactly one month after Representative Burton introduced 92 H.R. 9498, Republican Representative Malliard of San Francisco introduced a competing bill to establish the GGNRA. *See* Gross Dec., Ex. 6 (92 H.R. 10220, as introduced 7/29/71). This bill: (a) more narrowly defined the boundaries of the recreation area, (b) limited the automatic transfer of property to DOI to only certain U.S.. military property; (c) narrowly defined the DOI's authority to acquire lands and waters not so transferred, including a specific prohibition limiting the DOI to acquiring by donation the property of the State of California or its

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

5

subdivisions; and (d) limited the DOI's administrative jurisdiction to only the lands, waters, and interests therein acquired.

The Composition part of 92 H.R. 10220—Section 2—was substantially briefer than that of 92 H.R. 9498—Sections 2-7. *See* Gross Dec., Ex. 6 (92 H.R. 10220, as introduced 7/29/71), § 2; *compare id.*, Ex. 4 (92 H.R. 9498, as introduced 6/29/71), §§ 2-7. It also contained neither language providing for the recreation area to automatically include any submerged lands or waters nor language effecting the automatic transfer of rights, title or interest to the DOI over any lands below any navigable waters. The language contained 92 H.R. 10220's Acquisition part—Section 3—is analogously more circumspect that the language contained in the Acquisition part of 92 H.R. 9498—Section 8. Unlike, Section 8 of 92 H.R. 9498, Section 3 of 92 H.R. 10220, with the sole exception of certain Federal properties, did not contain language effecting the immediate transfer to the DOI of title to real property within the recreation area's boundaries or which granted the DOI the DOI to use eminent domain to gain title to other property. In fact, Section 3 included language specifically limiting the DOI to acquiring "only by donation . . . property or interest therein owned by the State of California or any political subdivision thereof. *Id.*, Ex. 6 (92 H.R. 10220, as introduced 7/29/71), § 3(A). Finally, 92 H.R. 10220's provisions concerning the DOI's administrative jurisdiction were analogously more constrained than the corresponding provisions in 92 H.R. 9498. Rather than make the geographic scope of the DOI's administrative jurisdiction coextensive with the boundaries of the recreation area, as 92 H.R. 9498 would have provided, Section 4 of the 92 H.R. 10220, titled "Administration" limited the DOI's administrative jurisdiction to "***the lands, waters, and interests therein acquired for the recreation area***." *Id.*, § 4(A) (emphasis added).

**C.**     **Administration's Proposal – 92 H.R. 13060, 92 H.R. 13018, & 92 S. 3174**

In early <u>February 1972</u>, the Nixon Administration's proposal for the establishment of the recreation area was introduced in the House and Senate. *See id.*, Ex. 10 (92 H.R. 13060, as introduced on 2/8/72); Ex. 9 (92 H.R. 13018, as introduced on 2/8/72); Ex. 11 (92 S. 3174, as

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

6

introduced on 2/5/72).[4] The Administration's proposal contained language very similar to that of the Congressional Republican proposal discussed above. Concerning the recreation area's composition, the Administration's proposal, like 92 H.R. 10220, made no reference to submerged lands or waters. *Id.*, § 1; *compare id.*, Ex. 6 (92 H.R. 10220, as introduced 7/29/71), § 2(A). The Administration's proposal similarly omitted any grant to the DOI of the authority to take property through eminent domain, omitted language effecting the automatic transfer of rights, title or interest to the DOI over any lands below any navigable waters, and contained language specifically limiting to donation how the DOI to could acquire the property of the State of California or its subdivisions. *Id.*, Ex. 9 (92 H.R. 13018, as introduced on 2/8/72), § 2(a). The Administration's proposal also limited the DOI's administrative jurisdiction to the lands, waters, and interests therein that the DOI had acquired for the recreation area using the same language as that contained in Section 4 of 92 H.R. 10220. *Id.*, Ex. 9 (92 H.R. 13018, as introduced on 2/8/72), § 3.

Secretary of the DOI Rogers Morton made clear that an intentional, considered component of the Administration's proposal, resulting from the above provisions, was:

> **[T]hat the State-owned lands within the recreation area be managed by the State of California** . . . and that there be **no transfer of State property to the administrative jurisdiction of the Secretary at this time**.

*Id.*, Ex. 7 (08/09/71, 5/11-5/12/72 House ("H.") NPS Subcomm. Hearings Rprt. (H.R. 9498 and H.R. 10220) at 245 (emphasis added); *see also id.*, Ex. 14 (9/22/72, 9/27/72 S. NPS Subcomm. Hearings Rprt. (S. 2342, S. 3174, H.R. 16444) at 93 (same); *id.*, Ex. 15 (10/5/72 S. Inter. Comm. Rprt. (S. 3174) at 3, 10-11 (same). Secretary Morton's letter further indicated that such State lands included 3,840 acres of "submerged land." *Id.* Ex. 7 (08/09/71, 5/11-5/12/72 H. NPS Subcomm. Hearings Rprt. (H.R. 9498 and H.R. 10220) at 245; *see also id.*, Ex. 15 (10/5/72 S. Inter. Comm. Rprt. (S. 3174) at 10 (same). According to the Secretary Morton, the Administration's proposal in this regard was "the result of careful consideration within the

---

[4] While a word-by-word comparison of the three bills hasn't been done, it appears they are the same, and they are referred to collectively without differentiation in legislative history . It is unclear why the bills were introduced in this fashion. For simplicity, reference herein will only be made to specific provisions in 92 H.R. 13018; however such references should be understood to also include the corresponding provisions in 92 H.R. 13060 and 92 S. 3174.

GROSS LAW
THE EMBARCADERO, PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

7

Department, and of consultation with other interested Federal agencies and the State of California." *Id.* Ex. 14 (9/22/72, 9/27/72 S. NPS Subcomm. Hearings Rprt. (S. 2342, S. 3174, H.R. 16444) at 94. And it accorded with the inclinations of some, such as then San Francisco Mayor Joseph Alioto, *see also id.* Ex. 7 (08/09/71, 5/11-5/12/72 H. NPS Subcomm. Hearings Rprt. (H.R. 9498 and H.R. 10220) at 400. However, others, such as the National Parks Conservation Association, bemoaned the Administration's less aggressive approach:

> In considering the non-military properties, we would like to see stronger protective language. . . . H.R. 9498 also protects more land in Marin County than does the Administration's proposal, by including it in the recreation area. ***It rightly includes submerged and adjacent water areas up to one-quarter mile offshore***. In addition, ***the legislation should provide "legislative taking"*** . . .

*Id.* Ex. 7 (08/09/71, 5/11-5/12/72 H. NPS Subcomm. Hearings Rprt. (H.R. 9498 and H.R. 10220) at 351.

**D.** **Compromise Bill – 92 H.R. 16444 -- Passed by Congress and Enacted as GGNRA Enabling Act, P.L. 92-589, Codified at 16 U.S.C. §§ 460bb *et seq.***

Ultimately, these competing proposals were resolved by the House's NPS Subcommittee, which "developed the basic format of the legislation which was considered by the Full Committee and ultimately incorporated into the clean bill presented to the House (H.R. 16444)." Gross Dec., Ex. 13 (9/12/72 H. Inter. Comm. Rprt. (92 H.R. 16444). With amendments related to the transfer of military properties, the bill was enacted into law, on October 27, 1972, *id.*, Ex. 20 (Pub.L. No. 92-589, 86 Stat. 1299 (1972)), and codified as 16 U.S.C. §§ 460bb *et seq.* According to the floor statement made by House Interior Committee Chairman, Representative Wayne Aspinal (D) in favor of the bill's passage:

> H.R. 16444 is the outgrowth of lengthy public hearings and detailed deliberations by the Subcommittee on National Parks and Recreation . . . on H.R. 9498 and numerous related bills which resulted in the legislation which was reported to the House by the committee. During those hearings everyone who requested an opportunity to testify was heard and every conceivable viewpoint was expressed. The committee bill is the product of those hearings and of the deliberations that followed . . . [and] it has been carefully considered . . . .

*Id.*, Ex. 16 (C.R. – H. (Oct. 11, 1972)) at 35058; *see id.* at 35060 ("[W]hen we concluded our deli-berations, elements of various measures before us had been included in the revised

GROSS LAW
THE EMBARCADERO, PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

8

language.") The result was a bill that in large part adopted language proposed by Congressional Republicans and the Nixon Administration concerning the acquisition of lands for the recreation area and the scope of the DOI's administrative jurisdiction. *Accord id.*, Ex. 19 (C.R. – S. (Oct. 18, 1972) at 37287 (Senator Tunney (D), sponsors of a competing proposal, while expressing his support for passage 92 H.R. 16444, stating that he "would have personally preferred a stronger bill.").

