UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN FRANCISCO HERRING ASSOCIATION,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,<br><br>    Defendants. | Case No. 13-cv-01750-JST<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT & DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: ECF Nos. 31 & 37 |

## I. INTRODUCTION

Plaintiff San Francisco Herring Association ("Plaintiff" or "SFHA") brought this action against Defendants the U.S. Department of the Interior, Interior Secretary Sally Jewell, the U.S. National Park Service ("N.P.S."), N.P.S. Director Jonathan Jarvis, and Golden Gate National Recreation Area General Superintendent Frank Dean ("Defendants"). First Amended Complaint ("FAC"), ECF No. 17. Defendants have filed a motion for summary judgment on the issue of "whether defendants acted in excess of statutory jurisdiction in prohibiting commercial fishing in the units of the National Park System, including the Golden Gate National Recreation Area." Defendants' Motion for Summary Judgment ("Defts' MSJ") 1:16-19, ECF No. 31. Plaintiff's cross-motion seeks a judgment "in its favor on the issue of the Defendants' jurisdiction to prohibit commercial fishing adjacent to shoreline of the GGRNA." Plaintiff's Opposition to Defendants' Motion for Summary Judgment and Cross-Motion for Summary Judgment ("Opp./Cross-MSJ") 1:19-23, ECF No. 37. The matter came for hearing on March 7, 2014.

For the reasons set forth below, the Court will grant Defendants' motion and deny Plaintiff's motion.

## II. BACKGROUND

### A. Statutory Background

In 1916, Congress enacted the NPS Organic Act. Ch. 408, § 1, 39 Stat. 535 (Aug. 25, 1916), codified at 16 U.S.C. § 1 *et seq*. The act states, in part, that the NPS shall:

> [P]romote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified . . . by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1.

In 1972, Congress established the Golden Gate National Recreation Area ("GGNRA") as an area of the National Park System, by enacting the GGNRA Enabling Act ("the GGNRA Act"). Pub. L. No. 92-589, 86 Stat. 1299 (1972), codified at 16 U.S.C. § 460bb-1 *et seq*.

Section 3 of the GGNRA Act, entitled "Acquisition policy," states that:

> Within the boundaries of the recreation area, the Secretary [of the Interior] may acquire lands, improvements, waters, or interests therein, by donation, purchase, exchange or transfer. Any lands, or interests therein, owned by the State of California or any political subdivision thereof, may be acquired only by donation.
>
> [. . .]
>
> Except as hereinafter provided, Federal property within the boundaries of the recreation area is hereby transferred without consideration to the administrative jurisdiction of the Secretary for the purposes of this subchapter, subject to the continuation of such existing uses as may be agreed upon between the Secretary and the head of the agency formerly having jurisdiction over the property.

16 U.S.C. § 460bb-2(a). Section 4, the immediately following provision of the GGNRA Act, is entitled "Administration," and states that:

> The Secretary shall administer the lands, waters and interests therein acquired for the recreation area in accordance with the provisions of sections 1, 2, 3, and 4 of this title, as amended and supplemented, and the Secretary may utilize such statutory authority available to him for the conservation and management of wildlife and natural

resources as he deems appropriate to carry out the purposes of this subchapter.

16 U.S.C. § 460bb-3(a).

Under the GGNRA Act, "[t]he recreation area . . . comprise[s] the lands, waters, and submerged lands generally depicted on the map entitled: 'Revised Boundary Map, Golden Gate National Recreation Area', numbered NRA-GG-80,003-K and dated October 1978, plus those areas depicted on the map entitled "Point Reyes and GGNRA Amendments and dated October 25, 1979." 16 U.S.C. § 460bb-1(a)(1). The boundary extends one-quarter mile offshore from the shoreline from approximately Sausalito to Bolinas Bay in Marin and San Francisco Counties, around Alcatraz Island, and from Ft. Mason in the City of San Francisco along the coast to south of Ocean Beach within San Francisco County. See Administrative Record ("A.R.") at 14, 18, 1683-86.

