DAVID L. ANDERSON
United States Attorney
SARA WINSLOW (DCBN 457643)
Chief, Civil Division
MICHAEL T. PYLE (CSBN 172954)
Assistant United States Attorney
150 Almaden Boulevard, Suite 900
San Jose, California 95113
Tel: (408) 535-5087 / Fax: (408) 535-5081
Email: michael.t.pyle@usdoj.gov

PRERAK SHAH
Deputy Assistant Attorney General
DAVID W. GEHLERT
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1386 / Fax: (303) 844-1350
Email: david.gehlert@usdoj.gov

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN FRANCISCO HERRING ASSOCIATION,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR: DAVID BERNHARDT, in his official capacity as Secretary of the Interior: UNITED STATES NATIONAL PARK SERVICE; DAVID VELA, in his official capacity as Director of the National Park Service: and LAURA JOSS, in her official capacity as General Superintendent of the Golden Gate National Recreation Area,<br><br>    Defendants. | Case No.    13-cv-1750-JST<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Date: No Hearing Scheduled[1]<br>Time:<br>Hon. Jon S. Tigar<br>Courtroom: 6, 2nd Floor |

---

[1]    Pursuant to the note on the Court's Calendar, Defendants have not requested a hearing date. *See* https://apps.cand.uscourts.gov/CEO/cfd.aspx?7146#Notes.

# **TABLE OF CONTENTS**

Introduction .................................................................................................................... 2

Background .................................................................................................................... 3

I.      THE NATIONAL PARK SERVICE'S AUTHORITY. ...................................... 3

II.     THE GOLDEN GATE NATIONAL RECREATION AREA ENABLING ACT. ............ 6

III.    FEDERAL OWNERSHIP OF THE SUBMERGED LANDS AND LEGISLATIVE
        JURISDICTION. .................................................................................... 7

IV.     THE SAN FRANCISCO BAY COMMERCIAL HERRING FISHERY. ........................ 9

Argument ...................................................................................................................... 13

I.      PLAINTIFF MUST PROVIDE COMPETENT EVIDENCE TO SUPPORT ITS
        ALLEGATION OF FINAL AGENCY ACTION. ........................................... 13

II.     CONGRESS AUTHORIZED THE NPS TO REGULATE THE NAVIGABLE
        WATERS WITHIN THE BOUNDARIES OF THE GGNRA. .............................. 13

        A.      Congress Granted the NPS Authority to Regulate Activity Occurring on
                Waters Throughout the National Park System ........................................ 13

        B.      The GGNRA Act Demonstrates that Congress Intended to Limit the NPS to
                Regulate the Waters Within the GGRNA. ............................................... 15

                1.      Section 4(a) of the GGNRA Act is an administrative provision that
                        grants the NPS broad authority. ............................................... 15

                2.      Section 4(a) of the GGNRA Act does not demonstrate that Congress
                        intended to impose an "acquisition prerequisite" on the NPS's
                        authority. ....................................................................... 16

        C.      The NPS's Interpretation of Section 4 (a) of the GGNRA Act Avoids a
                Conflict Between the GGNRA Act and the 1976 Amendment. ...................... 19

        D.      The NPS's Interpretation of Section 4(a) of the GGNRA Act is Entitled to
                Deference. ........................................................................................ 20

        E.      Legislative Jurisdiction Provides Additional Authority. ........................... 21

        F.      The United States' Ownership of Submerged Lands Provides Additional
                Authority. ......................................................................................... 21

Conclusion .................................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue,*
  926 F.3d 1061 (9th Cir. 2019) ........................................................................... 12, 20

*Arizona v. California,*
  373 U.S. 546 (1963) ............................................................................................... 18

*Bicycle Trails Council of Marin v. Babbit,*
  82 F.3d 1445 (9th Cir. 1996) ............................................................................... 5, 16

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) ..................................................................................... 12, 14, 20

*Christensen v. Comm'r,*
  523 F.3d 957 (9th Cir. 2008) ................................................................................. 15

*In re Cervantes,*
  219 F.3d 955 (9th Cir. 2000) ................................................................................. 19

*E. Bay Sanctuary Covenant v. Barr,*
  385 F. Supp. 3d 922 ............................................................................................... 12

*Fed. Power Comm'n v. Niagara Mohawk Power Corp.,*
  347 U.S. 239 (1954) ............................................................................................... 18

*High Point, LLLP v. Nat'l Park Serv.,*
  850 F.3d 1185 (11th Cir. 2017) ....................................................................... 14, 21

*Judulang v. Holder,*
  565 U.S. 42 (2011) ................................................................................................. 12

*Karuk Tribe of Cal. v. U.S. Forest Serv.,*
  681 F.3d 1006 (9th Cir. 2012) ............................................................................... 12

*Kleppe v. New Mexico,*
  426 U.S. 529 (1976) ............................................................................................... 21

*Leite v. Crane Co.,*
  749 F.3d 1117 (9th Cir. 2014) ............................................................................... 13

*Morton v. Mancari,*
  417 U.S. 535 (1974) ............................................................................................... 19

*Nat'l Rifle Ass'n of Am. v. Potter,*
  628 F.Supp. 903 (D. D.C. 1986) ............................................................................. 5

*Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n.,*
  457 F.3d 941 (9th Cir. 2006) ................................................................................. 13

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.,*
  18 F.3d 1468 (9th Cir. 1994) ................................................................................. 12

*Organized Fishermen of Fla. v. Hodel,*
775 F.2d 1544 (11th Cir. 1985) ................................................................. 17

*PPL Montana, LLC v. Montana,*
565 U.S. 576 (2012) ................................................................................... 18

*Ruckelshaus v. Monsanto Co.,*
467 U.S. 986 (1984) ................................................................................... 19

*San Francisco Herring Assoc. v. Dep't of the Interior,*
946 F.3d 564 (9th Cir. 2019) ..................................................................... 13

*Standard Oil Co. v. California,*
291 U.S. 242 (1934) ..................................................................................... 8

*Sturgeon v. Frost,*
139 S. Ct. 1066 (2019) ......................................................................... 13, 14

*Tarrant Regional Water Dist. v. Herrmann,*
569 U.S. 614 ............................................................................................... 18

*United States v. Armstrong,*
186 F.3d 1055 (8th Cir. 1999) ............................................................. 14, 21

*United States v. Brown,*
552 F.2d 817 (8th Cir. 1977) ..................................................................... 21

*United States v. Carter,*
339 F. Supp. 1394 (D. Az. 1972) ............................................................. 3, 4

*Utah Div. of State Lands v. United States,*
482 U.S. 193 (1987) ................................................................................... 18