### 1.     GGNRA Enabling Act, Section 3, 16 U.S.C. § 460bb-2– Acquisition

The enacted bill – like the Republican and Administration proposals on which it was based – made clear that the boundaries of the recreation area established by the law did <u>not</u> define the extent of property held by the DOI but rather defined the area in which the DOI *could* acquire property. It states: "***Within the boundaries*** of the recreation area, the Secretary ***may acquire*** lands, improvements, waters, or interests therein, by donation, purchase, exchange or transfer." *Id.*, Ex. 20 ((Pub. L. No. 92-589, 86 Stat. 1299 (1972)), § 3(a), 16 U.S.C. § 460bb-2(a)(emphasis added). Thus, a clear distinction is made between <u>acquisition</u> and the <u>boundaries</u> of the recreation area. The boundaries of the recreation area merely define the geographic area in which Congress authorized the DOI to acquire lands; and the DOI does not acquire lands or waters simply by virtue of those lands or waters falling within that boundary.[5] The only property that Congress provided should be automatically transferred to the DOI by virtue of it being within the boundaries of the recreation was some, but not all, federal property within those boundaries. *Id.* Section 3 of the enacted law furthermore – again, like the Republican and Administration proposals on which it was based – contained protective provisions limiting the DOI to acquisition "only by donation" the property of the State of California or its subdivisions, providing that such property and made no provision for the automatic transfer of any title, interests, or rights to the DOI of lands below navigable waters. *Id.* More generally, while the Democratic proposal would have empowered the DOI to have acquired lands, waters and

---

[5] The distinction that Congress made in the GGNRA Enabling Act between acquisition, on the one hand, and the boundaries Congress defined for the recreation area, on the other hand, is further evidenced in the limitations that Section 2, which is titled "Composition and Boundaries," places on the authority of the DOI to acquire certain properties within the recreation area's boundaries. *See* 16 U.S.C. § 460bb-1

interests therein through any "means as [it] deems in the public interest," Gross Dec., Ex. 4 (92 H.R. 9498, as introduced 6/29/71), § 8(a), the enacted law contained no such broad grant of authority, limiting the DOI to acquisition "by donation, purchase, exchange or transfer." Ex. 20 ((Pub. L. No. 92-589, 86 Stat. 1299 (1972)), § 3(a), 16 U.S.C. § 460bb-2(a)

## 2. **GGNRA, Section 4, 16 U.S.C. § 460bb-3 – Administration**

The more conservative approach of Congressional Republicans and the Administration is also reflected in the enacted bill's Section 4, which is titled "Administration" and defines the administrative jurisdiction granted to the DOI vis-à-vis the recreation area. Like these proposals the law provides: "The Secretary ***shall administer the lands, waters and interests therein acquired for the recreation area*** . . ." *Id.*, § 4(a), 16 U.S.C. § 460bb-3(a) (emphasis added).

As DOI Secretary Morton acknowledged would be the case with the Administration's proposal, Section 4's limitation of the DOI's administrative jurisdiction to acquired lands and waters, in combination with the distinction that Section 3 makes between the boundaries of the recreation area and such acquisitions, meant that the GGNRA Enabling Act created a situation in which lands and waters, despite being within the exterior boundaries of the GGNRA were not administered by the DOI. This fact, especially as it related to California State property was noted (and on occasion bemoaned) by several Congressmen, as well as the persons in the Administration, including the Secretary of the DOI. Chairman of the House Interior Committee, Representative Aspinal (D), in his floor statement preceding the House vote to pass 92 H.R. 16444: "Under the terms of the bill the ***lands owned by the State or its political subdivisions would come under the jurisdiction of the Secretary of the Interior if—and only if—they are donated.***" Gross Dec., Ex. 16 (C.R. – H. (Oct. 11, 1972)) at 35058 (emphasis added); *see also id.* at 35061 (Rep, Burton (D): "[n]umerous small public parks are included within the boundaries, but will be administered as part of the area only if they are donated."). With less enthusiasm for this result the House Interior Committee Report on the bill stated concerning it:

> It might be possible for may diverse authorities to administer a coordinated program successfully, but the prospects for conflict, delay and disagreement are so great that they could jeopardize the entire project. Enough complications will arise without assuming this additional handicap so ***it is hoped that the State and local governments will see the wisdom of such a unified administration—at***

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

10

**least in the San Francisco Unit—and will cooperate by transferring title of the to the lands involved to the Secretary of the Interior**.

*Id.*, Ex. 13 (9/12/72 H. Inter. Comm. Rprt. to accompany 92 H.R. 16444), at 11-12 (emphasis added); *see also id.* (acknowledging that lands and waters within the recreation area's boundaries would be subject to "multiple-agency administration"); *see also id.* , Ex. 15 (10/5/72 S. Inter. Comm. Rprt. (S. 3174) at 6-7. Not surprisingly, the officials in the Nixon Administration, including from the DOI, were less ambivalent concerning this result. DOI Secretary Rogers Morton testified in a Senate hearing that the Administration "fe[lt] pretty strongly about" preserving local ownership and thus control of these properties, irrespective whether they fell within the exterior boundaries of the recreation area. *Id.*, Ex. 14 (9/22/72, 9/27/72 S. NPS Subcomm. Hearings Rprt. (S. 2342, S. 3174, H.R. 16444) at 83. In a letter appended to the House Interior Committee Report quoted from in the previous paragraph, Assistant Secretary of DOI, Nathaniel Reed (May 10, 1972) stated:

> State-owned lands within the recreation area will continue to be managed by the State of California . . . section 2(a) of the bill provides for Federal acquisition, development and administration of State lands as may later be donated for this purpose.
>
> . . .
>
> Combining Federal, State, and private property within the boundaries of a single management unit, our proposal contemplates the establishment of an expansive recreation area at a cost lower than if all property were privately-owned.

*Id.*, Ex. 13 (9/12/72 H. Inter. Comm. Rprt. to accompany 92 H.R. 16444), at 17-18. As discussed *supra*, the Administration's proposal, which called for roughly the same total acreage to be included in within the recreation area's boundaries as did the final bill, identified 3,840 acres of "submerged land" to which the State of California held title that would fall within the recreation area's boundaries and remain subject to the administrative jurisdiction of the State. *Id.* Ex. 7 (08/09/71, 5/11-5/12/72 H. NPS Subcomm. Hearings Rprt. (H.R. 9498 and H.R. 10220) at 245.

## II. History of Ownership Interests Over the Waters in Question

GROSS LAW
THE EMBARCADERO, PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

As the foregoing discussion of the GGNRA Enabling Act's provisions and legislative history make clear, Congress explicitly drafted the Act such that neither title nor administrative jurisdiction over the property of California or its subdivisions within the GGNRA's boundaries would transfer to the DOI unless California or one of its subdivisions, as applicable, donated the property to the DOI. Thus, if the waters at issue were the property of the State of California at the time of the enactment of the GGNRA Enabling Act on <u>October 27, 1972</u>, they remained the property of the State and under the State's administrative jurisdiction, unless the State subsequently donated the waters to the DOI. The record shows that all of the waters at issue and the lands beneath them were not the property of the U.S. on October 27, 1972, and that the DOI never subsequently acquired an interest in either the waters in question or the lands beneath them that would give it the administrative jurisdiction to prohibit fishing in these waters.

**A.**    <u>Upon California's Admission to the Union in 1850, Waters of San Francisco Bay, Including Those at Issue Here, and Corresponding Submerged Lands Became the Property of the State of California as Trustee of the Public</u>

The waters at issue all are within the San Francisco Bay, as defined by according to "the universal rule governing the measurement of waters," as the waters east of the headlands where the bay meets the Pacific Ocean. *Knight v. United States Land Assoc.*, 142 U.S. 161, 183 (1891) (J. Field concurring).[6] These waters and the lands below them, thus, became the property of the State of California as trustee for the public upon California's admission to the union in 1850:

> It is a well established proposition that the lands lying between the lines of ordinary high and low tide, as well as that within a bay or harbor and permanently covered by its waters, belong to the state in its sovereign character and are held in trust for the public purposes of navigation and fishery. A public easement and servitude exists over these lands for those purposes.

*People v. California Fish Co.*, 166 Cal. 576, 584 (1913); *see also id.*, at 596. As the court went on to explain, this ownership derives from a transfer of sovereignty over navigable waters that occurred upon the achievement of independence from England: "'When the revolution took place, the people of each state became themselves sovereign; and in that character ***hold the absolute right to all their navigable waters, and the soils under them, for their own common***

---

[6] Specifically, the waters at issue are located offshore of the GGNRA in the vicinity of the Presidio and Fort Mason in San Francisco County and offshore of the areas in the vicinity of Fort Baker in Marin County.

GROSS LAW
THE EMBARCADERO, PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

*use*.'" *Id.* (quoting *Martin v. Wadell*, 16 Pet. (41 U.S.) 410, 10 L. Ed. 997 (1842)) (emphasis added). Since at least 1891, it has furthermore been "the settled rule of law" that States admitted to the union after the revolution "have the same rights, sovereignty and jurisdiction in that behalf as the original States possess within their respective borders." *Knight,* 142 U.S. at 183 (collecting cases); *accord Illinois R.R. Co. v. Illinois*, 146 U.S. 387, 434 (1892). Thus, when the U.S. acquired the territory that later became California, the title it received from Mexico to the navigable waters and submerged lands within the territory was held by the United States only "in trust for the future States that might be erected out of such territory." *Knight*, 142 U.S. at 183. When California became a State in 1850, that title was passed to the State of California.