In 1976, in an amendment to the NPS Organic Act, Congress authorized the Secretary of Interior to "[p]romulgate and enforce regulation concerning boating and other activities on or relating to waters located within areas of the National Park System, including waters subject to the jurisdiction of the United States." Pub L. No. 94-458, October 7, 1976, 90 Stat 1939, § 1, codified at 16 U.S.C. § 1a-2(h).

B.     Regulatory Background

In 1983, the NPS promulgated regulations that apply to persons within, *inter alia*: "[t]he boundaries of federally owned lands and waters administered by the National Park Service," persons within "[w]aters subject to the jurisdiction of the United States located within the boundaries of the National Park System, including navigable waters and areas within their ordinary reach (up to the mean high water line in places subject to the ebb and flow of the tide and up to the ordinary high water mark in other places) and without regard to the ownership of submerged lands, tidelands, or lowlands," as well to persons within "[o]ther lands and waters over which the United States holds a less-than-fee interest, to the extent necessary to fulfill the purpose of the National Park Service administered interest and compatible with the nonfederal interest." 36 C.F.R. § 1.2(a).

Within those areas, the regulation "prohibits commercial fishing except where specifically

3

authorized by Federal statutory law." 36 C.F.R. § 2.3(d)(4). Defendants have informed members of the SFHA of their intention to enforce this regulation within the waters in question.

### C. Jurisdiction

Plaintiff's causes of action arise under the APA, 5 U.S.C. §§ 701-706. Therefore, the Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. As discussed in the Court's Order Regarding Subject-Matter Jurisdiction, neither the statute of limitations nor the Quiet Title Act deprives this Court of subject-matter jurisdiction. ECF No. 84.

### D. Procedural History

Plaintiff filed this action on April 18, 2013, bringing three causes of action: for violations of 5 U.S.C. § 706(2)(C), 5 U.S.C. § 706(2)(A), and for estoppel. Complaint for Declaratory and Injunctive Relief, ECF No. 1. In July, the Court granted Defendants' unopposed motion to dismiss the estoppel cause of action. ECF No. 16. Plaintiff filed the FAC on July 10, bringing only the APA causes of action. ECF No. 17.

The instant cross-motions for summary judgment were initially set for hearing on December 12, 2013. However, the Court concluded that the parties' summary judgment motions might require the Court to reach questions in which the State of California might have a significant interest – namely, whether California owned a property interest in the waters in question, whether California owns a property interest in the submerged lands beneath those waters, and whether the United States has the statutory authority to prohibit fishing in waters in which California holds title or which lie above lands in which California holds title. Therefore, the Court invited the State of California to provide its views on those questions. See Notice to California Attorney General Kamala Harris, ECF No. 65. The California State Lands Commission ("CSLC") responded to accept the invitation to appear as *amicus curiae* to answer "some or all" of the questions presented, but requested until February 10 to provide its views. ECF No. 70. After the parties filed statements of non-opposition to this request, the Court granted it, gave the parties an opportunity to respond to the CSLC's filing, and continued the hearing on the parties' summary judgment motions to March 6, 2014. ECF No. 85.

In the meantime, after hearing argument only on issues going to subject-matter jurisdiction, the Court concluded that it did not lack jurisdiction over this action. Order Regarding

4

Subject-Matter Jurisdiction, ECF No. 84, 2013 WL 6698860, 2013 U.S. Dist. LEXIS 178497. The Court also heard, and denied, Plaintiff's motion for a preliminary injunction, after concluding that Plaintiff had neither demonstrated a substantial likelihood of success on the merits nor that the balance of equities tipped sharply in its favor. Order Denying Motion for a Preliminary Injunction ("P.I. Order"), ECF No. 75, 2014 WL 172232, 2014 U.S. Dist. LEXIS 5984.

The CSLC provided its views on February 10, only addressing the question of California's ownership of tidelands and submerged lands beneath the waters in question. California State Lands Commission's *Amicus Curiae* Brief on Ownership of Tide and Submerged Lands/ Legislative Jurisdiction within the Golden Gate National Recreation Area ("CSLC Brief"), ECF No. 118. CSLC's brief does not address whether the United States owns any property interest in the waters themselves, and neither does it take any opinion on the DOI's statutory authority to regulate the waters.