*Washington Envtl. Council v. Bellon,*
732 F.3d 1131 (9th Cir. 2013) ................................................................... 13

**Federal Statutes**

5 U.S.C. § 706(2)(C) ....................................................................................... 12

16 U.S.C. § 3101 ............................................................................................. 14

16 U.S.C. § 460bb ..................................................................................... 6, 20

16 U.S.C. § 460bb-1 .......................................................................................... 6

16 U.S.C. § 460bb-1(a)(1) .............................................................................. 17

16 U.S.C. § 460bb-2 ........................................................................................ 17

16 U.S.C. § 460bb-2(a) ............................................................... 4, 7, 17, 19

16 U.S.C. § 460bb-2(b) ..................................................................................... 7

16 U.S.C. § 460bb-3(a) ........................................................... 4, 7, 15, 16, 17

54 U.S.C. § 100101(a) ....................................................................................... 3

54 U.S.C. § 100101(b)(2) .................................................................................................. 5

54 U.S.C. § 100751(a) ....................................................................................................... 3

54 U.S.C. § 100751(b) ...................................................................................... 4, 13, 19

Pub. L. No. 92-589, 86 Stat. 1299 (1972) ................................................................... 20

Pub. L. No. 95-625, 92 Stat. 3484 (1978) ..................................................................... 6

Pub.L. No. 91-383, 84 Stat. 825 (1970) ......................................................................... 4

**State Statutes**

1859 Cal. Stat. 334 ............................................................................................................. 9

1897 Cal. Stat. 51 ............................................................................................................... 9

**Federal Regulations**

36 C.F.R. § 1.1(a) (1967) .................................................................................................. 3

36 C.F.R. § 1.2(a) ....................................................................................................... 5, 14

36 C.F.R. § 2.13 (1967) .................................................................................................... 3

36 C.F.R. § 2.13(j)(3) (1971) .......................................................................................... 6

36 C.F.R. § 2.3(d)(4) ............................................................................................... 5, 6, 14

36 C.F.R. § 2.3(d)(4) (1984) ........................................................................................... 5

36 C.F.R. § 2.3(g) ............................................................................................................ 21

36 C.F.R. § 5.3 (1967) ...................................................................................................... 3

36 C.F.R. Part 3 (1967) .................................................................................................... 3

31 Fed. Reg. 16,651 (Dec. 29, 1966) ............................................................................ 3

61 Fed. Reg. 35133 (July 5, 1996) .............................................................................. 5, 7

**State Regulations**

14 Cal. Code Reg. § 163.1 (2020)………………………………………………………10

**Other Authorities**

H.R. Rep. No. 92-1391 (1972)........................................................................................ 20

H.R. Rep. No. 95-581, 1978 U.S.C.C.A.N. 463 .......................................................... 5

H.R. Rep. No. 91-1265, 1970 U.S.C.C.A.N. 3785 ..................................................... 4

S. Rep. No. 92-1271 (1972) ............................................................................................ 20

S. Rep. No. 94-1190 (1976) .............................................................................................. 4

## NOTICE OF MOTION

**TO PLAINTIFF AND ITS COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that Defendants United States Department of the Interior ("DOI"), David Bernhardt, National Park Service ("NPS"), David Vela, and Laura Joss (collectively, "Defendants") will respectfully move this Court for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the ground that: (1) Plaintiff has not presented competent evidence to support its allegation of final agency action; and (2) Defendants have authority to enforce the NPS regulation prohibiting commercial fishing in the navigable waters within the boundary of Golden Gate National Recreation Area ("GGNRA").

## RELIEF REQUESTED

Defendants seek entry of judgment in their favor affirming that the NPS acted within its authority in prohibiting commercial fishing in the Golden Gate National Recreation Area.

## ISSUES TO BE DECIDED

1.     Has Plaintiff submitted competent evidence to support its allegation that the NPS has taken a final agency action?

2.     Does the NPS have the authority to enforce NPS regulations in the navigable waters within the boundary of the Golden Gate National Recreation Area?

## MEMORANDUM OF POINTS AND AUTHORITIES

### *Introduction*

Congress expressly drew the boundaries of Golden Gate National Recreation Area (GGNRA) to include the navigable waters ¼ mile from the shoreline in the San Francisco Bay[2] and expressly authorized the Secretary of the Interior ("Secretary") to administer the GGNRA using the statutory authority he deems appropriate. Despite that, Plaintiff contends that the NPS is without authority to regulate those waters *for any purpose* because Section 4(a) of the GGNRA Act purportedly obligates the United States to acquire a property interest in the waters within the boundaries of the GGNRA before the NPS can regulate those waters. This Court previously held that the NPS has authority over the waters within the boundaries of the GGNRA whether or not the United States owns the submerged lands below those waters or the waters themselves. *See* ECF 127 (Order granting Defendants' motion for summary judgment). The Court should once again rule in Defendants' favor on the merits.

The National Park Service Organic Act, as amended and supplemented, grants the NPS broad authority over lands and waters within the boundaries of units of the National Park System, including express authority to prescribe regulations concerning activities on water located within System units. Nothing in the GGNRA Act expresses a clear intent to abrogate that authority. To the contrary, Section 4(a) of the Act authorizes the Secretary to use the statutory authority he deems appropriate to carry out the purposes of the Act. Further, Plaintiff's "acquisition prerequisite," if applied to the waters within the boundaries of the GGNRA, would turn statutory boilerplate into a restriction uniquely applicable to the GGNRA, effectively render the inclusion of navigable waters within the GGNRA's boundaries a nullity and create a needless conflict with a 1976 Amendment supplementing the Organic Act.

---

[2] The Second Amended Complaint, ECF 168 ("Comp."), refers to "Waters At Issue" which Plaintiff defines as "waters abutting the shoreline of the Golden Gate National Recreation Area" Comp. ¶ 1. Because Defendants do not claim authority to regulate fishing in waters outside the boundaries of the GGNRA, the only waters "at issue" are those within the boundaries of the GGNRA.

Even if the plain language and context of the GGNRA Act did not resolve this matter, Defendants would still be entitled to summary judgment because the NPS's interpretation of Section 4(a) comports with the purpose and structure of the GGNRA Act and is entitled to deference. Further, federal legislative jurisdiction and ownership of submerged lands provide the NPS with additional authority to regulate the waters within the GGNRA's boundaries.

## *Background*

## I.    THE NATIONAL PARK SERVICE'S AUTHORITY.

In 1916, Congress enacted the National Park Service Organic Act ("the Organic Act"), 54 U.S.C. § 100101 *et seq*., which directed the Secretary of the Interior ("the Secretary") to manage the parks for the "fundamental purpose" of "conserv[ing] the scenery, natural and historic objects, and wild life" therein in a manner that "will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). Congress instructed the Secretary to do so by "prescrib[ing] such regulations as the Secretary considers necessary or proper for the use and management of System units." 54 U.S.C. § 100751(a).