**B.    On March 9 1897, California Conditionally Transferred Title to Certain Submerged Lands to the U.S. Military but *Not* an Interest Entitling its Holder to Exclude the Public from Fishing or Navigating the Waters Above**

In exercise, and expression, of its ownership of them, on <u>March 9, 1897</u> the State of California conditionally transferred to the U.S. title to certain submerged lands in the San Francisco Bay. 1897 Cal. Stat. (Ch. 81) 74-75 ("1897 Transfer Act") (attached to First Amended Complaint ("FAC") as Exhibit 2). The statute, titled "Chapter LXXXI – An Act relinquishing to the United States of America the title of this State to certain Lands," conditionally granted to the U.S. title to:

> parcels of land extending from high-water mark to three hundred yards beyond low water mark lying adjacent and contiguous to such lands of the United States in this State as lie upon tidal waters and are held, occupied, or reserved for military purposes or defense, lying adjacent and contiguous to any island, the title to which is in the United States, or which island is reserved by the United States for any military or naval purposes or for defense.

*Id.* This grant was explicitly conditional, lasting "only so long as the United States shall continue to hold and own the adjacent lands now belonging to the United States." *Id.*

As a matter of California Constitutional law, this conditional grant of title to certain submerged lands did not include with it the right to exclude the public from fishing or navigating on the waters above those lands. Stated slightly differently, but with the same legal import, the interest granted by the State of California to the U.S. military in the submerged lands was subject to a reservation of the public's right to fish and navigate the waters above

those waters. The U.S. Supreme Court, in *Illinois R.R. Co. v. Illinois*, explained why that stick is missing in the bundle of rights constituting title to lands below navigable waters:

> The title to lands under tide waters, within the realm of England, were, by the common law, deemed to be vested in the king as a public trust, to subserve and protect the public right to use them as common highways for commerce, trade and intercourse. The king, by virtue of his proprietary interest could grant the soil so that it should become private property, but his grant was subject to the paramount right of public use of navigable waters, which he could neither destroy nor abridge. ***In every such grant there was an implied reservation of the public right***, and so far as it assumed to interfere with it, or to confer a right to impede or obstruct navigation, or to make an exclusive appropriation of the use of navigable waters, the grant was void.

146 U.S. 387, 458 (1892) (internal quotation omitted). The exact countours of the public trust and the limits it places on State governments authority alienate lands and waters subject to it, including, is a matter of State law: "[I]t has been long established that the individual States have the authority to define the limits of the lands held in public trust and to recognize private rights in such lands as they see fit." *Phillips Petroleum Co. v. Miss.*, 484 U.S. 469, 475 (1988).

California law is clear on this subject. When the State of California grants title or any other real property interest to lands below its navigable waters, the bundle of rights so granted does <u>not</u> include the right to exclude others from fishing or navigating in the waters above. Stated slightly differently, as a matter of California Constitutional law, the California legislature and executive agencies lack the legal authority to include within any grant of property rights to lands below navigable waters a right to exclude that would interfere the public's rights to navigate or fish such waters. Or to state it one additional way, any such grant of title or other interest comes subject to the right, easement and servitude of the public to fish and navigate on the waters above. Article 1, § 25 of the California Constitution states:

> The people shall have the right to fish upon and from the public lands of the State and in the waters thereof, excepting upon lands set aside for fish hatcheries, and ***<u>no land owned by the State shall ever be sold or transferred without reserving in the people the absolute right to fish thereupon</u>***;

Cal. Const., Art. 1, § 25 (emphasis added). Article X, Section 4 of the California Constitution states:

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

14

No individual, partnership, or corporation, claiming or possessing the frontage or tidal lands of a harbor, bay, inlet, estuary, or other navigable water in this State, shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water; and the Legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of this State shall be always attainable for the people thereof.

Cal. Const, Art. X § 4.

The California Supreme Court, in the seminal case *People v. Cal. Fish Co.*, discussing the above quoted language from Article X, § 4 (at the time contained in Article XV, § 2), described the limiting effect it has on the bundle of rights contained in any grant of title by the State of California to lands below navigable waters this way:

> The effect of the section above quoted is that, no matter what effect a subsequent sale of tide lands may have to pass title to the soil of the tidal lands . . . , ***it cannot be effective to give the patentee a right to destroy, obstruct, or injuriously affect the public right of navigation in the waters thereof***. Since the adoption of that constitution in 1879, if not before, ***grants of such lands by the state carry, at most, only the title to the soil subject to the public right of navigation***.

166 Cal. 587-588 (emphasis added); *see also id.* at 598 ("Section 2 of article XV [re-numbered as Art. X, § 4] of the state constitution ***deprives the legislature of power*** to dispose of the tide lands fronting upon navigable water so as to entitle the grantee to destroy or interfere with the public easement for navigation.") (emphasis added); *see also id.* at 589.

> The several states hold and own the lands covered by navigable waters within their respective boundaries in their sovereign capacity, and primarily for the purpose of preserving and improving the public rights of navigation and fishery. They have in them a double right, a *jus publicum* and a *jus privatum*. The former pertains to their political power -- their sovereign dominion, and ***cannot be irrevocably alienated or materially impaired***. The latter is proprietary and the subject of private ownership, but it is alienable only in strict subordination to the former. No grant of lands covered by navigable waters can be made which will impair the power of a subsequent legislature to regulate the enjoyment of the public right. ***The grantee takes the mere proprietary interest in the soil, and holds it subject to the public easement***.

*Id.* at 593(internal quotation omitted, emphasis added). The only very narrow exception to this rule is when the State, in "the interests of navigation [and] to adapt the land to use for navigation in the best  manner . . . cuts of portions of [submerged] lands from access to navigable water, so that they become unavailable for navigation, the state has the power to exclude such portions from the public use and, to that extent, revoke the original dedication."

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

15

GROSS LAW
THE EMBARCADERO, PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1   *Id.* at 597. However, a strong presumption applies against finding an act by the legislature to

2   have such an effect:

3       [S]tatutes purporting to authorize an abandonment of such public use will be
        carefully scanned to ascertain whether or not such was the legislative intention,
4       and that intent must be clearly expressed or necessarily implied. ***It will not be
        implied if any other inference is reasonably possible. And if any interpretation
5       of the statute is reasonably possible which would not involve a destruction of
        the public use or an intention to terminate it in violation of the trust, the courts
6       will give the statute such interpretation***.

7   *Id.* (emphasis added).

8       There is nothing in the 1897 Act that could be even *reasonably* interpreted to express

9   the intent of the State to abandon the public trust rights over the waters in question in the

10  interests of navigation or fishing, let alone a clear expression of such intent or its necessary

11  implication. In fact, the conditional nature of the grant necessarily implies an intent opposite of

12  abandonment, and, indeed, subsequent actions by the California State Legislature confirm this.

13      **C.      On September 9, 1953, California Repealed the 1897 Act, Rescinding its
                Grant to the U.S. of Title to Certain Submerged Lands**
14

15      The first was California's repeal of the 1897 Act. *See* 1953 Cal. Stat. (Ch. 521) 1761

16  (attached as Exhibit 4 to FAC). The Statute is titled: "An act to repeal Chapter 81 of the Statutes

17  of 1897, relating to the relinquishment to the United States of America the title of this State to

18  certain lands." *Id.* The text of the statute states simply: "Chapter 81 of the Statutes is hereby

19  repealed." *Id.* Thus, as of <u>September 9, 1953</u>, the effective date of the statute, title to the

20  submerged lands transferred through the 1897 Act reverted back to the State of California.

21      **D.      On November 9, 1958, Title to the Submerged Lands Adjacent to Yellow
                Bluff (aka Fort Baker East) Transferred to the Sausalito School District**
22

23      Approximately five years later, on <u>November 9, 1958</u>, title to the submerged lands

24  adjacent to Yellow Bluff, aka Fort Baker East, were transferred by the Sausilito Board of

25  Supervisors to Sausalito School District. A search of the records at the Marin County Recorder,

26  for the property with the APN of 059-280-02, which county assessor maps show as the

27  submerged lands adjacent to Yellow Bluff, aka Fort Baker East, shows that the record owner of

28  the lands is the State of California, listing a reference for the last record deed of Book 1083,

Page 567. Gross Dec., ¶¶ 22-24, Ex. 21-23. The deed recorded in that book on that page, is a resolution by the Board of Supervisors granting to the Sausalito School District title to these submerged lands. *Id.* There are no other deeds on file for these submerged lands below the waters at issue.