### E. Legal Standard

Pursuant to 5 U.S.C. § 706(2)(C), a court shall hold unlawful and set aside agency action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." Because the issue to be decided is one of law, it may be answered on summary judgment. Nw. Motorcycle Ass'n v. U.S. Dep't of Agric., 18 F.3d 1468, 1472 (9th Cir. 1994). In an APA proceeding there are no material facts in dispute because the Court does not engage as a fact finder but rather rules upon the administrative record compiled by the agency. Id.

### III. ANALYSIS

Plaintiff claims that Defendants have violated the APA by acting in excess of statutory authority in enforcing the NPS's regulations prohibiting commercial fishing within the waters of the GGNRA. The question is one of statutory interpretation only. Plaintiff does not maintain that Congress lacks the authority, if it wishes, to authorize NPS to regulate the waters in question.[1]

---

[1] Much of Defendants' briefing argues that the United States can validly exercise constitutional authority to prohibit commercial fishing in the waters in question, pursuant to the Property and Commerce Clauses of the Constitution. Defendants also argue that the State of California has ceded legislative jurisdiction over much of the waters in question to the United States, giving the United States an additional constitutional authority it could exercise to prohibit commercial

5

Plaintiff's success depends on its argument that under federal statutory law, NPS may only regulate waters within the boundaries of the GGNRA if the DOI has acquired a property interest in those waters.[2]

The NPS Organic Act specifically authorizes NPS to "[p]romulgate and enforce regulation concerning boating and other activities on or relating to waters located within areas of the National Park System, including waters subject to the jurisdiction of the United States." 16 U.S.C. § 1a-2(h). This authority is broad in geographic scope (applying throughout the national park system), but is very narrowly focused on the specific authority NPS now seeks to invoke (prohibiting fishing by boats). There can be no doubt that, standing alone, 16 U.S.C. § 1a-2(h) plainly authorizes NPS to promulgate and enforce 36 C.F.R. § 2.3(d)(4), and Plaintiff does not suggest otherwise.

Plaintiff also does not dispute 36 C.F.R. § 2.3(d)(4)'s facial validity. It argues instead that the previously enacted GGNRA Act limits the scope of 16 U.S.C. § 1a-2(h)'s applicability to the GGNRA, and that therefore the NPS may not enforce the regulation in the GGNRA's waters. Plaintiff maintains that, under the GGNRA Act, Congress established an "acquisition prerequisite" that required the DOI to obtain a property interest in any waters before it could regulate those waters. Therefore, Plaintiff maintains, the 1972 GGNRA Act should be read to limit the 1976 NPS Organic Act amendment and to prevent its application to the GGNRA.

In so arguing, Plaintiff invokes the statutory canon that repeals by implication are

---

fishing in those waters. None of this is in dispute. Plaintiff does not argue that *Congress could not* authorize the N.P.S. to prohibit commercial fishing in the waters in question, it argues that Congress *did not* do so. If Defendants are arguing that the United States' constitutional authority to regulate the waters in question is somehow automatically self-effectuating, even absent a grant of legislative authority, the Court rejects that proposition. The fact that the *United States* can regulate these waters does not mean that *the N.P.S.* can. The Constitution makes the former proposition a possibility, but only Congress can make the latter one a reality.

[2] Since the Court agrees with Defendants' statutory construction on *de novo* review, it does not address the question of whether the agency's determination falls within the domain warranting deference under Chevron USA, Inc. v. Nat. Resources Def. Council, Inc., 467 U.S. 837, 843 (1984).

disfavored. As the case on which Plaintiff primarily relies states:

> It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum. "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." Morton v. Mancari, 417 U.S. 535, 550-551, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290, 301.7 "The reason and philosophy of the rule is, that when the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute in general terms, or treating the subject in a general manner, and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive previous provisions, unless it is absolutely necessary to give the latter act such a construction, in order that its words shall have any meaning at all." T. Sedgwick, The Interpretation and Construction of Statutory and Constitutional Law 98 (2d ed. 1874).