For generations the NPS has regulated activities on both navigable and non-navigable waters throughout the National Park System. Regulations adopted in 1966, and in effect when Congress established the GGNRA in 1972, provided that NPS regulations applied "within the boundaries of any federally owned or controlled areas administered by the National Park Service." 36 C.F.R. § 1.1(a)-(b) (1967); 31 Fed. Reg. 16,650, 16,651 (Dec. 29, 1966). Those regulations covered numerous activities occurring in the waters of the national park system, including fishing, boating and commercial businesses. *See e.g.* 36 C.F.R. § 2.13 (1967) (Fishing); 36 C.F.R. Part 3 (1967) (Boating), 36 C.F.R. § 5.3 (1967) (business activity); *see also United States v. Carter*, 339 F. Supp. 1394 (D. Az. 1972) (affirming NPS authority to regulate commercial boating in a national recreation area).

In 1970, Congress enacted the National Park System General Authorities Act ("1970 Act") to amend the Organic Act and "clarify the authorities applicable to the system." Pub.L. No. 91-383, 84 Stat. 825. The Act effectively affirmed the NPS's practice of regulating activities on the waters within park units by clarifying that the national park system includes "any area of land or water" administered by the NPS. *See id.* § 2(a); *see also Carter*, 339 F. Supp. at 1399. The 1970 Act also directed that all units of the national park system would be subject to the full suite of regulatory authority available to the Secretary under the Organic Act and other statutes. *See id* at § 2(b); *see also* H.R. Rep. No. 91-1265 (1970), *as reprinted in* 1970 U.S.C.C.A.N. 3785, 3787.

The GGNRA Enabling Act ("GGNRA Act"), which followed in 1972 and is discussed in more detail below, echoed the 1970 Act by expressly making waters part of the Park and instructing that the Secretary is to manage the Park in accordance with the mandates of the Organic Act and by utilizing all "statutory authority available to him…as he deems appropriate to carry out the purposes of [the Act]." 16 U.S.C. §§ 460bb-2(a), 460bb-3(a).

In 1976 Congress supplemented the provisions of the 1970 Act to further clarify the authorities provided by the Organic Act. *See* S. Rep. No. 94-1190, at 4 (1976); Pub. L. No. 94-458, § 2, 90 Stat. 1939, 1939 ("1976 Amendment"). Most relevant here, the 1976 Amendment confirmed that the Secretary has authority to "prescribe regulations . . . concerning boating and other activities on or relating to water located within System units, including water subject to the jurisdiction of the United States," so long as the Secretary's regulations are complementary to and not in derogation of the authority of the Coast Guard. *See* 54 U.S.C. § 100751(b). The legislative history of the 1976 Amendment recognized that although:

> The National Park Service has general, broad authority to make regulations to protect park resources and to provide for the safety of visitors . . . there is no specific authority to regulate recreational boating and other uses of waters within the National Park System. This clarification of authority will be exercised concurrently with the authority of the Coast Guard, except where more restrictive regulations are necessary to preserve and protect the natural resources, such as nesting waterfowl.

S. Rep. No. 94-1190, at 4.

Two years later, Congress reaffirmed that all units of the National Park System were subject to the all of the Secretaries authorities to achieve the Organic Act's non-impairment mandate throughout the System, "except as directly and specifically provided by Congress." Pub. L. No. 95-250 § 101(B), 92 Stat. 163, 166 (now codified at 54 U.S.C. § 100101(b)(2)); *see also* H.R. Rep. No. 95-581, *as reprinted in* 1978 U.S.C.C.A.N. 463, 467-68; *Nat'l Rifle Ass'n of Am. v. Potter*, 628 F.Supp. 903, 905-6 (D. D.C. 1986); *Bicycle Trails Council of Marin v. Babbit,* 1994 WL 508892 (N.D. Cal. Sept. 1, 1994), *adopted as modified*, 82 F.3d 1445 (9th Cir. 1996).

The series of clarifications to the Organic Act during the 1970s prompted the NPS to comprehensively revise its regulations in 1983. Consistent with those acts, and the broad grant of authority in the Organic Act itself, the regulations apply broadly to all "lands or waters . . . administered or otherwise subject to the jurisdiction of the National Park Service." *See* 36 C.F.R. § 1.2(a)(1)-(2) (1983), 48 Fed. Reg. 30252, 30275 (June 30, 1983). After a 1987 editorial change to § 1.2 had the "unforeseen and unintended effect of arguably linking federal title to submerged lands with the exercise of management authority over activities occurring on navigable waters," within national parks, the regulation was amended 1996 to "clarif[y] that NPS regulations continue to apply on navigable waters, as they have for years." 61 Fed. Reg. 35133, 35133 (July 5, 1996).

The 1996 amendment, which continues in force today, explained that the NPS's regulations apply to actions on "federally owned lands and waters administered by the National Park Service" as well as "[w]aters subject to the jurisdiction of the United States located within the boundaries of the National Park System, *including navigable waters . . . and without regard to the ownership of submerged lands, tidelands, or lowlands*." 36 C.F.R. § 1.2(a)(1)-(3) (emphasis added). The current regulations include 36 C.F.R. § 2.3(d)(4), unchanged since its adoption in 1983, which prohibits commercial fishing in national parks unless specifically authorized by federal statutory law. 36 C.F.R. §

2.3(d)(4) (1984); 48 Fed. Reg. at 30256, 30284.[3]  No provision of the GGNRA Act, nor any other

federal statute, authorizes commercial fishing within the GGNRA.  *See* 16 U.S.C. §§ 460bb – 460bb-5.

## II.  THE GOLDEN GATE NATIONAL RECREATION AREA ENABLING ACT.

Congress established the GGNRA in 1972 "to preserve for public use and enjoyment certain

areas of Marin and San Francisco Counties, California, possessing outstanding natural, historic, scenic,

and recreational values, and in order to provide for the maintenance of needed recreational open space

necessary to urban environment and planning."  Pub.L. No. 92-589, § 1, 86 Stat. 1299, 1299, *codified at*

16 U.S.C. § 460bb *et seq*. ("GGNRA Act").  Congress instructed the Secretary to manage the area to

"provide for recreation and educational opportunities [while] preserv[ing] the recreation area, as far as

possible, in its natural setting, and protect[ing] it from development and uses which would destroy the

scenic beauty and natural character of the area." 16 U.S.C. § 460bb.