**E.** **On September 29, 1978, the State of California Quitclaimed to the U.S. All Rights, Title and Interests to the Marin Headlands, *Specifically Reserving for Itself* All Adjacent Tideland and Submerged Lands**

On September 29, 1978, the State of California conditionally quitclaimed to the U.S. of all of the State's "rights, title and interest in and of [certain] property, in the State of California, City and County of Marin," on the condition that the lands be used for the GGNRA ("1978 Quitclaim"). AR 2021; *see also* SGG Dec., Ex. 26. This quit claim deed – which is last recorded deed at the Marin County Record for the parcel with the APN of 200-150-07, Gross Dec. ¶¶ 25-27, Ex. 24-26 – explicitly limits the title to lands above the high water mark and reserves for the State of California the tidelands and submerged lands below that mark:

> The seaward boundaries of properties transferred shall be the mean high water mark, and the tidelands and submerged lands below the mean high water mark shall remain under the jurisdiction of the State. . . . [T]he State shall retain all jurisdiction over such tidelands and submerged lands, and the State Department or Fish and Game shall continue to enforce all laws of the State relating to the protection of fish and game.

AR 2021; Gross Dec. Ex. 26, p. 1. The parcels described in the quitclaim deed include the upland portions of Yellow Bluff, aka Fort Baker East, and thus this limitation of the grant to upland areas above the high water mark preserved the title of the Sausalito School District to the submerged lands adjacent to these upland areas. Defendant concedes this quitclaim deed "did not transfer title these tide and submerged lands back to the United States." Ds' MSJ at 6.

**F.** **On July 16, 1987, the State of California Leased Submerged Lands Under the Waters in Question to the NPS, Specifically Excepting the Right to Exclude Persons Wishing to Fish or Navigate the Waters Above**

On September 16, 1987, consistent with its continued ownership of the submerged lands beneath the waters in question, the State of California, through its Lands Commission, granted a conditional and limited forty-nine year lease to the NPS ("1987 Lease") of the following:

A strip of submerged land 1000 feet wide in the Pacific Ocean and San Francisco Bay, Marin County, San Mateo County, and the City and County of San Francisco, said strip, lying between the ordinary high water mark of said Pacific Ocean and San Francisco Bay and an envelope line lying 1000 feet waterward of said ordinary high water mark and adjacent to or within the Golden Gate National Recreation Area as shown on the National Park Service Drawing 641-80046 received April 6, 1987, and filed with the State Lands Commission.

AR at 2071; *see* AR at 2062 – 2071 (entire lease). By operation of California Constitutional law, this lease excluded from the rights and interests granted thereby the right to exclude the public from fishing or navigating in the waters above the leased lands. *See* Cal. Const., Art. 1, § 25; Cal. Const, Art. X § 4; *Cal. Fish. Co.*, 166 Cal. 587-588, 599. However, the Lands Commission went further and made explicit this exclusion of rights and interests from those granted to the NPS. Section 3 of the lease, titled "Hunting and Fishing," provides:

> ***Fishing. including the taking of mollusk or crustacean <u>shall be permitted</u> in accordance with regulations imposed by the State Department of Fish and Game. Any restrictions.*** or enclosures of fishing shall be invoked only after consultation with and concurrence by the appropriate State agencies.

AR at 2064 (emphasis); *see also id.* (§5 requiring maintenance of public access across leased areas); AR at 2065 (§6(a)(1) expressly reserving "all natural resources in or on the Lease Premises"); AR at 2066 (§8(e) limiting the NPS' right to exclude others only if their presence interferes with the NPS' use and enjoyment of rights and interests granted by the lease).

**G.** **On June 1, 2009, the State of California Leased Submerged Lands Under the Waters in Question to the NPS, Specifically Excepting the Right to Exclude Persons Wishing to Fish or Navigate the Waters Above**

On June 1, 2009, the State of California, again through its Lands Commission, canceled the 1987 Lease and issued to the to the NPS a new conditional and limited forty-nine year lease of a 1320 foot wide strip of tide and submerged lands under the waters in question. AR at 2048 – 2060.[7] As in the case of the 1987 Lease, By operation of California Constitutional law, this lease excluded from the rights and interests granted thereby, the right to exclude the public from fishing or navigating in the waters above the leased lands. *See* Cal. Const., Art. 1, § 25; Cal.

---

[7] The pages of the 2009 lease are presented in the record out of order.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

18

Const, Art. X § 4; *Cal. Fish. Co.*, 166 Cal. 587-588, 599. The Lands Commission, though, went even further to eliminate any ambiguity in this regard. Section 2, Paragraph 3 of the lease states:

> Land Use or Purpose: Notwithstanding Section 4, Paragraph 4 of this Lease, Lessee agrees to manage the Lease Premises for the following purposes: (a) Conservation of the Lease Premises in their natural state and ***protection from development and uses inimical to such goals and the Public Trust as described in the case of*** <u>***People v. California Fish Company (1913) 166 Cal. 576 and cases following it.***</u>

AR at 2050 (emphasis added). Section 2, Paragraph 4 states:

> Hunting and Fishing: . . . <u>***Fishing as guaranteed by California Constitution, Article 1, Section 25, shall be permitted on the Lease Premises***</u> provided that all such fishing shall be conducted in accordance with the rules and regulations of the California Department of Fish and Game.

AR at 2050 (emphasis added); see also id. (§ 2(4) guaranteeing the "General Public['s] "right of access and use of the existing beaches and tied and submerged lands described in Section 3 hereto and those lands granted by the State of California to the United States pursuant to Chapter 81, Statutes of 1897, for the purposes described in this lease.");8 AR at 2054 (§ 5(a)(1), expressly reserving "all natural resources in or on the Lease Premises"); id. (§ 5(a)(3), requiring maintenance of public access across leased areas); AR at 2055, 2054 (§4(g) limiting the NPS' right to exclude others only in the event that their presence interferes with the NPS' use and enjoyment of rights and interests granted by the lease); AR at 2054 (§ 5(b), "This Lease may be subject to pre-existing contracts, leases, licenses, easements, encumbrances, and claims."). Evidencing the paramount importance that the Lands Commission placed on the foregoing provisions contained in  Section 2 ("Special Provisions"), the lease reads in bolded all capital letters at the beginning of the section: "**BEFORE THE EXECUTION OF THIS LEASE, ITS PROVISIONS ARE AMENDED, REVISED OR SUPPLEMENTED AS FOLLOWS:**." AR at 2049 (emphasis in original). And Paragraph 1 of the Section 2 states "In the event of any conflict between the provisions of Section 2 and Section 4 of this Lease. the provisions of

---

[8]  In light of the California Legislature's repeal of the 1897 Act in 1953,  the 2009 Lease's reference to it in the cited section, as well as elsewhere in the lease, *see* AR 2052-2053, can only be attributable to inadvertence on the part of the Lands Commission. It is notable in this regard that neither the 1978 Quitclaim nor the 1987 Lease made any reference to the 1897 Act or any rights/interest held by the NPS based thereon, but rather, by their terms were premised on the absence of any such rights/interests.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

19

GROSS LAW
THE EMBARCADERO, PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Section 2 shall prevail." AR at 2050. Section 4 of the lease, titled "GENERAL PROVISIONS," contains the general provisions governing the rights, interests and obligations granted to, and assumed by, the NPS under the lease. AR at 2055, 2054.

### III. History of Herring Fishing in the Waters in Question and Continued Operation and Intensive Regulation of the Commercial Roe Fishery by California from 1973 Until the NPS Prohibited its Operation in 2011

The history of herring fishing in the waters in question, in particular those in the vicinity of what is now the Marin portion of the GGNRA dates to California's beginning as a State:

> Immigrant Italian fishermen started fishing for herring about 1850, and by 1888, 35 to 40 boats were engaged in the fishery which was centered in Richardson Bay.

Gross Dec., Ex. 27 (Susan Smith and Susumu Kato, National Marine Fisheries Service ("NMFS"), *The Fisheries of San Francisco Bay: Past, Present and Future* (1977) ("*Fisheries of SF Bay*")) at 454; *see also* AR at 2223-2224; AR at 2160; Gross Dec., Ex. 28 (Jerome Spratt, CA DFG, Fish Bulletin 171, "Status of The Pacific Herring, Clupea Harengus Pallasii, Resource In California 1972 to 1980" (1981) ("Fish Bulletin 171")) at 7.[9] For approximately the next 100 years a commercial fishery focused on canning the fish whole or in pieces for human consumption operated in San Francisco Bay. *See* at *id.*; AR at 2226-2228, 2236.

The commercial San Francisco roe fishery began in approximately 1965. AR at 2161. Since that time to present, the waters adjacent to the GGNRA, especially the Marin County portion of the GGNRA, East of the Golden Gate Bridge have been critically important fishing grounds for commercial fishermen. *See* [Fishermen Decs.]. As a roe fishery, fishing is concentrated in the waters adjacent to areas in which herring come to spawn; because the shoreline of the Marin portion of the GGNRA, East of the Golden Gate Bridge is an area where herring traditionally come to spawn, fishing has traditionally occurred in adjacent waters:

> San Francisco Bay is sheltered from the ocean and influenced by freshwater. Spawning areas are primarily the intertidal zone and immediately adjacent subtidal areas to a depth of 4.5 m (15 ft). Herring literally cover the rocky and sandy shoreline and its associated vegetation with spawn. The only areas not utilized are mud flats with no vegetation. The shoreline areas most often utilized by herring are just inside the Golden Gate Bridge along the Marin Peninsula, the

---

[9] An incomplete and disordered version of Fish Bulletin 171 appears at AR 2181-2187.