Radzanower v. Touche Ross & Co., 426 U.S. 148, 153 (1976).

This canon remains well established in the law. See James v. City of Costa Mesa, 700 F.3d 394, 412 (9th Cir. 2012) cert. denied, __ U.S. __, 133 S. Ct. 2396 (2013) ("[r]epeals by implication are disfavored; every effort must therefore be made to make both statutes operative within their realm, rather than declaring a clash"); see also Nigg v. U.S. Postal Serv., 555 F.3d 781, 786-87 (9th Cir. 2009) ("Repeals by implication are disfavored—'[t]he intention of the legislature to repeal must be clear and manifest.'") (quoting Morton v. Mancari, 417 U.S. 535, 551 (1974)). As set forth below, however, the Court concludes that it doesn't apply here.

Defendants conceded at oral argument on the preliminary injunction motion that Section 4(a) of the GGNRA imposed an "acquisition prerequisite" with regard to the lands within the boundaries of the GGNRA. Recognizing that there were nonfederal lands within the boundaries it had drawn for the GGNRA, Congress established that the DOI could later acquire those lands "by donation, purchase, exchange or transfer," 16 U.S.C. § 460bb-2(a), and that it would only then have the authority to administer the interests it had thereby acquired. 16 U.S.C. § 460bb-3(a). It appears from the legislative history that Congress's anomalous approach to park-making was part of a legislative compromise between two competing camps. Some interests wanted the federal government to take possession of the entire area presently composing the GGNRA, while others

7

wanted to restrict the federal government's authority to areas it already owned. The compromise was a piecemeal approach in which the park's boundaries were set out in advance but would only come under unified regulation if the federal government acquired non-federal property within it from its then-current owners. See Opp./Cross-Motion 2-10. Thus, in considering a later, broader statute that gave the NPS some specific authority over *lands* within the park system, a court might very well apply Morton and read the GGNRA Act to limit the effect of the later act. 417 U.S. at 550-51.

But the problem for Plaintiff is that neither the statutory framework of the GGNRA nor the legislative history of the enactment indicate in any way that "the mind of the legislator[s] ha[d] been turned to the details of" the *waters* within the GGNRA. Radznower, 426 U.S. at 153. To the contrary, it seems implausible that Congress set up a requirement that the DOI would have to acquire property interests in the waters of San Francisco Bay before it could regulate the waters that Congress specifically included within the park's boundaries.

Plaintiff argued extensively in its summary judgment brief, and again emphasized at oral argument on the preliminary injunction, that the State of California may not, under its constitution, alienate the property interest it holds in its waters as a public trust for the purposes of fishing and navigation. See Plaintiff's Opp./Cross-Motion 13:24-16:7 (citing Cal. Const. Art. I, § 25, Cal. Const. Art. X, § 4, and People ex inf. Webb v. California Fish Co., 166 Cal. 576, 587 (1913).[3] Therefore, the only way the DOI could acquire title to the waters would be to take title to them by eminent domain. But in the GGNRA, Congress pointedly denied DOI the authority to use eminent domain to acquire property for the park, providing that acquisition could only be via "donation, purchase, exchange or transfer." 16 U.S.C. § 460bb-2(a). Under Plaintiff's reading, Congress established the GGNRA, drew its boundaries so as to include the waters in question, provided that DOI could not regulate those waters unless it acquired a property interest in those waters, and then in the same breath took away the only tool the DOI could ever use to acquire title to the waters. The net effect of this circuitous approach – assuming it constitutes a reasonable reading of the

---

[3] There is an exception to this limitation, which isn't relevant here. See Cal Fish Co., 166 Cal. at 597.

8

United States District Court
Northern District of California

GGNRA Act – would be to make it impossible for DOI to *ever* regulate these waters, making any discussion of *when* it could regulate them nonsensical, and in some ways making it a superfluous and unnecessary act to place the waters within the boundaries at all.