Congress directed that the GGNRA would include "the lands, waters, and submerged lands

generally depicted on the map entitled: 'Revised Boundary Map Golden Gate National Recreation

Areas', numbered NRA-GG-80,003-K and dated October 1978" which established the boundary of the

GGNRA to include the navigable waters ¼ mile offshore in the San Francisco Bay and the Pacific

Ocean.[4]  16 U.S.C. § 460bb-1(a)(1).

Section 3(a) of the Act, entitled "Acquisition Policy," provides in relevant part:

> [w]ithin the boundaries of the recreation area, the Secretary may acquire lands,
> improvements, waters, or interests therein, by donation, purchase, exchange, or transfer.
> Any lands, or interests therein, owned by the State of California or any political
> subdivision thereof, may be acquired only by donation.

---

[3]  The NPS had prohibited commercial fishing in National Park System "fresh waters" in 1970.
*See* 36 C.F.R. § 2.13(j)(3) (1971).  The prohibition promulgated in 36 C.F.R. § 2.3(d)(4) expanded the
prohibition to National Park System salt and marine waters.

[4]  The map referred to in the current version of 16 U.S.C. § 460bb-1 was substituted in 1978 for the
original boundary map referred to in the 1972 enabling legislation.  *See* Pub. L. No. 95-625, Title III, §
307(a), 92 Stat. 3484, 3544 (1978).  Both the original and the revised maps include the area ¼ mile
offshore in San Francisco Bay.  *See* AR 1683-86.

16 U.S.C. § 460bb-2(a). In the same section, Congress provided for the transfer of federal lands within the boundary to the administrative jurisdiction of the Secretary, but allowed some existing uses to continue by agreement between the Secretary and the head of the agency formerly having jurisdiction over the property.[5]  *Id.*

Section 4 of the Act is captioned "Administration," and provides in relevant part:

> The Secretary shall administer the lands, waters and interests therein acquired for the recreation area in accordance with the provisions of the Act of August 25, 1916 (39 Stat. 535; 16 U.S.C. 1, 2-4) [The Organic Act], as amended and supplemented, and the Secretary may utilize such statutory authority available to him for the conservation and management of wildlife and natural resources as he deems appropriate to carry out the purposes of this subchapter.

16 U.S.C. § 460bb-3(a).

## III. FEDERAL OWNERSHIP OF THE SUBMERGED LANDS AND LEGISLATIVE JURISDICTION.

For the reasons explained starting *infra* at 13 (argument Section II), the NPS's authority to regulate navigable waters within the GGNRA does not depend on either federal ownership of the submerged lands within the GGNRA's boundary or on the general lawmaking authority provided by federal legislative jurisdiction. *Cf.* 61 Fed. Reg. at 35134-35 (explaining the difference between legislative jurisdiction and jurisdiction within the meaning of "waters subject to the jurisdiction of the United States"). Nonetheless, the record demonstrates—and at the request of this Court, the California State Land Commission ("CSLC") has confirmed—that the federal government owns the great majority of submerged lands lying beneath the navigable waters within the GGNRA's boundaries and that the

---

[5]  Administration of some federally owned land within the GGNRA transferred to the NPS when the GGNRA was created in 1972 (for example, Ft. Mason and Alcatraz Island). *See* 16 U.S.C. § 460bb-2(b). Administration of other federally owned land within the GGNRA, including some submerged lands, remained with the Army until later transferred to the NPS's administration in a series of transactions, which were completed by 1994. AR 1949-53, 1973, 1864-86, 1911-13, 1925-29, 1944.

federal government had exclusive legislative jurisdiction over the relevant waters and submerged lands when Congress created the GGNRA in 1972.

The Presidio, Ft. Mason, and Alcatraz Island have been owned by the federal government since the Treaty of Guadalupe Hidalgo in 1848. 9 Stat. 922 (1848). Each of these areas was set aside for military purposes and administered by the Army pursuant to Presidential Executive Order. *See Standard Oil Co. v. California*, 291 U.S. 242, 244 (1934) (Presidio); AR 1708 (Alcatraz), AR 1710-1715 (Ft. Mason)). The area comprising Ft. Baker (as well as other lands in Marin County) was purchased by the federal government in 1866 and, with the exception of some land not at issue in this case, has remained in federal ownership since then. AR 1708-1709. Pursuant to the act of March 9, 1897, the State of California transferred title to the United States to the submerged lands 300 yards out from the low-water mark lying adjacent to federal lands held or used for military purposes within California, including the Presidio, Ft. Mason, Alcatraz Island, and Ft. Baker. AR 1693-1715, 1851; *see also* 1897 Cal. Stat. 74-75; ECF 118 ("CSLC Brief") at 8-9.

California ceded exclusive legislative jurisdiction to the United States over Ft. Baker, the Presidio, Ft. Mason, and Alcatraz Island and the adjacent waters and submerged lands in two stages. First, the State's Act of April 16, 1859 provided:

> Jurisdiction is hereby ceded to the United States over any such tract or tracts of land at or near Lime Point Bluff, on the northern side of the Harbor of San Francisco, as may be acquired by the United States for the purposes of military defence [*sic*], and over all the contiguous shores, flats, and waters, within five hundred yards from low-water mark. . .

1859 Cal. Stat. 334. Because the United States purchased the land at and near Lime Point in Marin County (now Ft. Baker) in 1866, AR 1708-1709, as of 1866, the United States had legislative jurisdiction over the uplands and the water and submerged lands five hundred yards from the low-water mark adjacent to Ft. Baker. AR 1693-96, 1948-49.

Second, California's act of March 2, 1897 provided:

> The State of California hereby cedes to the United States of America exclusive jurisdiction over all lands within this State now held, occupied, or reserved by the Government of the United States for military purposes or defense, or which may hereafter be ceded or conveyed to said United States for such purposes. . .

1897 Cal. Stat. 51-52; AR 1707. As a result of this statute, United States obtained exclusive legislative jurisdiction over the uplands at the Presidio, Ft. Mason,[6] and Alcatraz Island, and the waters and submerged lands within 300 yards of the shore. *See* AR 1692-1702, 1812-1813; *see also* 1897 Cal. Stat. 51-52, 74-75; AR 1707.

Thus, at the time the GGNRA was created, the United States owned the submerged lands 300 yards seaward adjacent to the uplands at Ft. Baker, the Presidio, Alcatraz Island, and Ft. Mason, and held exclusive legislative jurisdiction over the submerged lands and waters 300 yards out, and 500 yards out for the Ft. Baker area. AR 1692-1702, 1707-17; CSLC Brief at 6-7 (ownership), 8-9 (jurisdiction). Presently the NPS holds concurrent jurisdiction with the State of California over those submerged lands and waters because in 2009 the United States retroceded to the State of California concurrent legislative jurisdiction over all uplands in Marin County and all submerged lands and waters in San Francisco Bay administered by the NPS as part of the GGNRA that previously had been exclusively federal.[7] *See* AR 1875-76 (map of jurisdiction); CSLC Brief at 15 (endorsing map).