Tiburon Peninsula, Angel Island, and across the bay between Richmond and Oakland.

The roe herring fishery in California has been Gross Dec., Ex. 28 (Fish Bulletin 171) at 37; *see also id.,* at 45, 51-60 (showing consistent herring spawning in the waters of Marin portion of the GGNRA during the years 1974-80).

In 1973, the same year the GGNRA was established, CA DFW and the California Fish and Game Commission ("CA FGC") began intensive regulation of the commercial San Francisco herring roe fishery, which has included setting quotas on the amounts caught in the entire fishery each year. Since 1991, every year except 2003 and 2012, the quota has been set after a environmental review under the California Environmental Quality Act ("CEQA"):

> intensively regulated since its inception in 1973, at first by the California State Legislature, then by the Fish and Game Commission (Commission). Department of Fish and Game (Department) estimates of the spawning population biomass have provided a critical source of information used for establishing fishery quotas to control the harvest of herring and provide for the longterm health of the herring resource.

Gross Dec., Ex. 29 (2013 Final Supplemental Environmental Document Re: Pacific Herring Commercial Fishing Regulations ("2013 Herring CEQA")) at 3-2; *see also* Fish Bulletin 171 at 14-18, Gross Dec., Ex. 30 (Jerome Spratt, CA DFG, "The Evolution of California's Herring Roe Fishery: Catch Allocation, Limited Entry, and Conflict Resolution" (1992) ("Herring Fishery Evolution")) at 20-30; AR at , 2236-2241; Gross Dec., Ex. 31 (Cover page and table of contents of CEQA environmental documents concerning the commercial herring fishery for each year from 1991-2002, 2004-2011, and 2013).[10] In fact, as part of the CEQA process that precedes the opening of the San Francisco commercial herring fishery each year, the decision is not merely how much to herring to allow the fishermen to catch but rather whether to allow a commercial herring fishery at all. *See* Gross Dec., Ex. 29 (2013 Herring CEQA) at S-5.

During the same period, until 2011, commercial herring fishermen were never prevented from harvesting herring in waters adjacent to the GGNRA by the NPS or any other entity. *See*

---

[10] Upon request of the Court, Plaintiff will provide the complete version of any or all of these documents, which range in length from approximately 50 pages to approximately 450 pages.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

21

Henry Dec., ¶ 5; Papetti Dec., ¶¶ 2-4; Sohrakoff Dec., ¶¶ 2-4; Ryan Dec., ¶¶ 2-4; Baumgart Dec., ¶¶ 2-4; Koepf Dec., ¶¶ 2-4; Cameron Dec., ¶¶ 2-4; Mellor Dec., ¶¶ 2-5; Marilley Dec., ¶¶ 2-4. Furthermore, according to Greg Lind, Assistant Field Solicitor for the DOI/NPS, the NPS has never studied the herring fishery's operation in the waters in question and, thus, at the time it made its decision to prohibit fishing in such waters had no qualitative opinion concerning the fishery's impact or the desirability of its current manner of operation in the area. Gross Dec. ¶¶ 33. During unsuccessful efforts by Plaintiff to negotiate a resolution with the NPS to avoid the necessity of the instant lawsuit, GGNRA Superintendent Frank Dean shared with Plaintiff's President, Matt Ryan, that the regulation prohibiting fishing in national parks, 26 C.F.R. § 2.3(d)(4) , cited by the NPS as a basis to prevent commercial herring fishing in the waters in question, was not issued by the DOI with the GGNRA or the San Francisco Bay herring fishery in mind.

## ARGUMENT

### I. Legal Standard

#### A. Summary Judgment Standard Under Fed. R. Civ. P. 56

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where . . . the only disputes relate to the legal significance of undisputed facts, the controversy is a question of law suitable for disposition on summary judgment." *Wash. Mutual Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Further, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (emphasis in original). "[T]he requirement is that there be no *genuine* issue of *material* facts," and "the substantive law will identify which facts are material." *Id.* at 248 (emphasis in original).

#### B. Judicial Review of Agency Actions Claimed to be *Ultra Vires*

Pursuant to 5 U.S.C. § 706(2)(C), a court shall hold unlawful and set aside agency action found to be in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. *NW Environmental Advocates v. EPA*, 537 F.3d 1006, 1014 (9th Cir. 2008); *see also Iowa*

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

22

GROSS LAW
THE EMBARCADERO, PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

*League of Cities v. EPA*, 711 F.3d 844, 876 (8th Cir. 2013) (§ 706(2)(C) "authorizes courts to strike down as ultra vires rules promulgated without valid statutory authority"). To determine whether an agency has exceeded its statutory authority in violation of § 706(2)(C), a court must engage in the two-step inquiry required by *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984).

> Under *Chevron*, a reviewing court must first ask "whether Congress has directly spoken to the precise question at issue." If Congress has done so, the inquiry is at an end; the court "must give effect to the unambiguously expressed intent of Congress."

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (quoting *Chevron*, 467 U.S. at 842-843). Under the first step, court's should employ "traditional rules of statutory construction" to determine whether Congress has expressed its intent unambiguously on the question before the court. *Chevron*, 467 U.S. at 843 n.9. These rules include without limitation application of traditional cannons of statutory interpretation, as well as examination of legislative history, and the conduct of the administrative agency post enactment of the law in question. *See Brown & Williamson,* 529 U.S. 120.

## II. Congress' Unambiguous Intent was to Limit the NPS' Administrative Jurisdiction to Lands, Waters, and Interests Therein Acquired for the GGNRA- No Evidence in the Record That the NPS Ever Acquired Such an Interest that Would Give it the Administrative Jurisdiction to Prohibit Fishing in the Waters In Question

Congress spoke directly to the issue of the NPS adminstrative jurisdiction over the waters in question: the NPS would only have jurisdiction over such water if it acquired those waters or the appropriate interest therein. 16 U.S.C. § 460bb-3. There is no evidence in the record that the NPS ever acquired an interest in the waters in question or the land beneath them that would meet this criterion. Rather, the evidence indisputably shows exactly the opposite: the NPS never gained title to the water in question or the lands beneath them; rather, the best that the NPS has acquired is leasehold interest in certain of the lands beneath the waters that specifically excluded the right to exclude the public from fishing. The NPS' conduct until 2011 reflects the NPS itself interpreted the limitation placed by Congress on its adminstrative jurisdiction the same way and its acknowledgement that under limitation it lacked the administrative jurisdiction to prohibit commercial fishing in those waters.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-
MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

23

**A.** **After Careful Consideration of Other Alternatives Congress Directly Spoke to the Issue of the NPS' Administrative Jurisdiction, Limiting it to Lands, Waters, and Interests Therein *Acquired* by the DOI for the Recreation Area**

Section 4 of the GGNRA speaks directly to the issue of the NPS' administrative jurisdiction. Under the heading "Administration," it states: "The Secretary shall administer ***the lands, waters and interests therein acquired for the recreation area*** . . ." 16 U.S.C. § 460bb-3(a) (emphasis added). As discussed in Section I of the Factual Background Part *supra*, this language was not enacted by Congress inadvertently or without consideration of its import or meaning. Rather, Congress enacted this language after considering and rejecting alternative language that would have made the NPS' administrative jurisdiction coextensive with the recreation area's boundaries, evidencing its clear intent, instead, to limit the NPS' administrative jurisdiction to only those lands, waters, and interests therein that the DOI acquired. A*ccord Brown & Williamson*, 529 U.S. at 142. Furthermore, Congress did so with the clear understanding that the result would be that "lands owned by the State or its political subdivisions would come under the jurisdiction of the Secretary of the Interior if—and only if—they are donated," regardless whether such lands fell within the boundaries of the GGNRA. Gross Dec., Ex. 16 (C.R. – H. (Oct. 11, 1972)) at 35058. There was also a specific recognition that these lands owned by the State of California included over almost four thousand acres of submerged lands. *Id.* Ex. 7 (08/09/71, 5/11-5/12/72 H. NPS Subcomm. Hearings Rprt. (H.R. 9498 and H.R. 10220) at 245. The unambiguous statement of Congressional intent contained in Section 4 of the GGNRA Enabling Act and the legislative history discussed in Section I of the Factual Background Part resolve the question under *Chevron* whether the NPS must show it acquired the waters in question, or an interest therein, in order to have the authority to prohibit commercial fishing in them. However, several other factors further support this conclusion.