At oral argument, Plaintiff's counsel acknowledged that on its reading of the statute and the California Constitution, it is impossible for the DOI to acquire complete title to the waters, and therefore it is also impossible for the DOI to ever comprehensively regulate the waters in the way that it regulates the remainder of the GGNRA. But Plaintiff's counsel argued that this still does not render superfluous Congress's decision to place the waters within the GGRNA boundaries. Plaintiff argues that the California Constitution permits the DOI to acquire some lesser property interest in the waters, such as a limited purpose easement, and that the DOI could then issue regulations necessary to administer that more limited property interest. Even assuming California is, in fact, permitted to alienate such an interest in its navigable waters, this suggestion seems implausible. As set forth more fully *infra*, the surrounding provisions of the GGNRA contemplate that the DOI would begin acquiring complete title to the lands within the GGNRA boundaries, and that the land within the boundaries would thereby fall under the unified regulation of the DOI as part of the national park system. The suggestion that a non-federal entity would continue to own portions of the park, and that the DOI would have some subsidiary regulatory authority in those areas, is difficult to square with the remainder of the Act.

It was clearly Congress's intention that the DOI begin attempting to acquire land for the park. But there is little in the statute to suggest that the DOI would also begin actually acquiring property interests in the navigable waters of San Francisco Bay. While it may be possible for the United States to acquire title to navigable waters owned in public trust by a state, it appears to be a rare occurrence. The examples cited by Plaintiff are an unclear reference in a 1913 case to the United States possibly taking "the whole flow" of a Michigan river, United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 65 (1913), and the U.S. military's condemnation of water rights in tidelands (not navigable waters) off the California coast. United States v. 32.42 Acres of Land, 683 F.3d 1030, 1034 (9th Cir. 2012). If Congress had expected the DOI to begin attempting to *purchase* the waters of San Francisco Bay from the State of California (or even acquire a more limited property interest therein), the GGNRA would probably reflect that fact somewhere. As the

9

Supreme Court put it in different context, "Congress . . . does not, one might say, hide elephants in mouseholes." Whitman v. Am. Trucking Associations, 531 U.S. 457, 468 (2000). Instead, Section 4 of the GGNRA goes into great detail about which federal lands would be transferred to the DOI, without any mention of the waters in the Bay. And Section 3(a) provides specifically that "[a]ny *lands, or interests therein*, owned by the State of California or any political subdivision thereof, may be acquired only by donation," notably omitting any mention of the waters owned by the state. 16 U.S.C. § 460bb-2(a).

It is notable that the precise phrase "lands, waters, and interests therein" appears in 54 different places within Title 16 of the United States Code. See, e.g., 16 U.S.C. § 668dd(a)(1) (National Wildlife Refuge System); 16 U.S.C. § 3102(2) (Alaska National Interest Lands Conservation Act); 16 U.S.C. § 1461(e)(3)(A) (National Estuarine Research Reserve System). In context with the statute as a whole, as well as with the title as a whole, the most persuasive explanation for the inclusion of the word "waters" in Section 4(a) is that the entire phrase is boilerplate, employed with near-automatic regularity when Congress enacts a statute relating to the DOI's authority. It appears that little thought was devoted to how this standard language would fit with the idiosyncratic "acquisition prerequisite" that Congress placed within the GGNRA Act.

The Court finds these indications within the statute's text dispositive. But it is worth noting, as an additional matter, that this understanding is also supported by the legislative history. Plaintiff's account of the legislative history amply demonstrates that Congress understood that land would need to be owned to be regulated. But that same history also provides virtually no evidence that Congress thought the same way about the waters. In none of the discussions and records submitted by Plaintiff do legislators, or even observers, express any understanding of the effect the statute would have on waters.

Given this statutory framework and the legislative history, there is no indication that Congress gave any significant thought to whether DOI would ever begin purchasing the waters of San Francisco Bay, much less that the "mind of the legislator . . . [was] specifically turned to the details" of the subject. Radzanower, 426 U.S. at 153.

Out of context, Plaintiff's interpretation of the isolated phrase "lands, waters, and interests

10

therein acquired" could be reasonable. But "a section of a statute should not be read in isolation from the context of the whole Act." Planned Parenthood Arizona Inc. v. Betlach, 727 F.3d 960, 971 (9th Cir. 2013) (quoting Richards v. United States, 369 U.S. 1, 11 (1962). In the context of the whole act, applying the "acquisition prerequisite" to the waters of San Francisco Bay does not seem to be a plausible construction.