## IV. THE SAN FRANCISCO BAY COMMERCIAL HERRING FISHERY.

The California Department of Fish and Wildlife ("CDFW," formerly the California Department of Fish and Game) allows commercial herring fishing within San Francisco Bay for only a few months each year, from December or January through March. *See* Comp. ¶ 43; AR 600, 597. Commercial

---

[6] Because California had conveyed several lots adjacent to Ft. Mason to private owners before the 1897 Act, the ownership of the submerged lands adjacent to Ft. Mason is a complicated mix of federal and private lands. *See* CSLC Brief at 9-11.

[7] The retrocession was part of an effort initiated by the NPS to provide for more efficient law enforcement and resource protection by the two sovereigns. AR 1877-1883; CSLC Brief at 13-14.

herring fishing does not occur on a consistent schedule or in consistent locations during a season, but is instead dependent on when and where herring spawn. *See* ECF 78 at ¶ ¶ 2, 4; *see also* Comp. ¶ 16 (noting that herring spawn at "varying locations" within the Bay). Spawns do not always, or even regularly, occur within the boundaries of the GGNRA. *See* ECF 99-1 at 2-23 (as of 2012, only 14 of prior 40 years).

CDFW's primary tool for regulating the fishery is a cap on the maximum allowable catch, which it sets to permit an adequate number of fish to spawn and then return to the ocean to maintain the herring stock. *See* Comp. ¶ 16; AR 600 (2011-12 quota). CDFW also regulates fishing nets, sets time and place limitations for fishing, and closes certain areas within the Bay to fishing, including sites within the boundaries of GGNRA. *See* Comp. ¶ 42; 14 Cal. Code Reg. § 163.1 (2020) (regulatory limits on harvest of Pacific Herring); *see also* AR 615 (map of closures including Horseshoe Bay jetties and Ft. Baker fishing pier within the GGNRA); AR 596 (identifying closed areas).

As part of its regulatory efforts, CDFW convenes a meeting each year with "allied" agencies— other local, state, and federal agencies that have some role or authority over activity within San Francisco Bay. AR 27-28, 46-47, 63-65, 185-186, 237-40. Before the season starts, CDFW sends out an information packet each year to commercial herring fisherman that sets out basic information such as the dates of the season, the year's quota, and numerous safety and equipment requirements. *See e.g.*, AR 600-22 (packet for 2011-12 season). These packets also include information requested by CDFW from other "allied" agencies, including the NPS, Coast Guard, Navy, Army Corps of Engineers, and the California Department of Public Health. *Id.* Several of those agencies often close or limit herring fishing in particular areas. *E.g.*, AR 604-05 (Corps of Engineers), AR 606-13 (Coast Guard), 616, 620 (Navy).

NPS staff from the GGNRA began attending the allied agency meetings in the late 1990s. AR 827, 830. Soon after a CDFW biologist questioned the NPS's authority to regulate commercial fishing

on the navigable waters included within the GGNRA's boundaries.  *See* AR 42-45, 830; *see also* AR 59-62, 168-69. The dispute over the NPS's authority continued even after representatives from the two agencies met in November 2000 and CDFW officials concurred that they lacked authority in areas where the federal government had exclusive jurisdiction and ceased enforcement of state regulations in the Fort Baker area. AR 144-45, 831.  In 2003, at the request of CDFW, the NPS provided a notice explaining that 36 C.F.R. § 1.2(a)(3) prohibits commercial fishing within Park waters to be included in the CDFW packet.  AR 1-6, 145, 827, 830-31.  However, the same CDFW biologist refused to include the NPS's notice in CDFW's information packet that year and continued to do so in subsequent years. AR 145, 827, 830-31.

In 2005, the NPS, acting with the assistance of the Coast Guard, stopped a boat illegally fishing herring within the GGRNA.  AR 843-45.  CDFW officers arrived on the scene and assisted the NPS in contacting 12 additional boats fishing inside the GGNRA's boundaries.  AR 843.  This pushed matters to a head and prompted the CDFW and NPS to begin a process to resolve questions regarding their respective jurisdictions.  *See* AR 172.  After a meeting between the two agencies in June of 2006, the dispute was resolved and CDFW acknowledged that the NPS had exclusive jurisdiction in the waters within the GGNRA. AR 1882; *see also* AR 735-45 (2006 NPS permit issued to CDFW for herring research within GGNRA).

In November of 2007, CDFW included its own letter in the packet sent to commercial herring fisherman that recognized exclusive federal jurisdiction over waters within the GGNRA.  AR 66; ECF 98 at 15 (letter).  CDFW's recognition of the NPS's regulatory authority over waters within the Park's boundary prompted complaints from members of the SFHA.  *See* AR 663-64 (Letters from Ernie Koepf, member of SFHA, to the Superintendent of the GGNRA), AR 726-27, 732 (Letter from Nick Sohrakoff, member of SFHA, to Congresswoman Pelosi's office.).  Each year since 2007, with the exception of

2009 when the fishery was closed by the agency, CDFW has included the NPS notice of the NPS regulation that prohibits commercial fishing within Park's boundary. ECF 98 at 17-50; AR 601.

### *Standard of Review*

Plaintiff contends that the NPS lacks authority to prohibit commercial fishing within the GGNRA and thus has acted "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" by doing so. *E.g.,* Comp. ¶ 14 (quoting 5 U.S.C. § 706(2)(C)). Summary judgment is appropriate because this is a question of law which is resolved based on review of the administrative record compiled by the NPS. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) ("Because this is a record review case, we may direct that summary judgment be granted to either party based upon our review of the administrative record."); *accord Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.,* 18 F.3d 1468, 1472 (9th Cir. 1994).

Plaintiff's claim that the NPS has misconstrued its statutory authority are reviewed under the deferential two step framework of *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1075 (9th Cir. 2019); *accord E. Bay Sanctuary Covenant v. Barr,* 385 F. Supp. 3d 922, 938–39 (N.D. Cal.), *order reinstated,* 391 F. Supp. 3d 974 (N.D. Cal. 2019). In *Chevron* step one, the Court applies the traditional tools of statutory construction to determine whether "Congress has directly spoken to the precise question at issue." *Altera Corp.*, 926 F.3d at 1075 (quoting *Chevron*, 467 U.S. at 842). "If the intent of Congress is clear, that is the end of the matter." *Chevron*, 467 U.S. at 842-43.