First, ignoring the requirement that the DOI have acquired the waters in question, or the appropriate interest therein, to assert administrative jurisdiction over them, would render the above quoted language concerning acquisition surplusage. A "cardinal rule of statutory interpretation [is] that no provision should be construed to be entirely redundant." *Kungys v. United States*, 485 U.S. 759, 778 (U.S. 1988); *see also Lowe v. SEC*, 472 U.S. 181, 208 (1985)

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

24

("[W]e must give effect to every word that Congress used in [a] statute."). Ignoring the acquisition prerequisite to the NPS's administrative jurisdiction that Congress specifically included in the GGNRA Enabling Act would directly violate this rule of interpretation and, more importantly, disregard the clear intent of Congress that it reflects.

In fact, ignoring this explicit prerequisite as surplusage would render several other provisions of the GGNRA Enabling Act surplusage as well. For example, Section 3(a) prohibits the DOI from acquiring the property of the State of California or its subdivisions except "by donation." 16 U.S.C. § 460bb-2(a). If the acquisition prerequisite of Section 4 was ignored, this limitation in Section 3 would be rendered nugatory, as the NPS could assume administrative jurisdiction over the property of the State of California and its subdivisions regardless of acquisition, as long as they fell within the recreation area's boundaries. Indeed, the entirety of Section 3, which governs acquisitions by the DOI for the recreation area, would be rendered nugatory. Why would the DOI need to acquire title to any lands and waters for the recreation area if it was entitled to administer those lands and waters, and impose whatever restrictions it desired on the use of them, as long as they fell within the recreation area's boundaries? In turn, this would also rendered nugatory other provisions, including the carve outs made to the DOI's acquisition authority, *see* 16 U.S.C. §460bb-1(a)(3), the exclusion of Muir Woods and Fort Point from the NPS' jurisdiction in administering the recreation area, *see* 16 U.S.C. § 460bb-3(a), and the appropriation of funds for the acquisition of lands and interests in lands, *see* 16 U.S.C. § 460bb-5. Why appropriate funds for the acquisition of lands, if the NPS gained administrative authority of any that fell within the boundaries, whether acquired or not? Thus, ignoring the acquisition prerequisite of Section 4 would also violate the requirement that "[i]n ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier*, 486 U.S. 281, 291 (1988); *accord Brown & Williamson*, 529 U.S. at 133.

In short, there is no ambiguity whatsoever concerning Congress' intent as to the NPS' administrative jurisdiction as to the GGNRA. Congress spoke directly to this issue: the NPS'

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

25

GROSS LAW
THE EMBARCADERO, PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

administrative jurisdiction is specifically limited to "the lands, waters, and interest therein acquired for the recreation area." 16 U.S.C. § 460bb-3(a).

**B.** **Nothing in Record that DOI Acquired an Interest in the Waters in Question Giving it the Administrative Jurisdiction to Prohibit Fishing in Them**

**1.** **1897 Act Cannot Form a Basis for Claim by DOI to Have Acquired the Waters in Question**

The only claim of ownership by Defendants to any lands or waters in the vicinity of the waters in question, is that "the United States has owned the submerged lands 300 yards seaward from low water at Ft. Baker, the Presidio, Ft. Mason and Alcatraz since March 9, 1897." Ds' MSJ at 18. Defendants cite as the basis for this claim of title 1897 Cal. Stat. (Chap. 81) 74-75. *Id.* In addition to the obvious initial shortcoming that the NPS is claiming the authority to prohibit commercial fishing in waters extending *400 yards* out into the bay, not 300, [CITE], there are several other vary significant problems with this claimed ownership as basis for the NPS' administrative jurisdiction over the waters in question under Section 4 of the GGNRA Enabling Act.

First, as discussed in *supra*, in 1953 the California Legislature repealed 1897 Cal. Stat. (Chap. 81) 74-75. *See* 1953 Cal. Stat. (Ch. 521) 1761 (attached as Exhibit 4 to FAC). Thus, these submerged lands were not "Federal property" at the time of the GGNRA Enabling Act's enactment on October 27, 1972 and therefore they were not "transferred . . . to the administrative jurisdiction of the [DOI]" at the enactment of the GGNRA Enabling Act. 16 U.S.C. § 460bb-2(a).[11]

Second, even if the repealed 1897 Act could, notwithstanding its repeal in 1953, almost 20 years before creation of the GGNRA (it can't), the 1897 Act cannot form a basis a claim by the DOI to an interest in the waters above the referenced submerged lands that include the right to exclude others wishing to fish in the waters above. The California Legislature quite simply lacked the legal authority to include within the grant to the United States of property rights over

---

[11] The fact that personnel in the California State Lands Commission who drafted a summary of land ownership at the DOI's request in 1974, [CITE] and those who drafted the 2009 Lease appear to have been unaware of the 1953 Act's repeal of the 1897 Act, AR at 2050, does not change the legal reality effected by the 1953 Act.

these submerged lands a right to exclude others from fishing in the navigable waters above them. *Cal. Fish Co.*, 166 Cal. at 587-99. Thus, the 1897 Act only gave the United States title to the referenced submerged lands, it did not give the United States an interest in the waters above that could have been transferred to the DOI in 1972 (assuming that any grant contained in the 1897 Act was still effective at the time—none was).[12]Thus provided the NPS a basis to assert administrative jurisdiction over those waters and prohibit fishing therein.[13]

**C.    The DOI Cannot Assert Title Over the Waters in Question Based on Eminent Domain**

Defendants have not argued that they acquired title over the waters in question or the lands beneath by operation of eminent domain. Nonetheless, it bears noting that Congress specifically prevented the DOI from acquiring the property of the State of California or its subdivisions by any means other than donation. 16 U.S.C. § 460bb-2. Thus, Defendants cannot argue that they have satisfied through eminent domain the GGRNA Enabling Act's acquisition prerequisite for administrative jurisdiction. *Contra United States v. 422978 Square Feet of Land*, 445 F.2d 1180, 1187 (9th Cir., 1971)

**D.    Any Purported Grant of "Legislative Jurisdiction" by the State of California Over These Waters to the DOI was Ineffective to Give the DOI the Administrative Jurisdiction to Prohibit Fishing in These Waters**

---

[12] As discussed in the preceding footnote, while the fact that personnel at the California State Lands Commission who drafted the 2009 Lease appear to have been unaware of the 1953 Act's repeal of the 1897 Act, AR at 2050, does not change the legal reality effected by the 1953 Act, the 2009 Lease's inclusion of "lands granted by the State of California to the United States pursuant to Chapter 81, Statutes of 1897" among those to which the public's "right of access and use" is guaranteed further supports the argument that if the latter grant is still valid (it's not), it does no include any interest on which the NPS can base its exclusion of fishermen from the waters in question.

[13] Defendants misget Plaintiff's argument concerning California's public trust doctrine. Contrary to Defendants' statement, Plaintiff does not "contend California's public trust doctrine precludes Defendants from prohibiting commercial fishing in the waters under the jurisdiction in the GGNRA." Ds' MSJ at 19. Rather, Plaintiff contends that the California's public trust doctrine precluded the State of California from granting to the United States any property interest in the waters of San Francisco Bay that could provide the basis for the NPS to assert the jurisdiction to prohibit the public from fishing or navigating in those waters. Thus, this argument does not "ignore[] that the United States does not permit a tate's public trust authority to impede the United States' exercise of its sovereign or proprietary authority over federal property." *Id.* Rather, the argument is that the public trust doctrine *precluded the State of California* from ever making the waters of the San Francisco Bay federal property in which commercial fishing could be prohibited.

---

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

27

Oddly, while Defendants fail to explicitly argue anywhere that they ever gained an interest in the waters in question that would given the NPS administrative jurisdiction over them under Section 4 of the GGNRA Enabling Act, Defendants argue that "[t]he authority of the NPS to prohibit commercial fishing within the waters of GGNRA is additionally supported by the fact that the United States has had legislative jurisdiction over the waters and submerged lands offshore from Ft. Baker, the Presidio, Fr. Mason, and Alcatraz Island since the nineteenth-century" based on certain acts of the California legislature. Ds' MSJ at 17. There are several very significant problems with this argument.

First and fundamentally, it is the United States Congress that defines *the administrative jurisdiction* of the NPS, not the California State Legislature of any California executive agency. Thus, whether the State of California granted the United States "legislative jurisdiction" over the waters in question is completely irrelevant to the question before the Court: is the DOI's prohibition of fishing in the waters in question *in excess of the statutory authority <u>granted by Congress</u>* to the DOI?

Second and relatedly, the *sin qua non* of the DOI's administrative authority over the waters in question is <u>not</u> whether the State of California has granted the United State "legislative jurisdiction" over the waters in question; rather it is whether the DOI "acquired" the waters in question or the appropriate interest therein. 16 U.S.C. § 460bb-3. Thus, any purported grants of "legislative jurisdiction" to the United State is inapposite.