It might be another thing if the Court were being asked to consider whether the DOI could regulate the waters in question under the GGNRA Act alone. But the Court is asked to attempt to harmonize the GGNRA Act with a later-enacted, and equally valid, Act of Congress which specifically gives NPS the general authority to regulate boating within the waters of the national park system. For good reasons, the presumption against repeals by implication is generally employed when the previous enactment's provisions are clear and undisputed. See, e.g., Morton, 417 U.S. at 542-45. Since Plaintiff has not demonstrated that Congress specifically turned its attention to the question of whether DOI would need to acquire a property interest in the waters of San Francisco Bay before it could regulate them, Plaintiff cannot escape the otherwise clear effect of 16 U.S.C. § 1a-2(h).[4]

For purposes of this motion, the Court assumes without deciding that the DOI has never acquired any property interest in the waters in question.[5] As the Court interprets the GGNRA Act

---

[4] In citing this portion of Radzanower regarding whether the "mind of the legislator . . . [was] specifically turned to the details" of a subject, the Court does not mean to suggest that courts must seek out legislative history or extrinsic sources of Congressional intent to determine whether to apply the presumption against repeals by implication. But the Court does read Morton and its progeny as assuming that the court is confronted with an earlier statute whose effect is, after applying traditional tools of statutory interpretation, clear and undisputed. And the presumption against repeal by implication lives alongside other well-established canons, such as the Whole Act Rule, which affects the Court's construction of the GGNRA Act, *supra*. See, e.g., Gonzales v. Oregon, 546 U.S. 243, 273-74 (2005) (interpreting an act in the context of "[t]he statutory scheme with which . . . [it] is intertwined").

[5] CSLC has taken no position on this question, and no other agency of the State of California responded to the Court's invitation to provide its views. However, "[i]t is a well established proposition that the lands lying between the lines of ordinary high and low tide, as well as that within a bay or harbor and permanently covered by its waters, belong to the state in its sovereign character and are held in trust for the public purposes of navigation and fishery." People v. California Fish Co., 166 Cal. 576, 584 (1913). "A public easement and servitude exists over these lands for those purposes." Id. Under the concept of public trust, "the sovereign owns 'all of its navigable waterways and the lands lying beneath them as trustee of a public trust for the benefit of

and the NPS Organic Act, this fact does not deprive DOI and NPS of statutory authority to apply 36 C.F.R. § 2.3(d)(4) within the waters in question.

## IV. CONCLUSION

Defendants' Motion for Summary Judgment is GRANTED, and Plaintiff's Cross-Motion is DENIED. Defendants shall submit a proposed form of judgment consistent with this order within fourteen days.

**IT IS SO ORDERED.**

Dated: April 29, 2014

_____
JON S. TIGAR
United States District Judge

---

the people.'" Nat'l Audubon Soc'y v. Superior Court, 33 Cal. 3d 419, 434 (1983) (quoting Colberg, Inc. v. State of California ex rel. Dept. Pub. Works, 67 Cal.2d 408, 416 (1967). "The State of California acquired title as trustee to such lands and waterways upon its admission to the union." Nat'l Audubon Soc'y, 33 Cal. 3d at 434. Defendants do not claim that the United States ever at any point after California's admission acquired any property interest in the waters themselves. There is some question about whether the United States has acquired *some* of the tide and submerged land *beneath* the waters in question. See CSLC Brief 2-8. But Defendants do not claim that the United States owns title to *all* of such land. And in any case, Defendants do not claim that by acquiring title to such submerged land, the United States acquired title to the water above such land, or that the United States acquired a property interest in such water that is superior to the interests California previously possessed in such water. Acquisition of submerged land does not generally include an interest in waters above that are owned by the State of California in public trust. See Cal. Const. Art. X, §3; Cal. Fish Co., 166 Cal. at 576; Cal. Public Resource Code §6009.1.