If the Court concludes that Congress's intent is unclear, *Chevron* step two requires the Court to defer to the agency's interpretation, so long as it "is based on a permissible construction of the statute," or in other words, so long as it is not "arbitrary, capricious, or manifestly contrary to the statute." *Altera Corp.*, 926 F.3d at 1075 (quoting *Chevron*, 467 U.S at 843- 44). Ultimately, an agency's interpretation of its statutory authority "fails if it is 'unmoored from the purposes and

concerns' of the underlying statutory regime.'" *Id.* at 1076 (quoting *Judulang v. Holder*, 565 U.S. 42, 64 (2011)); *accord E. Bay Sanctuary,* 385 F. Supp. 3d at 939.

*Argument*

## I.  PLAINTIFF MUST PROVIDE COMPETENT EVIDENCE TO SUPPORT ITS ALLEGATION OF FINAL AGENCY ACTION.

Under the APA, a Plaintiff may only challenge final agency action.  *San Francisco Herring Assoc. v. Dep't of the Interior,* 946 F.3d 564, 575 (9th Cir. 2019); *see also Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n.*, 457 F.3d 941, 950 (9th Cir. 2006) (final agency action is a requirement for prudential standing).  In this case, the Ninth Circuit, accepting Plaintiff's allegations as true, held that oral instructions by NPS rangers enforcing the regulation banning commercial fishing constituted final agency action.  *San Francisco Herring Ass'n,* at 575, 577 (the "allegations pertaining to Mr. Koepf," *i.e.,* Comp. ¶ 72, "are alone enough to sustain this action.").  Now, because this case has reached the summary judgment stage, Plaintiff is obligated to support those allegations with competent evidence. *See Washington Envtl. Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013) (at summary judgment stage a plaintiff's claim of standing can no longer rest on "mere allegations" but instead must be supported by "affidavit or other evidence"); *see also Leite v. Crane Co.,* 749 F.3d 1117, 1121 (9th Cir. 2014 (a plaintiff is obligated to support its jurisdictional allegations with "competent proof") (citation omitted).

## II.  CONGRESS AUTHORIZED THE NPS TO REGULATE THE NAVIGABLE WATERS WITHIN THE BOUNDARIES OF THE GGNRA.

### A.  Congress Granted the NPS Authority to Regulate Activity Occurring on Waters Throughout the National Park System.

As the Supreme Court recently reminded, the Organic Act granted the Secretary "broad authority. . . to administer both lands and waters within all [national park] system units[.]"  *Sturgeon v. Frost*, 139 S. Ct. 1066, 1076 (2019) (citations omitted).  That authority includes the ability to "issue regulations concerning 'boating and other activities on or relating to water located within System

units.'" *Id.* (quoting 54 U.S.C. § 100751(b)). Outside of Alaska, as directed by Congress, "the Park

Service freely regulates activities on all navigable (and some other) waters 'within [a park's] boundaries

[] without regard to ... ownership' [of "waters (or lands beneath waters)"]."[8] *Id.* (quoting 36 C.F.R. §

1.2(a)(3)); *see also High Point, LLLP v. Nat'l Park Serv.*, 850 F.3d 1185, 1198-1200 (11th Cir. 2017)(

affirming NPS authority over navigable waters (included submerged lands owned by the state) within

the boundary of a park unit); *United States v. Armstrong,* 186 F.3d 1055, 1061-62 (8th Cir. 1999)

(same).

In 1983, the Secretary exercised that broad grant of regulatory authority to prohibit commercial

fishing within all units of the National Park System, "except where specifically authorized by Federal

statutory law." 36 C.F.R. § 2.3(d)(4). Plaintiff does not dispute that § 2.3(d)(4) is a validly enacted

regulation which operates to generally bar commercial fishing throughout the National Park System.

*See* Comp. ¶ 2. Nor does Plaintiff dispute that the waters within the GGNRA at issue are navigable,

which subjects them to the jurisdiction of the United States. *Id.* ¶ 1. Instead, Plaintiff argues that

Section 4 of the GGNRA Act imposes what they call an "acquisition prerequisite," *id.* ¶ 9, a regulatory

limitation which would be unique to the GGNRA and which Plaintiff claims requires the NPS to obtain

a property interest in these navigable waters before the NPS could administer them. *Id.* at ¶¶ 4-5.

This Court has previously held that Section 4 should not be read to limit the NPS's regulatory

authority. *See* ECF 127 at 6-12. The Court should do so again because Plaintiff's argument fails at Step

1 of *Chevron*. Far from evidencing an "unambiguously expressed intent of Congress" to abrogate the

NPS's statutory authority over the navigable waters within the GGNRA, *Chevron*, 467 U.S. at 843 n.9,

Section 4 does not address the sources of the NPS's authority over navigable waters within the GGNRA

---

[8] The issued addressed by the Supreme Court in *Sturgeon* was whether the Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3101 *et seq.* "created an Alaska-specific exception" to the authority available to the NPS. *See* 139 S. Ct. at 1072-73. Although the Supreme Court held that it did, the Court observed that "[i]f Sturgeon lived in any other State, his suit would not have a prayer of success." *Id.* at 1080.

at all.  Further, Plaintiff's strained construction of the first clause of Section 4 is inconsistent with the

remainder of the Section, undermines the purpose of the GGNRA Act, and creates unnecessary conflict

with the 1976 Amendment.  Finally, even if the Court determines Congress has not made its intent clear,

the NPS's interpretation of Section 4 must be affirmed because it furthers the purposes of the GGNRA

Act, as well as the Organic Act, as amended and supplemented, and is entitled to deference.

> **B.** **The GGNRA Act Demonstrates that Congress Intended to Limit the NPS to Regulate the Waters Within the GGRNA.**

Interpretation of the GGNRA Act must start with the language of the statute itself.  *E.g.,*

*Christensen v. Comm'r*, 523 F.3d 957, 960 (9th Cir. 2008) (citation omitted).  Particular words and

phrases of the statute are not read in isolation.  Rather, they must be read in the context of the relevant

statutory provisions as a whole and in turn, those statutory provisions must be interpreted in light of the

statutory scheme as a whole.  *Id.* (citations omitted).  Here both the plain terms and context of the

GGNRA Act demonstrate that Congress did not intend to limit the NPS's authority over the navigable

waters within the boundary of the GGNRA.

> **1.** **Section 4(a) of the GGNRA Act is an administrative provision that grants the NPS broad authority.**

Section 4(a) of the GGNRA Act is a nuts and bolts administrative provision.  It first identifies

"who" is responsible for administering the GGNRA and "how" it is to be administered:

> The Secretary shall administer the lands, waters and interests therein acquired for the recreation area in accordance with the provisions of the Act of August 25, 1916 (16 U.S.C. 1, 2-4), as amended and supplemented

16 U.S.C. § 460bb-3(a).  It then addresses "what" authorities the Secretary is to use in

administering the GGNRA:

> the Secretary may utilize such statutory authority available to him for the conservation and management of wildlife and natural resources as he deems appropriate to carry out the purposes of this subchapter.