Third, the issue before the Court is not one of *legislative* jurisdiction. Plaintiffs are not challenging the authority of the U.S. Congress to enact the GGNRA Enabling Act, or the validity thereof. In fact, Plaintiff is challenging the DOI's failure to obey the GGNRA Enabling Act, specifically the limitations it places on the DOI's administrative authority. Plaintiff is furthermore not challenging any "legislative" jurisdiction claimed by the DOI: Plaintiff is not challenging the DOI's authority to promulgate 36 C.F.R 2.3(d)(4) but rather its authority to enforce that regulation in the waters in question. Thus, issues of *legislative* jurisdiction are, again, inapposite.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

28

1    Fourth, if the extent of jurisdiction granted by the State of California to the NPS is

2    relevant to the Court's decision whether the NPS has acted in excess of the authority granted to

3    the NPS by the United States Congress (it's not), the State of California has consistently and

4    specifically limited such grants in such a way to exclude the authority of the NPS to exclude

5    fishing in the waters in question. As discussed *supra*, when the State quitclaimed upland

6    portions of the Marin Headlands to the NPS in 1978, it specifically excluded from the grant and

7    reserved for itself jurisdiction over the adjacent tide- and submerged lands. *See* AR 2021; Gross

8    Dec. Ex. 26, p. 1. Then, when the State decided to lease portions of those lands to the NPS in

9    1987 and again in 2009, it included language in the leases that specifically required the NPS

10   allow the public to fish in the waters above them. *See* AR at 2064 (§ 3 of the 1987 Lease); AR

11   2050 (§§ 2(3) and 2(4) of the 2009 Lease). Indeed, Defendants implicitly concede as much by

12   notably failing to mention the 1987 Lease or the 2009 Lease in their argument concerning the

13   purported grant of "Legislative Jurisdiction," choosing instead to focus on a grant of jurisdiction

14   purportedly effected by an enactment of the California legislature in the 1800s, Ds' MSJ at 18-

15   19, which these later leases superseded.

16       **E.    NPS Conduct Subsequent to Enactment of the GGNRA Enabling Act
                 Confirms that Congress Specifically Limited the NPS's Administrative
17               Jurisdiction to Lands, Waters, and Interests therein Acquired and the NPS
                 Has not Acquired the Waters in Question**
18

19   As discussed in Section I(C) – I(D) of the Factual Background Part *supra*, at the time of

20   the GGNRA Enabling Act's enactment, the Secretary of the DOI and other DOI personnel

21   specifically recognized that: (1) the act would limit the DOI's (and thus the NPS')

22   administrative jurisdiction to lands, waters, and interests therein acquired; (2) the property of

23   the State of California and its subdivisions within the recreation area's boundaries would only

24   be acquired by the NPS if donate to it; (3) the latter property included, in 1972, almost 4000

25   acres of submerged land; and thus (4) there would significant areas of submerged lands and

26   waters within the boundaries of the recreation area that would be subject to the administrative

27   jurisdiction of State of California rather than the NPS. Subsequent conduct by the NPS, up until

28   its decision to prevent commercial fishing in the waters in question in 2011, reflect the

GROSS LAW

THE EMBARCADERO, PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

persistence of this recognition. As discussed in Section III of the Factual Background Part *supra*, 2011 was the first year since the GGNRA's establishment that herring fishermen were prevent from fishing in the waters in question.[14] If, as Defendants now claim, the NPS had the administrative jurisdiction to prohibit commercial fishing in the waters in question since 1983, why did it take them almost 30 years to exercise that jurisdiction? Furthermore, if the NPS had the administrative jurisdiction to prohibit fishing in the waters in question and owned those waters and the submerged lands beneath them based on the 1897 Act, why did it enter into leases in 1987 and 2009 for those same lands that specifically forbade the NPS from prohibiting fishing in those waters? The reason is that the NPS recognized that the clear intent of Congress was to limit its jurisdiction to lands, waters, and interests therein acquired, and the NPS has never acquired an interest in the waters in question or the lands below that would give them the right to exclude others from fishing or navigating in the waters. *Accord Brown & Williamson*, 529 U.S. at 144-146 (discussing the FDA's continued failure to exercise the authority to regulate tobacco under the Food, Drug, and Cosmetic Act as evidence that it lacked such authority under the act.).

**III.** **The Defendants Cannot Avoid the Specific Acquisition Prerequisite Contained in GGNRA Enabling Act § 4 Based on the General Grant of Administrative Jurisdiction Contained in the Earlier Enacted Organic Act 16 U.S.C. § 1a-2(h**

In a clear tell of their recognition that the GGNRA Enabling Act specifically limits the NPS' administrative jurisdiction to lands, waters, or interests therein acquired and that the record does contain evidence establishing that the NPS ever acquired a sufficient interest in either the waters in question or the lands below them to meet this prerequisite, Defendants, instead, focus most of their rhetorical energy on the argument that general provisions of the

---

[14] If one reads Defendants' brief closely, it is apparent that Defendants' claim that the NPS' prohibition of commercial fishing began in 1983 is based solely on the fact that the regulation that the NPS seeks to improperly enforce in the waters in question was promulgated in 1983, not on any evidence in the record that the NPS enforced the regulation in the waters in question that year. *See* Ds' MSJ at 9-10. In fact, the only instance that Defendants identify as having actually prevented herring fishermen from fishing the waters in question is a single instance in 2005. *See id.* at 11. However, one of the fishermen involved in that single instance, the President of the SFHA Matt Ryan, swears under oath that after he showed the Coast Guard captain his regulations from the CA DFG, showing that he could fish in the waters in question, the Coast Guard captain left, and Mr. Ryan continued fish unmolested. Ryan Dec., ¶ 5.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

30

1  earlier enacted Organic Act give the NPS administrative jurisdiction over any lands and waters

2  within a recreation area or national park regardless of ownership of those lands or waters.

3      The fundamental problem with this argument is that basic cannons of statutory

4  interpretation prevent the Court from ignoring the specific provisions in the GGNRA Enabling

5  Act that define the NPS' administrative jurisdiction vis-à-vis the GGNRA in favor of general

6  provisions contained in the Organic Act. "It is a 'fundamental canon of statutory construction

7  that the words of a statute must be read in their context and with a view to their place in the

8  overall statutory scheme.'" *Brown & Williamson*, 529 U.S. at 133 (*quoting Davis v. Michigan*

9  *Dept. of Treasury*, 489 U.S.. 803, 809, 103 L. Ed. 2d 891, 109 S.. Ct. 1500 (1989)). In the event

10 two statutes, one of general application and one of specific application, could be interpreted to

11 govern the conduct of an agency in ways that would be in conflict, the statute that speaks

12 "'more specifically to the topic at hand'" governs regardless of sequence of enactment.

13 *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 463 F.3d 50, 66 (1st Cir.

14 Mass. 2006) (quoting *Brown & Williamson,* 529 U.S. at 121). This follows from the "basic

15 principle of statutory construction that a statute dealing with a narrow, precise, and specific

16 subject is not submerged by a later enacted statute covering a more generalized spectrum."

17 *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976); *see also Morton v. Mancari*, 417

18 U.S. 535, 550-551 (1974) ("Where there is no clear intention otherwise, a specific statute will

19 not be controlled or nullified by a general one, regardless of the priority of enactment.").

20      "The reason and philosophy of the rule is, that when the mind of the legislator
21      has been turned to the details of a subject, and he has acted upon it, a subsequent
        statute in general terms, or treating the subject in a general manner, and not
22      expressly contradicting the original act, shall not be considered as intended to
        affect the more particular or positive previous provisions, unless it is absolutely
        necessary to give the latter act such a construction, in order that its words shall
23      have any meaning at all."

24 *Radzanower,* 426 U.S. at 153 (quoting T. Sedgwick, The Interpretation and Construction of

25 Statutory and Constitutional Law 98 (2d ed. 1874)); *accord*  (quoting *Brown & Williamson*, 529

26 U.S. at 133.); *accord Ctr. for Biological Diversity v. DOE*, No. 08-168, 2008 U.S. Dist. LEXIS

27 110452, 13-14 (C.D. Cal. Oct. 16, 2008) ("While 'the meaning of one statute may be affected

28

by other Acts,' this is true only 'where Congress has spoken subsequently and more specifically to the topic at hand.'").

Nothing in the Organic Act could be construed as specifically contradicting the acquisition prerequisite for the NPS' administrative jurisdiction that Congress included – after considering and rejecting less limiting language – in the GGNRA Enabling Act § 4. And there is certainly no absolute necessity that the Organic Act be interpreted to void the specific acquisition prerequisite in the GGNRA Enabling Act § 4 in order for the Organic Act's words to "have any meaning at all." *Radzanower,* 426 U.S. at 153 (quotation omitted). Indeed, in the text of the Organic Act, itself, is evidence of Congress' recognition that its provisions would give way when in conflict with specific provisions enacted by Congress to govern individual national parks or recreation areas. *See, e.g.,* 16 U.S.C. § 1a-1. Thus, the acquisition prerequisite to the NPS' administrative jurisdiction that Congress included in GGNRA Enabling Act Section 4, 16 U.S.C. § 460bb-3, governs whether the NPS has jurisdiction in the waters in question, not the general grant of jurisdiction to the NPS contained Section 1a-2(h) of the Organic Act, 16 U.S.C. § 1a-2(h), as claimed by Defendants. *See* Ds' MSJ at 12.