*Id.*

Read as a whole, the provision directs the Secretary to manage the area as a national park, *i.e.*, "in accordance with the [Organic Act], as amended and supplemented," and grants the Secretary broad authority to "utilize such statutory authority available to him" to achieve the GGNRA Act's protective purposes. The NPS's administration of the navigable waters within GGNRA (as expressly included in the park by Congress), including enforcing the NPS regulation prohibiting commercial fishing, falls squarely within this clause, as the regulation was adopted under the authority of the Organic Act, as amended and supplemented by the 1976 Amendment, which plainly constitutes "statutory authority available to" the NPS, and it falls well within the broad discretion Section 4 grants the NPS to utilize such authority for "the conservation and management of wildlife and natural resources . . . [it] deems appropriate to carry out the purposes of this subchapter."[9] *Id.*; *see also Bicycle Trails Council,* 82 F.3d at 1454 (decision limiting mountain bike use is based upon a permissible interpretation of the Organic Act).

In contrast, Plaintiff's attempt to leverage the section's reference to "lands, waters and interests therein acquired" into a limitation on the Secretary's authority would require the Court to adopt strained readings of both Section 4(a) itself and the Act as a whole, and to ignore the intent of the Act.

### 2. Section 4(a) of the GGNRA Act does not demonstrate that Congress intended to impose an "acquisition prerequisite" on the NPS's authority.

Plaintiff's reading of Section 4(a) implausibly suggests that Congress intended to use a common place phrase to prescribe a unique limitation on the Secretary's authority. As this Court observed, the phrase "lands, waters and interests therein" is effectively boilerplate that Congress has used in more than fifty statutes. ECF 127 at 10. This routine use of the phrase counsels against reading it to impose significant a limitation on the Secretary's authority that is unique to the GGRNA. Further, had Congress had intended to prohibit the NPS from regulating the navigable waters within the park, a far simpler and

---

[9] Moreover, as is explained below, the "statutory authority available to" the NPS also includes the exercise of federal legislative jurisdiction over the waters and submerged lands at issue in this case.

1  clearer way to do so would have been to not included them within the GGNRA's boundaries in the first
2  place.

3      Plaintiff's purported "acquisition prerequisite" is also at odds with the remainder of Section 4(a).
4  The second clause of the Section specifically addresses the Secretary's authority and evidences no intent
5  to limit that authority.  To the contrary, it allows the Secretary to use the statutory authority "*he deems*
6  *appropriate* to carry out the purposes of [the GGNRA]."  16 U.S.C. § 460bb-3(a) (emphases added).
7  Further, the plain terms of the GGNRA Act demonstrate that when Congress intended to limit the NPS's
8  authority, it did so directly.  *See* 16 U.S.C. § 460bb-1(a)(1) (prohibiting Congress from acquiring certain
9  parcels within the Marin County portion of the GGNRA).  Moreover, "[w]here Congress has intended to
10  permit commercial fishing in a national park, it has done so expressly by statute."  *See Organized*
11  *Fishermen of Fla. v. Hodel*, 775 F.2d 1544, 1548 (11th Cir. 1985) (citing enabling acts where Congress
12  dictated that commercial fishing was permitted)).

13      In contrast to Section 4, which does not address acquisition-based limitations at all, Congress
14  squarely addressed the subject in Section 3 of the GGNRA Act, entitled "Acquisition Policy."  16
15  U.S.C. § 460bb-2.  The detailed nature of Section 3 demonstrates that Congress carefully considered
16  what property interests the Secretary could acquire and the means by which he is authorized to do so.  If
17  Congress had intended to require the NPS to acquire title to the navigable waters within the GGNRA, it
18  can be expected to have expressed that intent in this section, not in Section 4(a).

19      The limitations on acquisition Congress did impose only further illustrate that Congress did not
20  intend the NPS to have to acquire a property interest in the waters of the GGNRA in order to be able to
21  regulate those waters.  Section 3(a) commands that "that '[a]ny *lands, or interests therein*, owned by the
22  State of California or any political subdivision thereof, may be acquired only by donation." 16 U.S.C. §
23  460bb-2(a).  As this Court observed, this command omits any mention of the waters owned by the state.
24  ECF 127 at 10.  The most compelling explanation for that omission is that Congress did not authorize

the NPS to acquire a property interest in the navigable waters within the boundary of the GGNRA because there was no need for Congress to do so—the waters within the boundaries of the GGNRA were already subject to federal authority and thus administration could be delegated to the NPS.

That is so because property interests in navigable water are fundamentally different than those in land. While states possess a right to the use of all the navigable waters within their boundaries, *Tarrant Regional Water Dist. v. Herrmann*, 569 U.S. 614, 630-31 (2013), neither the federal government nor state governments "can acquire anything more than a mere usufructuary right [in the water itself]." *Fed. Power Comm'n v. Niagara Mohawk Power Corp.*, 347 U.S. 239, 247 n.10 (1954). Consequently, and as the Supreme Court has long recognized, even when a state owns the submerged lands beneath navigable waters, the federal government retains its regulatory powers, including "the paramount power of the United States to control such waters for purposes of navigation in interstate and foreign commerce" pursuant to the Commerce Clause. *PPL Montana, LLC v. Montana*, 565 U.S. 576, 591 (2012); *accord Arizona v. California*, 373 U.S. 546, 597 (1963); *Utah Div. of State Lands v. United States*, 482 U.S. 193, 202 (1987) ("even if the land under navigable water passes to the State, the Federal Government may still control, develop, and use the waters for its own purpose"). Accordingly, it is unsurprising that Congress included navigable waters within the GGNRA's boundaries but did not express any intent that the NPS could or should acquire a property interest in the navigable waters, since those waters were already subject to federal authority.

Further, assuming *arguendo* that Plaintiff is correct that California lacks the authority to alienate the property interest it holds in the waters, Comp. ¶ 56, that would leave eminent domain as the only means by which the United States could obtain the property interest SFHA claims is a necessary prerequisite to enforcement of the NPS regulation prohibiting commercial fishing. *See* ECF 127 at 8. But Section 3 does not authorize the Secretary to use eminent domain to acquire property for the GGNRA. 16 U.S.C. § 460bb-2(a). As the Court has already held, the net result of Plaintiff's reading of

the GGNRA Act is that "Congress established the GGNRA, drew its boundaries so as to include the waters in question, provided that DOI could not regulate those waters unless it acquired a property interest in those waters, and then in the same breath took away the only tool the DOI could ever use to acquire title to the waters." ECF 127 at 8. Because Plaintiff's reading of the GGNRA Act effectively renders Congress' inclusion of navigable waters within the GGNRA's boundaries a nullity it should not be adopted. *See id.* at 8-9; *see also In re Cervantes*, 219 F.3d 955, 961 (9th Cir. 2000) (courts should reject interpretations that would render statutory provision a nullity).