Accordingly Defendants' citation to cases interpreting the Organic Act are inapposite. While ignoring Section 4 of the GGNRA Enabling Act, Defendants spill much ink discussing cases that purportedly stand for the proposition that "[t]he Organic Act grants the Secretary broad discretion in administering units of the National Park System," Ds' MSJ at 13 (citing *Davis v. Latschar*, 202 F.3d 359, 365 (D.C. Cir. 2000); *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1454 (9th Cir. 1996); *Sierra Club v. Watt*, 487 F. Supp. 443, 448 (D. D.C. 1980); *National Rifle Asso. v. Potter*, 628 F. Supp. 903 (D.D.C. 1986)). The problem is that none of these case address either of the two issues before the Court on the parties' cross motions: how has Congress defined the NPS administrative jurisdiction vis-à-vis the GGNRA, and is the NPS' prohibition of fishing in the waters in question in excess of that definition? With the exception of *Latschar*, which doesn't even discuss the Organic Act and does not contain the page to which Defendants pinpoint cite in it – merely stand for the unremarkable (and irrelevant) proposition that the Organic Act gives the NPS broad authority to promulgate

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

32

certain regulations governing uses of areas under NPS administrative jurisdiction. This isn't at issue on these cross-motions. Rather, at issue, is whether the waters at issue fall within the NPS administrative authority as defined by the GGNRA Enabling Act.

The second set of cases, all of which are out of circuit, purportedly stand for proposition that, under the Organic Act, the NPS has the "authority to regulate the sue ao0f [sic] lands and waters within the boundaries of federally designated areas regardless of ownership." *Id.* at 14 (citing, without pinpoint, *Organized Fishermen of Florida v. Hodel*, 775 F.2d 1544, 1550 (11th Cir. 1985); and, with pinpoint, *United States v. Brown*, 552 F.2d 817, 820-23 (8th Cir. 1977); *United States v. Armstrong*, 186 F.3d 1055 (8th Cir. 1999); *Minnesota by Alexander v. Block*, 660 F.2d 1240 (8th Cir. 1981).The problem for Defendants, however, is that two of these cases concern a national park and wilderness area, respectively, the Everglades National Park ("ENP") and Boundary Waters Canoe Area Wilderness ("BWCAW"), the enabling acts for both of which contained no acquisition prerequisite for the NPS' administrative jurisdiction but rather a general grant of administrative authority throughout the park or area.[15] Accordingly, the plaintiffs in neither case argued that the challenged actions of the NPS were in excess of the limits placed on the NPS' administrative jurisdiction by the applicable enabling act. *See Organized Fishermen of Fla.,* 775 F.2d at 1546; *Minnesota*, 660 F.2d at 1244. Thus, rather than support Defendants' argument, they support Plaintiff's argument by highlighting through contrast the specific limitations upon the NPS' administrative jurisdiction that Congress chose to include in the GGNRA Enabling Act. Not only does the legislative history of the GGNRA Enabling Act reflect Congress consideration and rejection of broader grant of administrative jurisdiction, the fact that Congress chose to include a broader grant in the enabling acts for other areas further supports the argument that the more limited grant in the GGNRA Enabling Act was a conscious, deliberate, and intentional decision to which "the court, as well as the agency, must give effect." *Chevron*, 467 U.S. at 842- 843.

---

[15] ENP Enabling Act, 16 USCS § 410b ("The administration, protection, and development of the aforesaid park shall be exercised. . ." BWCAW Enabling Act, Pub.L. No. 95-495, 92 Stat. 1649 (1978) § 4(a) ("The Secretary shall administer the wilderness . . .")

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

33

GROSS LAW
THE EMBARCADERO, PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS LAW
THE EMBARCADERO, PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

The claims in the other two case, *Brown* and *Armstrong*, were phrased as challenges to whether the State of Minnesota had "ceded jurisdiction" over the waters in question, <u>not</u> whether the NPS had acquired those waters. *Brown*, 522 F.2d at 819; *Armstrong*, 186 F.3d at 1058. Thus, while the applicable enabling law contains an acquisition prerequisite, *see* 16 U.S.C. § 160(f), neither *Brown* nor *Armstrong* address this limitation. This may be due to the fact both cases were criminal cases or due to the failure of the defendants in either case to examine the issue.[16] Whatever the reason, it makes there conclusions of no value in determining the issue before the Court: whether the NPS' prohibition of fishing in the waters in question is in excess of its administrative jurisdiction set by Congress in GGNRA Enabling Act § 4.

Finally, the language contained in the preambles to the 1996 version of 36 C.F.R. § 1.2 is similarly inapposite. While it is true that, in the case of some parks and wilderness areas, such as the ENP and BWCAW, Congress has chosen to make the NPS' administrative jurisdiction coextensive with the park or area's boundaries "'irrespective of ownership of submerged lands,'" Ds' MSJ at 16 (quoting 61 Fed. Reg. 35), in the case of the GGNRA, after considering and rejecting a similarly broad grant of administrative jurisdiction, Congress chose, instead, to limit the NPS's administrative jurisdiction to "the lands, waters and interests therein acquired for the recreation area . . ." 16 U.S.C. § 460bb-3(a). The fact the NPS when discussing its own authority fails to make this distinction has no bearing on the effectiveness of the distinction that Congress created tothe NPS "must give effect to it." *Chevron*, 467 U.S. at 843.

**IV.** **Plaintiff is Not Challenging Congress' Constitutional Power to Enact any Provision of the GGNRA Enabling Act or the Organic Act, but Rather the NPS' Transgression of the Limits to its Administrative Authority Set by Congress; Thus, Defendants' Property Clause and Commerce Clause Argument is Inapposite**

Defendants' constitutional argument, *see* Ds' MSJ at 11-12, which is based primarily on the Property Clause, U.S. Const., Art. IV, § 3, cl. 2, and secondarily on the Commerce Clause,

---

[16] These case are furthermore distinguishable from the instant case on the grounds that while the court in *Brown*, 522 F.2d at 820-21, and *Armstrong*, 186 F.3d. at 1060-61, found that the legislative history of the Voyageurs National Park Enabling Act supported a finding of legislative intent to include the waters in question within the NPS' administrative jurisdiction, as the discussion of the GGNRA Enabling Act's legislative history makes clear the specific intent of Congress was that State property within the boundaries of the GGNRA remain the property of the State and be administer by the State. *See* Sections ### *supra*.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

34

U.S. Const., Art. I, § 8, cl. 3, 18, is inapposite for analogous reasons as the decisions cited by Defendants and discussed above. Plaintiffs are not challenging the constitutional authority of Congress to have enacted either the GGNRA Enabling Act or the Organic Act or any provision thereof or the authority of the NPS to have promulgated 26 C.F.R. § 2.3(d)(4) based on the Organic Act. *Contra Kleppe v. New Mexico*, 426 U.S. 529, 531 (1976) ("At issue in this case is whether Congress exceeded its powers under the Constitution in enacting the Wild Free-roaming Horses and Burros Act."); *Brown*, 552 F.2d at 822 ("[T]he instant case presents the question left open in *Kleppe*: whether the Property Clause empowers the United States to enact regulatory legislation protecting federal lands from interference occurring on non-federal public lands, or, in this instance, waters."); *United States v. Bohn*, 622 F.3d 1129, 1133 (9th Cir. 2010) ("Defendant contends that, because the federal government does not have exclusive or concurrent jurisdiction over the Stehekin Valley Road, requiring motorcyclists to wear helmets on the road exceeds congressional authority."); *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967) (Whether Congress had authority under the Commerce Clause to enact the Rivers and Harbors Act of 1899); *United States v. Rands*, 389 U.S. 121, 123 (1967) (Whether the Commerce Clause's grant Congress of the "power to regulate navigation confers upon the United States a 'dominant servitude,'" over navigable waters that released it from its Fifth Amendment obligation to provide compensation for condemned riparian land's lost value as a port.). Rather, quite to the contrary, Plaintiff is challenging the NPS' transgression of the limits of its administrative authority set by Congress in the GGNRA Enabling Act. Thus, Plaintiff is not seeking to invalidate an enactment of Congress but rather compel the NPS to obey it.

## CONCLUSION

For the foregoing reasons, Plaintiff is entitled to summary judgment on its claim that the NPS, in prohibiting commercial fishing in the waters in question, exceeded its authority under the GGNRA Enabling Act and are entitled to summary judgment on that claim. Thus, Plaintiff respectfully requests that the Court grant its cross-motion for summary judgment and deny Defendants' motion for summary judgment.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

35

Dated: October 24, 2013

Respectfully submitted,

**GROSS LAW**

_____*/s/ Stuart G. Gross*_____
STUART G. GROSS (#251019)
sgross@gross-law.com
**GROSS LAW**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
t (415) 671-4628
f (415) 480-6688

*Counsel for Plaintiff San Francisco Herring Association*

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT; Case No. 13-1750 (JST)

36