In sum, Congress expressly included the navigable waters of San Francisco Bay within ¼ mile of the shoreline within the GGNRA, directed the Secretary to "preserve the recreation area, as far as possible, in its natural setting" and empowered the Secretary to utilize such statutory authority "as he deems appropriate" to do so. Given that Plaintiff's reading of the GGNRA Act would defeat those purposes, it "seems implausible that Congress [intended to] set up a requirement that the DOI would have to acquire property interests in the waters of San Francisco Bay before it could regulate the waters that Congress specifically included within the park's boundaries." ECF 127 at 8.

## C. The NPS's Interpretation of Section 4 (a) of the GGNRA Act Avoids a Conflict Between the GGNRA Act and the 1976 Amendment.

As explained above, through the 1976 Amendment Congress confirmed the NPS's authority to regulate "boating and other activities on or relating to water located within [areas of the National Park System], including water subject to the jurisdiction of the United States," 54 U.S.C. § 100751(b). Adopting Plaintiff's reading of the GGNRA Act would require the Court to carve out an exception to this statute and contravene the long-standing rule that when two acts address the same subject, a court "is to give effect to both if possible." *Morton v. Mancari,* 417 U.S. 535, 551 (1974); *accord Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1018 (1984) (emphasizing that where two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.).

Here the two statutes can be readily reconciled by construing both to authorize regulation of the GGNRA's navigable waters. Doing so is especially warranted here because Section 4(a) of the GGNRA Act expressly directs the NPS to manage the recreation area in accordance with the Organic Act "as amended and supplemented," including the 1976 Amendment. Moreover, while the scope of the NPS's authority over navigable waters may not have been at the forefront of Congress's mind when it enacted the GGNRA Act in 1972,[10] ECF 127 at 8, Congress's mind had unquestionably turned to that subject when it expressly granted the NPS with authority over navigable waters within the National Park System in 1976.

### D. The NPS's Interpretation of Section 4(a) of the GGNRA Act is Entitled to Deference.

If the Court is not convinced that Congress has directly spoken to the question of whether the navigable waters of the GGNRA are subject to regulation by the NPS, the Court should defer to the NPS's construction of the GGNRA Act because it "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. As explained above, the NPS's interpretation comports with the purpose and structure of the GGNRA Act, gives effect to all of its provisions, including the Act's "Acquisition Policy," and prevents an avoidable conflict with the Organic Act. Moreover, far from being "unmoored" from the purposes of the underlying statutory regime, *Altera Corp.*, 926 F.3d at 1076, the NPS's interpretation furthers the Act's purpose of "preserv[ing] the recreation area, as far as possible, in its natural setting, and protect[ing] it from development and uses which would destroy the scenic beauty and natural character of the area." 16 U.S.C. § 460bb.

---

[10] Nonetheless, the legislative history demonstrates Congress created the GGNRA "to preserve and protect, for public use and enjoyment, the nationally significant land *and water areas* which border San Francisco . . . ." H.R. Rep. No. 92-1391, at 2 (1972)(emphasis added); S. Rep. No. 92-1271, at 1 (1972) (same statement) (emphasis added). The House Report addressed H.R. 16444, which became the GGNRA Act. *See* Pub. L. No. 92-589, 86 Stat. 1299 (1972).

**E.      Legislative Jurisdiction Provides Additional Authority.**

As explained above, at the time that Congress created the GGNRA in 1972 the United States had exclusive legislative jurisdiction over submerged lands and waters in San Francisco Bay within the boundaries of the GGNRA and since 2009 has had concurrent jurisdiction with the State of California over the same area. *See* AR 1692-1702, 1707-17. Thus, pursuant to 36 C.F.R. § 2.3(g), commercial fishing is prohibited within the waters of GGNRA within San Francisco Bay for the additional reason that the area is part of the "lands and waters within a park that are under the legislative jurisdiction of the United States." 36 C.F.R. § 2.3(g); *see also United States v. Armstrong,* 186 F.3d 1055, 1057-63 (8th Cir. 1999).

**F.      The United States' Ownership of Submerged Lands Provides Additional Authority.**

As also explained above, and as confirmed by the CSLC, the United States owns the submerged lands 300 yards seaward adjacent to the uplands as Ft. Baker, the Presido, Alcatraz Island, and Ft. Mason, all within the boundaries of the GGNRA. Ownership of the submerged lands provides another basis for the NPS's authority to activity within the waters above those lands, including commercial fishing. *United States v. Brown*, 552 F.2d 817, 822 (8th Cir. 1977) ("we view the congressional power over federal lands to include the authority to regulate activities on non-federal public waters…") (citing *Kleppe v. New Mexico*, 426 U.S. 529, 540-41 (1976)); *accord High Point, LLLP v. Nat'l Park Serv.*, 850 F.3d 1185, 1199 (11th Cir. 2017).

### Conclusion

Through the Organic Act, Congress granted the NPS authority over the navigable waters within all units of the National Park System. Section 4(a) of the GGNRA Act does not demonstrate a clear intention by Congress to limit that authority. To the contrary, Section 4(a) of the GGNRA Act is an administration provision that does not address the permissible bases of the NPS's authority over the GGNRA's navigable waters at all, much less impose the significant, *sui generis* requirement that the

federal government acquire a property interest in those navigable waters. Even if that were not the case, the NPS's interpretation of Section 4(a) comports with the purpose and structure of the GGNRA Act, gives full effect to all of its provisions, prevents an avoidable conflict with the 1976 Amendment, and is entitled to deference. Finally, there can be no doubt that the NPS ultimately has authority to regulate the waters within the boundaries of the GGNRA because federal legislative jurisdiction and ownership of submerged lands provide additional sources of authority.

Respectfully submitted,

PRERAK SHAH
Acting Deputy Assistant Attorney General

*Of counsel:*

__/s/ David W. Gehlert__

GREGORY LIND
U.S. Department of the Interior
Office of the Solicitor

DAVID W. GEHLERT
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
999 18th Street

MICHAEL T. PYLE
Assistant U.S. Attorney

South Terrace, Suite 370.
Denver, CO 80202
Phone: (303) 844-1386
Fax: (303) 844-1350
Email: david.gehlert@usdoj.gov