STUART G. GROSS (CSB No. 251019)
sgross@grosskleinlaw.com
TIMOTHY S. KLINE (CSB No. 319227)
tk@grosskleinlaw.com
**GROSS & KLEIN LLP**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
Telephone: (415) 671-4628
Facsimile: (415) 480-6688

TODD R. GREGORIAN (CSB No. 236096)
tgregorian@fenwick.com
**FENWICK & WEST LLP**
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300
Facsimile: 415.281.1350

Attorneys for Plaintiff
SAN FRANCISCO HERRING ASSOCIATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SAN FRANCISCO HERRING ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT, in his official capacity as Secretary of the Interior; UNITED STATES NATIONAL PARK SERVICE; DAVID VELA, in his official capacity as Deputy Director of the National Park Service; and CICELY MULDOON, in her official capacity as General Superintendent of the Golden Gate National Recreation Area, of the Golden Gate National Recreation Area,<br><br>Defendants. | Case No.: 4:13-cv-01750-JST<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Date: November 18, 2020<br>Time: 2:00 p.m.<br>Judge: Hon. Jon S. Tigar<br>Courtroom: 6, 2nd floor |

FENWICK & WEST LLP
ATTORNEYS AT LAW

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ................................... 1

RELIEF REQUESTED ................................................................................................................ 1

STATEMENT OF ISSUES TO BE DECIDED ......................................................................... 1

INTRODUCTION ...................................................................................................................... 2

FACTUAL BACKGROUND ..................................................................................................... 2

I.   LEGISLATIVE HISTORY OF THE GGNRA ENABLING ACT AND ITS
     RESULTING STRUCTURE ........................................................................................... 2

II.  THE DEFENDANTS DID NOT ACQUIRE A PROPERTY INTEREST IN THE
     DISPUTED WATERS ..................................................................................................... 6

    A.   The San Francisco Bay and its submerged lands became California state
          property on its admission to the Union in 1850. ................................................. 7

    B.   In 1859, California conditionally granted concurrent jurisdiction to the U.S.
          as acquired or required for military defense. ...................................................... 7

    C.   In 1897, California conditionally transferred certain submerged lands to the
          U.S. Military subject to the public trust right to fish in the waters above. ........... 7

    D.   In 1958, title to the submerged lands adjacent to "Yellow Bluff" (aka Fort
          Baker East) transferred to the Sausalito School District. .................................... 8

    E.   In 1978, California quitclaimed to the U.S. title to the Marin Headlands,
          but reserving all adjacent tidelands and submerged lands. ................................. 9

    F.   In 1987, California leased submerged lands to the Park Service, reserving
          the right to exclude persons wishing to fish or navigate the waters above. ........... 9

    G.   In 2009, California again leased submerged lands to the Park Service,
          reserving the same rights the waters above. ...................................................... 10

III. THE SAN FRANCISCO BAY HERRING FISHERY AND DEFENDANTS'
     2011 PROHIBITION OF COMMERCIAL FISHING ................................................. 10

ARGUMENT ............................................................................................................................ 13

I.   LEGAL STANDARD ................................................................................................... 13

II.  DEFENDANTS HAD NO AUTHORITY TO PROHIBIT COMMERCIAL
     HERRING FISHING OUTSIDE OF THE NATIONAL PARK SYSTEM ..................... 14

    A.   The GGNRA Act expressly required Defendants to acquire an interest in
          the waters of the San Francisco Bay to join them to the National Park
          System. ............................................................................................................. 14

FENWICK & WEST LLP
ATTORNEYS AT LAW

B.      The Department never acquired a property interest in the San Francisco Bay that would allow it to prohibit commercial herring fishing there. .................. 16

C.      Defendants' own conduct for over twenty years confirms that the Department and Park Service knew they had no power to interfere with fishing expressly permitted by the State of California. .......................... 17

D.      The legislative jurisdiction of the United States is irrelevant. ............................ 18

III.    THE ORGANIC ACT DID NOT REPEAL THE GGNRA ACT EITHER EXPRESSLY OR BY IMPLICATION. .......................................................... 19

IV.     PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT THAT IT CHALLENGES A FINAL AGENCY ACTION ........................................... 23

CONCLUSION ...................................................................................................... 25

FENWICK & WEST LLP
ATTORNEYS AT LAW

**<u>TABLE OF AUTHORITIES</u>**

**Cases**

*Aden v. Holder*, 589 F. 3d 1040 (9th Cir. 2009) .................................................................. 15, 21

*Ass'n of Civilian Technicians, Silver Barons Chapter v. Fed. Labor Relations Auth.*, 200 F.3d 590 (9th Cir. 2000)......................................................................................................... 20

*Bennett v. Spear*, 520 U.S. 154 (1997)................................................................................. 24

*Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984)....................................................... 13, 14, 15

*Cmty. Hosp. of Monterey Peninsula v. Thompson*, 323 F.3d 782 (9th Cir. 2003)........................ 14

*Colberg, Inc. v. State ex rel. Dep't of Pub. Works*, 67 Cal. 2d 408 (Cal. 1967) .......................... 22

*Cty. of Orange v. Heim*, 30 Cal. App. 3d 694 (1973) ............................................................. 22

*Donaldson v. U.S.*, 653 F.2d 414 (9th Cir. 1981) ................................................................. 20

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014)............................................. 23

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ................................................... 18

*Exxon Corp. v. Hunt*, 475 U.S. 355 (1986)......................................................................... 15

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005)........................................... 23

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) .................................... 13, 15, 17

*Illinois R.R. Co. v. Illinois*, 146 U.S. 387 (1892) .................................................................. 7, 8

*Iowa League of Cities v. EPA*, 711 F.3d 844 (8th Cir. 2013) .................................................. 13

*James v. City of Costa Mesa*, 700 F.3d 394 (9th Cir. 2012) ................................................... 19

*K Mart Corp. v. Cartier*, 486 U.S. 281 (1988)..................................................................... 15

*Knight v. United States Land Asso.*, 142 U.S. 161 (1891) ...................................................... 7

*Ledezma-Galicia v. Holder*, 636 F.3d 1059 (9th Cir. 2010) .................................................... 20

*Lowe v. SEC*, 472 U.S. 181 (1985)..................................................................................... 15

*Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031 (9th Cir. 2008) ..................... 20

*Martin v. Wadell*, 16 Pet. (41 U.S.) 410, 10 L. Ed. 997 (1842)............................................... 7

*Morton v. Mancari*, 417 U.S. 535 (1974) ............................................................................ 19

*NW Environmental Advocates v. EPA*, 537 F.3d 1006 (9th Cir. 2008) .................................... 13

FENWICK & WEST LLP
ATTORNEYS AT LAW

*Pebble Ltd. P'ship v. United States EPA*, 604 F. App'x 623 (9th Cir. 2015) .................................. 24

*People v. California Fish Co.*, 166 Cal. 576 (1913) ............................................................... passim

*Phillips Petroleum Co. v. Miss.*, 484 U.S. 469 (1988) ...................................................................... 8

*Radzanower v. Touche Ross & Co.*, 426 U.S. 148 (1976) ......................................................... 19, 20

*S.F. Herring Ass'n v. U.S. Dept. of Interior*, No. 18-15443, (9th Cir. Dec. 31, 2020) .................... 1

*San Francisco Herring Ass'n v. Dep't of the Interior,* 946 F.3d 564, 582 (9th Cir. 2019)........ 24, 25

*Sturgeon v. Frost*, 136 S. Ct. 1061 (2016) ..................................................................................... 15

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) ............................................................................ 24

*United States v. Armstrong*, 186 F.3d 1055 (8th Cir. 1999) .......................................................... 18

*United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53 (1913) .................................. 22

*United States v. 32.42 Acres of Land*, 683 F.3d 1030 (9th Cir. 2012) .......................................... 22

*Wildearth Guardians v. NPS*, 703 F.3d 1178 (10th Cir. 2013) ..................................................... 20

**Statutes**

16 U.S.C § 121 ................................................................................................................................. 15

16 U.S.C § 122 ................................................................................................................................. 15

16 U.S.C § 124 ................................................................................................................................. 15

16 U.S.C. § 1 .................................................................................................................................... 13

16 U.S.C. § 156 ............................................................................................................................... 15

16 U.S.C. § 1a-2(h) ......................................................................................................................... 13

16 U.S.C. § 1c(b) ............................................................................................................................ 20

16 U.S.C. § 21a ............................................................................................................................... 15

16 U.S.C. § 410bb-1 ........................................................................................................................ 15

16 U.S.C. § 410ff ............................................................................................................................. 22

16 U.S.C. § 410gg ........................................................................................................................... 22

16 U.S.C. § 410hh-2 ........................................................................................................................ 22

16 U.S.C. § 410i .......................................................................................................................... 15, 21

16 U.S.C. § 410o ............................................................................................................................. 21

FENWICK & WEST LLP
ATTORNEYS AT LAW

16 U.S.C. § 459f-3 ................................................................................................ 21

16 U.S.C. § 460bb-1 ............................................................................................... 6

16 U.S.C. § 460bb-1(a)(1) ...................................................................................... 2

16 U.S.C. § 460bb-2(a) .......................................................................... 2, 14, 16, 21

16 U.S.C. § 460bb-3(a) ................................................................................ 3, 14, 16

16 U.S.C. § 460bb-5 .............................................................................................. 16

16 U.S.C. § 460ii ................................................................................................... 21

16 U.S.C. § 460ii-1 ............................................................................................... 21

16 U.S.C. § 668dd ................................................................................................. 22

16 U.S.C. § 698n ................................................................................................... 21

16 U.S.C. § 715i .................................................................................................... 21

16 U.S.C. § 80 ....................................................................................................... 15

16 U.S.C. § 81a ..................................................................................................... 15

16 U.S.C. § 90b ..................................................................................................... 22

16 U.S.C. §§ 460bb ................................................................................................. 2

16 U.S.C. §460bb-1(a)(3) ...................................................................................... 16

1859 Cal. Stat. 334 .................................................................................................. 7

1897 Cal. Stat. 74-75 .............................................................................................. 8

1953 Cal. Stat. (Ch. 521) 1761 ............................................................................. 16

1953 Cal. Stat. 1761 ................................................................................................ 8

5 U.S.C. § 704 ....................................................................................................... 24

5 U.S.C. § 706(2)(C) .......................................................................................... 1, 13

54 U.S.C. § 100101(b)(2) ..................................................................................... 19

54 U.S.C. § 100102 ............................................................................................... 20

54 U.S.C. § 100501 ............................................................................................... 20

54 U.S.C. § 100751 ............................................................................................... 13

54 U.S.C. § 100755 ............................................................................................... 19

FENWICK & WEST LLP
ATTORNEYS AT LAW

**Other Authorities**

Cal. Const, Art. X § 4 ........................................................................................................ 8

Cal. Const., Art. 1, § 25 ..................................................................................................... 8

Charles, H. Koch & Richard Murphy, 4 Admin. L. & Prac. § 12:20 "Finality" (3d ed. 2018) ..... 24

T. Sedgwick, The Interpretation and Construction of Statutory and Constitutional Law 98 (2d ed. 1874) ............................................................................................................... 19

**Rules**

Fed. R. Civ. P. 37(c) ......................................................................................................... 24

**Regulations**

14 C.C.R. § 163 ................................................................................................................ 11

36 C.F.R. § 1.2(a) ............................................................................................................. 13

36 C.F.R. § 1.4 ................................................................................................................. 18

36 C.F.R. § 2.3(d)(4) ........................................................................................................ 13

36 C.F.R. § 2.3(d)(4) ........................................................................................................ 11

36 C.F.R. § 2.3(g) ............................................................................................................. 18

Fenwick & West LLP
Attorneys at Law

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE that November 18 at 2:00 p.m., in Courtroom 6  of the United States District Court for the Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, before the Honorable Jon S. Tigar, plaintiff San Francisco Herring Association ("Plaintiff") will and hereby does move this Court for an order granting summary judgment in favor of Plaintiff on its claim that Defendants' prohibition of commercial fishing in the waters adjacent to the shoreline of the Golden Gate National Recreation Area ("GGNRA") is ultra vires in violation of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(C). This motion is based upon this Notice of Motion, Motion, and Memorandum of Points and Authorities, the concurrently filed Declarations of Dennis Deaver ("Deaver Decl."), Nick Sohrakoff ("Sohrakoff Decl."), Ernie Koepf ("Koepf Decl."), Matt Ryan ("Ryan Decl."), and Dominic Papetti ("Papetti Decl.") the Administrative Record ("AR"), the previously filed Declarations of Stuart G. Gross, Dkt. 36, Mr. Sohrakoff, Dkt. 51, Mr. Ryan, Dkt. 45, Mr. Baumgart, Dkt. 49, Mr. Koepf, Dkt. 47, Mr. Cameron Dkt. 46, Mr. Mellor Dkt. 50, Kevin Marilley, Dkt. 44, and all exhibits attached thereto; all pleadings and records on file in this case; and such oral arguments and evidence allowed at the hearing.

## RELIEF REQUESTED

Plaintiff seeks entry of summary judgment that the Defendants acted without statutory authority when they prohibited commercial herring fishing in certain San Francisco Bay waters that were never acquired for the GGNRA and thus do not comprise part of the National Parks. To the extent the Court decides it must first reach the issue of whether Plaintiff has challenged a "final agency action" under the APA, Plaintiff requests summary judgment that it has.

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether Defendants have the statutory authority to prohibit commercial fishing in the San Francisco Bay waters within the drawn map boundaries of the GGNRA, without first acquiring a property interest in such waters.

2.      Whether Plaintiff has challenged a final agency action under the Ninth Circuit's decision in *S.F. Herring Ass'n v. U.S. Dept. of Interior*, No. 18-15443, (9th Cir. Dec. 31, 2020).

FENWICK & WEST LLP
ATTORNEYS AT LAW

**INTRODUCTION**

This case challenges whether the Defendants have authority to prohibit commercial fishing in waters in San Francisco Bay that abut the GGNRA but that the State of California owns and historically has regulated. Early in the case, the Court entertained cross-motions for summary judgment on this legal issue and ruled for Defendants. *See* Dkt. 127. Two intervening appeals addressed whether the Court has jurisdiction under the APA to hear the case at all. *See* Dkts. 133; 139 at 2, ¶ 1 and p. 5; 155. The Circuit ruled that it does. Plaintiff therefore renews its original motion on the issue of Defendants' statutory authority and requests the Court enter summary judgment in its favor.

**FACTUAL BACKGROUND**

**I.  LEGISLATIVE HISTORY OF THE GGNRA ENABLING ACT AND ITS RESULTING STRUCTURE**

In 1972, Congress established the GGNRA as part of the National Park system by passing the GGNRA Enabling Act. Pub. L. No. 92-589, 86 Stat. 1299 (1972), codified at 16 U.S.C. §§ 460bb *et seq*. The GGNRA Act sets the borders of the recreation area as "the lands, waters, and submerged lands generally depicted on" two identified boundary maps. 16 U.S.C. § 460bb-1(a)(1); *see also* AR 1686 (Boundary Map); AR14, 18, 1683-86a.

Section 3 of the GGNRA Act, entitled "Acquisition policy," states:

> **Within the boundaries** of the recreation area, the Secretary [of the Interior] **may acquire lands, improvements, waters, or interests therein**, by donation, purchase, exchange or transfer. Any lands, or interests therein, owned by the State of California or any political subdivision thereof, may be acquired only by donation. . . .
> Except as hereinafter provided, Federal property within the boundaries of the recreation area is hereby transferred without consideration to the administrative jurisdiction of the Secretary for the purposes of this subchapter, subject to the continuation of such existing uses as may be agreed upon between the Secretary and the head of the agency formerly having jurisdiction over the property.

16 U.S.C. § 460bb-2(a) (emphases added). Section 4, entitled "Administration," states:

> The Secretary **shall administer the lands, waters and interests therein acquired for the recreation area** in accordance with the provisions of sections 1, 2, 3, and 4 of this title, as amended and supplemented, and the Secretary may utilize such statutory authority available to him for the conservation and management of

FENWICK & WEST LLP
ATTORNEYS AT LAW

wildlife and natural resources as he deems appropriate to carry out the purposes of this subchapter.

16 U.S.C. § 460bb-3(a) (emphasis added).

The bill that became the GGNRA Act was a compromise of *twelve* competing proposals introduced in Congress.[1] These proposals differed in at least three ways relevant to the issue before the Court: (1) whether they would have effected a direct transfer of property in the recreation area to the Department of the Interior (the "Department"); (2) whether, and to what extent, they would have granted the Department the power to effect such transfers itself; and (3) what limits they would have placed on the Department's administrative jurisdiction. For example:

**92 H.R. 9498 & 92 S. 2342**. This proposal would have broadly defined boundaries for the recreation area, provided for automatic transfers of ownership to the Department, and given the Department broad authority to acquire other lands and waters including through eminent domain. The "Composition" part of the bill began:

> The recreation area shall comprise the following land areas ***together with adjacent submerged lands and adjacent water areas not to exceed one-quarter of a mile offshore*** as generally depicted on the map entitled "A Proposed Golden Gate National Recreation Area Boundary Map" . . . :

*Id.*, § 2(a) (emphasis added). It then provided for automatic transfer of various "Federal lands" to the Department "without consideration, for inclusion in the recreation area," *Id.*, § 2(b), including "all right, title, and interest of the United States in and to any land beneath any navigable waters of the United States within or contiguous to such real property." *Id.*, § 7.

The following part, titled "Acquisition," provided that, except for the real property owned by the State of California and certain small parcels:

> [t]here is hereby vested in the United States all right, title, and interest in, and the right to immediate possession of, all real property within the boundaries of the recreation area.

---

[1] These bills were: 92 H.R. 866 introduced on Jan. 22, 1971 (Dkt. 36-1); 92 H.R. 3238 introduced on Feb. 2, 1971 (Dkt. 36-2); 92 H.R. 4350 introduced on Feb. 17, 1971 (Dkt. 36-3); 92 H.R. 9498 introduced on June 29, 1971 (Dkt. 36-4); 92 S. 2342 (Dkt. 36-5); 92 H.R. 10220 introduced on July 29, 1971 (Dkt. 38)); 92 H.R. 12994 introduced on Feb. 7, 1972 (Dkt. 39); 92 H.R. 13018, introduced on February 8, 1972 (Dkt. 39-1); 92 H.R. 13060, introduced on February 8, 1972 (Dkt. 39-2); 92 S. 3174 introduced on February 15, 1972 (Dkt. 39-3); and 92 H.R. 14946 introduced on May 11, 1972 (Dkt. 39-4).

FENWICK & WEST LLP
ATTORNEYS AT LAW

*Id.*, § 8(b)(1). Another section would have given the Department the authority "[w]ithin the boundaries of the reaction area, … [to] acquire land, water, interests therein by donation, purchase with donated or appropriated funds, exchange, transfer, *or by such other means as he deems in the public interest.*" *Id.*, § 8(a) (emphasis added). The bill would have also granted to the Department the jurisdiction to administer "*the recreation area,*" without any distinction as to whether lands or waters had been first "acquired" by the Department. *Id.*, § 9(a) (emphasis added).

**92 H.R. 10220.** This bill defined the boundaries of the recreation area more narrowly and had fewer automatic property transfers. *See* Dkt. 38 (92 H.R. 10220, 7/29/71), § 2. Under it, the recreation area would not include submerged lands or waters on enactment, nor would it effect any transfer of the same. *Id.* It would have limited the Department to acquiring "only by donation ... property or interest therein owned by the State of California or any political subdivision thereof." *Id.*, § 3(A). And it would have limited the Department's administrative jurisdiction not to the map boundaries but to "*the lands, waters, and interests therein acquired for the recreation area.*" *Id.*, § 4(A) (emphasis added).

**92 H.R. 13060, 92 H.R. 13018, & 92 S. 3174.** The Nixon Administration's proposal was similar. *See* Dkt. 39-2 (92 H.R. 13060, 2/8/72); Dkt. 39-1 (92 H.R. 13018, 2/8/72); Dkt. 39-3 (92 S. 3174, 2/5/72).[2] This proposal also omitted any permission for the Department to use eminent domain, omitted any automatic transfer of rights to lands below navigable waters to the Department, and limited the Department to accept California state "property" only by donation. Dkt. 39-3 (92 H.R. 13018, as introduced on 2/8/72), § 2(a). The Administration's proposal also limited the Department's administrative jurisdiction to the "lands, waters, and interests therein" that the Department had acquired for the recreation area. *Id.*, (92 H.R. 13018, 2/8/72), § 3.

The Secretary of the Interior made clear that not interfering with state property was an intentional part of the proposal:

> [T]hat the State-owned lands within the recreation area be managed by the State of California . . . and that there be no transfer of State property to the administrative jurisdiction of the Secretary at this time.

---

[2] For simplicity, citations herein are to 92 H.R. 13018; however, 92 H.R. 13060 and 92 S. 3174 contain analogous (if not identical) provisions.

FENWICK & WEST LLP
ATTORNEYS AT LAW

Dkt. 38-5 (08/09/71, 5/11-5/12/72 House ("H.") NPS Subcomm. Hearings Rprt. (H.R. 9498 and H.R. 10220) at 245 (emphasis added); *see also* Dkt. 40-1 (9/22/72, 9/27/72 S. NPS Subcomm. Hearings Rprt. (S. 2342, S. 3174, H.R. 16444) at 93 (same); Dkt. 40-3 (10/5/72 S. Inter. Comm. Rprt. (S. 3174) at 3, 10-11 (same). The referenced "State-owned lands" included 3,840 acres of "submerged land." Dkt. 38-5 (08/09/71, 5/11-5/12/72 H. NPS Subcomm. Hearings Rprt. (H.R. 9498 and H.R. 10220) at 245; *see also* Dkt. 40-3 (10/5/72 S. Inter. Comm. Rprt. (S. 3174) at 10 (same). And all this was "the result of careful consideration within the Department, and of consultation with other interested Federal agencies and the State of California," *see* Dkt. 40-1 (9/22/72, 9/27/72 S. NPS Subcomm. Hearings Rprt. (S. 2342, S. 3174, H.R. 16444) at 94, over the objections of others, like the National Parks Conservation Association, for example, who objected that "the legislation should provide 'legislative taking'…" (Dkt. 38-7, 08/09/71, 5/11-5/12/72 H. NPS Subcomm. Hearings Rprt. (H.R. 9498 and H.R. 10220) at 351.

**92 H.R. 16444.** Ultimately, these competing proposals were resolved by the House's National Park Service Subcommittee. Dkt. 39-5 (9/12/72 H. Inter. Comm. Rprt. (92 H.R. 16444); *see also id.*, Dkt. 40-4 Congressional Record ("C.R.") – House ("H."). (Oct. 11, 1972)at 35058; *see id.* at 35060. The bill enacted into law: (1) did *not* transfer to the Department title to any property of the State of California within the map boundaries of the recreation area; (2) restricted the Department from acquiring such property (as to "lands") except by donation; and (3) limited the Department's administrative jurisdiction to *only* the "lands, waters, and interests therein" that it had acquired within the recreation area's boundaries. The enacted law also jettisoned the proposal that would have empowered the Department to acquire other property within the map boundaries through "means as [it] deems in the public interest." Dkt. 36-4 (92 H.R. 9498), § 8(a). And it identified 3,840 acres of "submerged land" to which California held title that would fall within the recreation area's boundaries but remain subject to the State's jurisdiction. Dkt. 38-5 (08/09/71, 5/11-5/12/72 H. NPS Subcomm. Hearings Rprt. (H.R. 9498 and H.R. 10220) at 245.While some who had sponsored competing measures "would have personally preferred a stronger bill," Dkt. 41-5 (C.R. – Senate ("S.") (Oct. 18, 1972) at 37287 (floor statement of Senator John Tunney (D)), ultimately this was the law Congress chose.

FENWICK & WEST LLP
ATTORNEYS AT LAW

Accordingly, the boundaries of the recreation area merely define the geographic area in which Congress authorized the Department to acquire lands, waters, and interests therein; the Department did not acquire lands or waters simply by virtue of the fact they fell within the map boundary.[3] 16 U.S.C. § 460bb-3. And as the Secretary of the Interior acknowledged would be the case, these limitations meant that the GGNRA Act left the Department with no power to administer certain property within the boundaries of the park. *See also* Dkt. 40-4 (C.R. – H. (Oct. 11, 1972)) at 35058 (Rep. Aspinall: "lands owned by the State or its political subdivisions would come under the jurisdiction of the Secretary of the Interior if—and only if—they are donated"; *see also id.* at 35061 (similar); Dkt. 39-5 (9/12/72 H. Inter. Comm. Rprt. to accompany 92 H.R. 16444), at 11-12 (similar);. Dkt. 40-3 (10/5/72 S. Inter. Comm. Rprt. (S. 3174) at 6-7 (similar); Dkt. 40-1 (9/22/72, 9/27/72 S. NPS Subcomm. Hearings Rprt. (S. 2342, S. 3174, H.R. 16444) at 83 (noting that the Administration "fe[lt] pretty strongly about" preserving local ownership and control); Dkt. 39-5 (9/12/72 H. Inter. Comm. Rprt. to accompany 92 H.R. 16444), at 17-18 (describing "Combining Federal, State, and private property within the boundaries of a single management unit").

## II.  THE DEFENDANTS DID NOT ACQUIRE A PROPERTY INTEREST IN THE DISPUTED WATERS

The disputed waters and the lands beneath them were not the property of the United States on the enactment of the GGNRA Act and that the Department never acquired an interest in them thereafter that would permit them to ban fishing there. The following map depicts the waters:



---

[3] The distinction is reinforced in the limitations that Section 2, titled "Composition and Boundaries," places on the Department's authority to acquire certain properties within the recreation area's boundaries. *See* 16 U.S.C. § 460bb-1.

Fenwick & West LLP
Attorneys at Law

AR14

**A.     The San Francisco Bay and its submerged lands became California state property on its admission to the Union in 1850.**

The disputed waters are within the San Francisco Bay, defined by "the universal rule governing the measurement of waters" as the waters east of the headlands where the Bay meets the Pacific Ocean. *Knight v. United States Land Asso.*, 142 U.S. 161, 183 (1891) (J. Field concurring). Upon California's admission to the union in 1850, these waters and the lands below them became the property of the State as trustee for the public:

> It is a well-established proposition that the lands lying between the lines of ordinary high and low tide, as well as that within a bay or harbor and permanently covered by its waters, belong to the state in its sovereign character and are held in trust for the public purposes of navigation and fishery. A public easement and servitude exists over these lands for those purposes.

*People v. California Fish Co.*, 166 Cal. 576, 584 (1913); *see also id.*, at 596 (quoting *Martin v. Wadell*, 16 Pet. (41 U.S.) 410, 10 L. Ed. 997 (1842).[4]

**B.     In 1859, California conditionally granted concurrent jurisdiction to the U.S. as acquired or required for military defense.**

On April 16, 1859, the State of California conditionally granted the U.S. jurisdiction of certain lands and waters in the San Francisco Bay, "as may be ac[re]quired [sic] by the United States for the purposes of military defence [sic]." 1859 Cal. Stat. 334. Not only was this grant of jurisdiction conditional on the U.S. needing it for military defense. Contrary to Defendants' assertion, the jurisdiction granted was <u>not</u> exclusive, it was concurrent: "this State shall retain a current jurisdiction with the United States over the premises in question," as long as the assertion by the State of its jurisdiction did not "affect the real or personal property of the United State." *Id.*; *Cf.* Dkt. 182 at 8. Furthermore, any grant of jurisdiction to the U.S. did not include the right to prohibit fishing or navigating in the affected waters. *See Cal. Fish*, 166 Cal. at 587-589, 598.

**C.     In 1897, California conditionally transferred certain submerged lands to the**

---

[4] Since at least 1891, it has furthermore been "the settled rule of law" that States admitted to the union after the revolution "have the same rights, sovereignty and jurisdiction in that behalf as the original States possess within their respective borders." *Knight*, 142 U.S. at 183 (collecting cases); *accord Illinois R.R. Co. v. Illinois*, 146 U.S. 387, 434 (1892). Thus, when the U.S. acquired the territory that later became California, the title it received from Mexico to the navigable waters and submerged lands within the territory was held by the United States only "in trust for the future States that might be erected out of such territory." *Knight*, 142 U.S. at 183.

FENWICK & WEST LLP
ATTORNEYS AT LAW

**U.S. Military subject to the public trust right to fish in the waters above.**

On March 9, 1897, the State of California conditionally transferred to the U.S. title to certain submerged lands in the San Francisco Bay. 1897 Cal. Stat. 74-75 ("1897 Act"). The statute conditionally granted to the U.S. title to:

> parcels of land extending from high-water mark to three hundred yards beyond low water mark lying adjacent and contiguous to such lands of the United States in this State as lie upon tidal waters and are held, occupied, or reserved for military purposes or defense, lying adjacent and contiguous to any island, the title to which is in the United States, or which island is reserved by the United States for any military or naval purposes or for defense.

*Id.* This grant lasted "only so long as the United States shall continue to hold and own the adjacent lands now belonging to the United States," (*id.*), and under state law reserved the public's right to fish and navigate the waters above the submerged lands. *See Illinois R.R. Co. v. Illinois*, 146 U.S. 387, 458 (1892) ("In every such grant there was an implied reservation of [this] public right…"); *Phillips Petroleum Co. v. Miss.*, 484 U.S. 469, 475 (1988) (public trust rights are defined by state law). Specifically, Article 1, § 25 of the California Constitution states:

> The people shall have the right to fish upon and from the public lands of the State and in the waters thereof, excepting upon lands set aside for fish hatcheries, and ***no land owned by the State shall ever be sold or transferred without reserving in the people the absolute right to fish thereupon***;

Cal. Const., Art. 1, § 25 (emphasis added); *see also* Cal. Const, Art. X § 4; *Cal. Fish*, 166 Cal. 587-589, 598.[5] That reservation notwithstanding, on September 9, 1953, California repealed the 1897 Act, and title to the submerged lands reverted to the State. *See* 1953 Cal. Stat. 1761.

**D.   In 1958, title to the submerged lands adjacent to "Yellow Bluff" (aka Fort Baker East) transferred to the Sausalito School District.**

On November 9, 1958, title to the submerged lands adjacent to Yellow Bluff (one portion of the disputed area) were transferred to Sausalito School District. The Marin County Recorder shows that the record owner of the lands (APN of 059-280-02) is the State of California. Dkt. 42-2 (Record deed of Book 1083, Page 567). The recorded deed shows a resolution by the Sausalito Board of Supervisors granting title to the Sausalito School District. *Id.*

---

[5] A narrow exception to this rule, not applicable to the 1897 Act, exists when the State, in the course of improving navigation overall, impedes access to certain waters or submerged lands. *See Cal. Fish, 166* Cal. at 597.

FENWICK & WEST LLP
ATTORNEYS AT LAW

**E.     In 1978, California quitclaimed to the U.S. title to the Marin Headlands, but reserving all adjacent tidelands and submerged lands.**

On September 29, 1978, the State of California conditionally quitclaimed to the U.S. of all of the State's "rights, title and interest in and of [certain] property, in the State of California, City and County of Marin," on the condition that the lands be used for the GGNRA ("1978 Quitclaim"). AR2021; *see also* Dkt. 42-5. This deed explicitly limits the title to lands above the high-water mark and reserves for California the tidelands and submerged lands below that mark:

> [T]he State shall retain all jurisdiction over such tidelands and submerged lands, and the State Department or Fish and Game shall continue to enforce all laws of the State relating to the protection of fish and game.

AR2021; *Id,* p. 1. The parcels described include the upland portions of Yellow Bluff, and thus this limitation of the grant to upland areas above the high-water mark preserved the title of the Sausalito School District to the submerged lands adjacent to these upland areas. *See id.*, pp. 3-11 (Legal Description); *see also* Dkt. 42-3 (related parcel map).

**F.     In 1987, California leased submerged lands to the Park Service, reserving the right to exclude persons wishing to fish or navigate the waters above.**

On September 16, 1987, California granted a conditional 49-year lease to the Park Service ("1987 Lease") of the submerged land beneath the waters disputed here:

> A strip of submerged land 1000 feet wide in the Pacific Ocean and San Francisco Bay, Marin County, San Mateo County, and the City and County of San Francisco, said strip, lying between the ordinary high water mark of said Pacific Ocean and San Francisco Bay and an envelope line lying 1000 feet waterward of said ordinary high water mark and adjacent to or within the Golden Gate National Recreation Area as shown on the National Park Service Drawing 641-80046 received April 6, 1987, and filed with the State Lands Commission.

AR2071; *see* AR2062-71 (entire lease). By operation of law, this lease excluded California public trust rights, including the right to fish the waters above (*see Cal. Fish Co.*, 166 Cal. 587-588), but Section 3 of the lease made this reservation express:

> Fishing. including the taking of mollusk or crustacean shall be permitted in accordance with regulations imposed by the State Department of Fish and Game. Any restrictions. or enclosures of fishing shall be invoked only after consultation with and concurrence by the appropriate State agencies.

AR2064; *see also id.* (§5 requiring maintenance of public access); AR2065 (§6(a)(1) reserving "all natural resources in or on" the leased lands); AR2066 (§8(e) limiting the Park Service's right to

FENWICK & WEST LLP
ATTORNEYS AT LAW

exclude others).

### G.    In 2009, California again leased submerged lands to the Park Service, reserving the same rights the waters above.

On June 1, 2009, California canceled the 1987 Lease and replaced it with a new 49-year lease to a wider (1320 feet in total) strip of submerged lands under the waters ("2009 Lease"). AR2048–60.[6] Like the 1987 lease, public trust rights were excluded both by operation of law and by the lease terms. Section 2, Paragraph 3 of the lease states:

> Land Use or Purpose: Notwithstanding Section 4, Paragraph 4 of this Lease, Lessee agrees to manage the Lease Premises for the following purposes: (a) Conservation of the Lease Premises in their natural state and ***protection from development and uses inimical to such goals and the Public Trust as described in the case of <u>People v. California Fish Company (1913) 166 Cal. 576</u> and cases following it.***

AR2050 (emphasis added). Section 2, Paragraph 4 states:

> Hunting and Fishing: . . . ***<u>Fishing as guaranteed by California Constitution, Article 1, Section 25, shall be permitted on the Lease Premises</u>*** provided that all such fishing shall be conducted in accordance with the rules and regulations of the California Department of Fish and Game.

AR2050 (emphasis added); *see also* AR2050-54, §§ 2(4), §4(g), 5(a)(1), 5(a)(3), 5(b) (describing similar exclusions as 1987 Lease). The 2009 Lease also introduces the Section 2 exclusions with a notice in bold text, and provides that they control in the event of any conflict with the provisions setting forth the Park Service's affirmative rights. AR2049, AR2050.

## III.    THE SAN FRANCISCO BAY HERRING FISHERY AND DEFENDANTS' 2011 PROHIBITION OF COMMERCIAL FISHING

The San Francisco Bay constitutes the major portion of the California commercial Pacific herring fishery, one of the most highly regulated and successful commercial fisheries and stock management programs in the country. *See* Dkt. 168, ¶ 42; Dkt. 45, ¶3. The commercial San Francisco Bay roe fishery began around 1965 (AR2161), but immigrant Italian fishers fished for whole herring there beginning in 1850, growing to a fleet of 35-40 boats by 1888. Dkt. 42-6 at 454. As a roe fishery, fishing is concentrated in herring spawning areas, making the waters at issue in this case critically important. Dkt. 42-7 at 37; *see also id.* at 45, 51-60 (showing consistent herring spawning in the waters of Marin portion of the GGNRA during the years 1974-80); Dkt. 48, ¶ 5

---

[6] The pages of the 2009 lease are presented in the record out of order.

FENWICK & WEST LLP
ATTORNEYS AT LAW

(identifying the waters in dispute as "consistently among the most important fishing grounds for commercial herring fishers").

California has regulated and managed the herring roe fishery since 1973. *See* Dkt. 42-8 at 3-2; 14 C.C.R. §§ 163, *et seq*; AR2236-2241; Dkt. 42-7 at 14-16. California and fishery stakeholders employ measures to ensure safe and environmentally sensitive commercial fishing. The fishery is a limited-entry quota fishery: only persons who hold one of a limited number of special permits can fish, and the total amount of fish harvested during a season is capped at a set weight. Since 1991, the weight quota and number of allowed permits follows an environmental review under the California Environmental Quality Act. *See* Dkt. 43-1 (cover pages and TOCs of Final and Supplemental CEQA Environmental Documents from 1991-2002, 2004-2011, and 2013). Most fishing occurs only on the days surrounding the few times per season that herring enter the bay to spawn in successive waves. *See, e.g.,* AR 328-330 (describing the correlation between spawning and landings during the 96/97 season). Fishing is stopped for the season when the quota is met. This helps focus the catch on older fish, a critical management goal. *See* AR 2240, 2245, Dkt. 42-8 at 2-10 to 2-11. The CEQA process also includes a decision each season, based on health of the herring stock, as to whether to allow a commercial herring fishery at all. *See id.* at 2-13.

The decision to "enforce" the commercial fishing regulation in the disputed waters represented a marked change in agency position. Defendants first prohibited commercial fishing in the National Park system in 1983. 36 C.F.R. § 2.3(d)(4). Both before and after 1983, commercial herring fishing regularly occurred in the disputed waters. *See* Dkt. 44, ¶¶ 2-4; Dkt. 45, ¶¶ 2-4; Dkt. 46, ¶¶ 2-4; Dkt. 48, ¶ 5; Dkt. 49, ¶¶ 2-4; Dkt. 50, ¶¶ 2-5; Dkt. 51, ¶¶ 2-4; Dkt. 52, ¶¶ 2-4. Defendants knew this, but for almost *twenty years*, Defendants never asserted that the regulation prohibited fishing in the disputed waters. This was not inadvertence; Defendants considered the issue in 1999, for example, and concluded that they "[did]n't have a strong defensible position" to do so. AR142. Defendants did not publicly adopt a contrary position until 2003, *see* Dkt. 98, ¶ 5, AR1-2, and even then, only did so tentatively. Between 2003 and 2011, CDFW objected to the Defendants' threatened enforcement as infringing California's jurisdiction over the waters. *See* AR61, AR166-

FENWICK & WEST LLP
ATTORNEYS AT LAW

172, AR248-249, AR827.[7] And Defendants acquiesced and did not impede herring fishing during those years, consistent with its original position. Dkt. Nos. 44-52.

The Park Service did not apply its changed interpretation of its statutory authority until November 2011, when it first prevented fishers from harvesting herring. Dkt. 44, Dkt. 45, Dkt. 49, Dkt. 50, Dkt. 51, Dkt. 52. Defendants also did not study the herring fishery before this change, and thus lacked information about the environmental impact of either the fishery or their own enforcement activity. Dkt. 36, ¶ 33. In November 2011, Defendants provided a letter to commercial herring fishers as part of their 2012 herring season CDFW regulatory packet. Deaver Decl. ¶ 3; Sohrakoff Decl. ¶ 3; Koepf Decl. ¶ 3; Ryan Decl. ¶ 3; Papetti Decl. ¶ 3. This letter not only asserted Defendants' jurisdiction but attempted to justify it based on faulty and irrational premises. The letter first asserted that commercial fishing was prohibited "within the Recreation Area, *which includes the waters within the boundary*." AR 13. It went on to claim that that there existed "federal concurrent jurisdictional status" over various "tideland and submerged tracts," described in an "Attachment A." *Id.* The attachment claimed that this federal ownership and "Legal Authority" was based on: (1) the 1897 Act (which had of course been repealed and invalid for more than 50 years); (2) the 1987 Lease (which had just recently been cancelled in 2009), and (3) the 1859 Act (which conditioned its grant of *concurrent* jurisdiction on the U.S.'s use of the specified lands and waters for the purpose of military defense).[8] (All of these transfers were also, of course, subject to California's reserved public trust rights that left regulation of the fishery in State control, and thus were not a basis on which the Park Service could exclude fishers from the waters.) The letter made no mention of the GGNRA Act. Following this and similar notices, the Park Service and CDFW rangers working in coordination with it began ordering fishers to cease fishing in the waters and vacate them, in the acts complained of in this case. Deaver Decl. ¶ 5; Sohrakoff Decl. ¶ 5; Koepf

---

[7] In the mid-1990s, Defendants threatened to prohibit herring fishers from fishing elsewhere in the Bay (in the vicinity of the finger piers of Fort Mason, Gas House Cove, and Alcatraz), but relented after determining that doing so "had the potential of opening up a can of worms." AR 134. There is also record, in 2000, of Defendants having communicated to CDFW, on an inter-agency level, Defendants' belief that they had exclusive administrative jurisdiction in the waters in dispute, *see* AR 144; however, there is no evidence in the record that Defendants did anything further until they issued the referenced notices in 2003.

[8] Oddly, the Attachment A that was attached to the 2011 does not appear in the administrative record. However, the letter with attachment does appear elsewhere in the record. AR 119-120.

FENWICK & WEST LLP
ATTORNEYS AT LAW

1   Decl. ¶ 5; Ryan Decl. ¶ 5; Papetti Decl. ¶ 5

2   Defendants claim authority for their actions in this case under the NPS Organic Act.

3   Originally enacted in 1916 the Organic Act states that the Park Service shall:

> [P]romote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified . . . by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1 (repealed 2014), recodified at 54 U.S.C. § 100101. In a 1976 amendment, Congress authorized the Department to "[p]romulgate and enforce regulation concerning boating and other activities on or relating to waters located within areas of the National Park System, including waters subject to the jurisdiction of the United States." Pub L. No. 94-458, October 7, 1976, 90 Stat 1939, § 1, codified at 16 U.S.C. § 1a-2(h) (repealed 2014), recodified with variations at 54 U.S.C. § 100751. In 1983, the Park Service issued a regulation prohibiting commercial fishing within the National Park system, except where authorized by federal law. 36 C.F.R. §§ 1.2(a) & 2.3(d)(4).

## ARGUMENT

## I.   LEGAL STANDARD

Pursuant to 5 U.S.C. § 706(2)(C), a court shall hold unlawful and set aside agency action found to be in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. *NW Environmental Advocates v. EPA*, 537 F.3d 1006, 1014 (9th Cir. 2008); *see also Iowa League of Cities v. EPA*, 711 F.3d 844, 876 (8th Cir. 2013) (§ 706(2)(C) "authorizes courts to strike down as ultra vires rules promulgated without valid statutory authority"). To determine whether an agency has exceeded its statutory authority in violation of § 706(2)(C), a court must engage in the two-step inquiry required by *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984).

> Under *Chevron*, a reviewing court must first ask "whether Congress has directly spoken to the precise question at issue." If Congress has done so, the inquiry is at an end; the court "must give effect to the unambiguously expressed intent of Congress."

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (quoting *Chevron*, 467 U.S.

FENWICK & WEST LLP
ATTORNEYS AT LAW

at 842-843). Under the first step, courts should employ "traditional rules of statutory construction" to determine whether Congress has expressed its intent unambiguously on the question before the court. *Chevron*, 467 U.S. at 843 n.9. These rules include without limitation application of traditional cannons of statutory interpretation, as well as examination of legislative history, and the conduct of the administrative agency post enactment of the law in question. *See Brown & Williamson,* 529 U.S. 120. No deference is owed to an agency when "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842; *Cmty. Hosp. of Monterey Peninsula v. Thompson*, 323 F.3d 782, 789 (9th Cir. 2003).

## II.   DEFENDANTS HAD NO AUTHORITY TO PROHIBIT COMMERCIAL HERRING FISHING OUTSIDE OF THE NATIONAL PARK SYSTEM

Congress spoke directly regarding Defendants' jurisdiction over the waters at issue: it would only have jurisdiction over if it acquired an appropriate property interest in those waters. There is no evidence that ever occurred. Rather, the evidence shows exactly the opposite: the Department never gained title to the water in question or the lands beneath them; the best that it has acquired is a leasehold interest in submerged lands that specifically excludes the right to interfere with the lawful fishing occurring there. The Park Service's conduct for decades, until 2011, reflects that the agency itself interpreted the statute the same way.

### A.   The GGNRA Act expressly required Defendants to acquire an interest in the waters of the San Francisco Bay to join them to the National Park System.

In the GGNRA Act, Congress spoke directly to the issue presented by this case.

- Section 3 provides that the Department *may acquire* lands, improvements, *waters*, or interests therein within the boundaries that Congress drew for the recreation area; and

- Section 4 provides that the Department *shall administer* the lands, *waters* and interests *therein acquired* for the recreation area.

*See* 16 U.S.C. § 460bb-2(a) & 3(a). The Act on its face limits the Department's jurisdiction to property within the recreation area that it has *acquired*. This language was not enacted by Congress without considering its meaning. Congress rejected alternative language that would have both: (1) transferred title to property within the GGNRA boundaries to the federal government; and (2) given the Department administrative jurisdiction coextensive with the recreation area's map boundaries.

Dkt. 36-4 (92 H.R. 9498), §§ 8(b)(1) & 9(a). Congress chose the alternative it did understanding that the result, without further action by the Department, would be State and local control of certain inholdings within the park boundaries. The statute thus contains no ambiguity on this point, and it should be enforced according to its plain meaning, without deference under *Chevron* to the agency's new interpretation. Several other reasons support this conclusion.

The acquisition requirement in the GGNRA Act is not an exceptional or *sui generis* requirement but is, in fact, a common provision that Congress has used on other occasions. *See Sturgeon v. Frost*, 136 S. Ct. 1061, 1063 (2016). Congress has used several different means to create National Parks. These include designating all property within map boundaries,[9] allowing Department to acquire property in a general area and set its own map boundaries,[10] and, as here, setting map boundaries but requiring Department to acquire property within them to create the park.[11] Congress has also previously required the Department to acquire waters to include them in a park. *See* 16 U.S.C. § 410i. The GGNRA Act is therefore not unusual, and its routine nature counsels in favor of enforcing its terms and not disregarding them.

Moreover, courts construe a statute to give effect to all its provisions. *Aden v. Holder*, 589 F. 3d 1040, 1044 (9th Cir. 2009) (citing *Exxon Corp. v. Hunt*, 475 U.S. 355, 369 (1986)); *see also Lowe v. SEC*, 472 U.S. 181, 208 (1985) ("[W]e must give effect to every word that Congress used in [a] statute."). And "[i]n ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier*, 486 U.S. 281, 291 (1988); *accord Brown & Williamson*, 529 U.S. at 133.

---

[9] 16 U.S.C. § 21a ("[a]ll of those lands lying within the boundary lines…. are included in and made a part of the Yellowstone National Park"); 16 U.S.C. § 45a ("all of those lands lying within the boundary line above described are hereby included in and made a part of the Roosevelt-Sequoia National Park"); *see also* 16 U.S.C. § 80 (reserving a specific tract as Kings Canyon National Park subject to existing rights and grazing permits); 16 U.S.C §§ 121-122, 124 (creating and assuming jurisdiction over Crater Lake National Park).

[10] 16 U.S.C. § 156 (Secretary of Interior to acquire property for Big Bend National Park "within the boundaries to be determined by him"); *see also* 16 U.S.C. § 81a (DOI to acquire property and recommend boundaries of Colonial National Historical Park to President, who will then set them "by proclamation").

[11] *See* 16 U.S.C. § 410i (Everglades National Park) ("[T]he land and water therein not in Federal ownership shall be administered as a part of the park only after being acquired ..."); 16 U.S.C. § 410bb-1 (Klondike Gold Rush National Historical Park) ("[T]he Secretary shall administer lands, waters, and interests therein acquired for the park in accordance with the provisions of [the Act] ...").

Defendants apparently still urge the Court to rule that the GGNRA Act places *no limit* on its authority within the map boundaries. Dkt. 182 at 14 ("This Court has previously held that Section 4 *should not be read to limit the NPS's regulatory authority*.")  But ignoring the acquisition requirement would make several other provisions of the GGNRA Act surplusage. For example, Section 3(a) prohibits the Department from acquiring lands of the State of California except "by donation." 16 U.S.C. § 460bb-2(a). If the Park Service could assume jurisdiction over California property in the map boundaries regardless of whether the Department first acquired it, there would be no reason to make any acquisitions. The same goes for other provisions, including the other carve-outs from the Department's authority to acquire properties, *see* 16 U.S.C. §460bb-1(a)(3), the exclusion of Muir Woods and Fort Point (located within the map boundaries) from the Park Service's jurisdiction to administer the recreation area, *see* 16 U.S.C. 460bb-3(a), and the appropriation of funds for land acquisition, *see* 16 U.S.C. 460bb-5. And finding that acquisition prerequisite applies to "lands" but not "waters," reads "waters" out of Sections 3 and 4 of the Act. Ignoring the acquisition prerequisite to the Department's jurisdiction over waters that Congress specifically included in the GGNRA Act would directly violate this rule of interpretation and, more importantly, disregard the clear intent of Congress that it reflects.

### B. The Department never acquired a property interest in the San Francisco Bay that would allow it to prohibit commercial herring fishing there.

Defendants' only claim of ownership to lands or waters in the vicinity of the disputed waters is that "the United States owns the submerged lands 300 yards seaward adjacent to the uplands as Ft. Baker, the Presidio, Alcatraz Island, and Ft. Mason, all within the boundaries of the GGNRA." Dkt. 182 at 21. That claim is incorrect. First, it is based on the 1897 Act, which, as discussed above, was a conditional grant that California repealed in 1953. *See* 1953 Cal. Stat. (Ch. 521) 1761. Thus, these submerged lands were not "Federal property" when the GGNRA Act was signed into law in 1972, and they were never "transferred... to the administrative jurisdiction of the [Department]." 16 U.S.C. § 460bb-2(a).[12]  *See* Dkt. 118 at 5. Second, even if Defendants ever argued that the repeal

---

[12] While the California State Lands Commission appear to have been unaware of the 1953 Act repeal when drafting the 2009 Lease, AR2050, that has no effect on the validity of the California Legislature's repeal.

FENWICK & WEST LLP
ATTORNEYS AT LAW

was invalid (they haven't, and have waived any such argument), the 1897 Act transfer did not carry with it any rights to exclude the public from fishing in the waters above. *Cal. Fish Co.*, 166 Cal. at 587-99. Just as the 1987 Lease and 2009 Lease expressly withheld that right for the State, the same reservation was implied in the 1897 Act under the California Constitution. Thus, while the 1897 Act gave the United States title to the submerged lands, it could not provide the Park Service a basis to assert administrative jurisdiction over the waters above in order to prohibit fishing in them even if the United States had retained title.

### C.   Defendants' own conduct for over twenty years confirms that the Department and Park Service knew they had no power to interfere with fishing expressly permitted by the State of California.

When the GGNRA Act was passed, the Secretary of the Interior and other Department personnel specifically acknowledged its jurisdictional limitations. The agency maintained that position with respect to the disputed waters for more than 30 years, including for over 20 years after enacting its regulation prohibiting commercial fishing in the National Parks. It was not until 2003 that Defendants publicly announced their change in position, and even then Defendants did not act to prevent herring fishing in the disputed waters until 2011.[13]  And when it changed its position, the agency cited as its justification the 1859 Act, the *repealed* 1897 Act, and the *cancelled* 1987 Lease. In other words not only did the agency impliedly acknowledge *that it needed to show it had acquired a property interest* under the statute, it cited three legal documents, two of which were null and void, and all of which reserved to the State of California the exact regulatory power the Park Service sought to claim. For these additional reasons the Court should read the statute as the Plaintiff urges:  that reading comports with the agency's own view for decades. *Accord Brown & Williamson*, 529 U.S. at 144-146 (the agency's continued failure to regulate tobacco was evidence that it lacked such authority under the relevant statute). And at the very least this shows that the agency's current view is entitled to no deference, even if the Court finds the statute ambiguous. As the Supreme Court recently explained in *Encino Motorcars, LLC v. Navarro*, 136

---

[13] The only prior instance that Defendants discuss took place in 2005. Dkt. 182 at 11.  However, Matt Ryan, one of the fishers actually present for that event, testified that after he showed the Coast Guard captain his regulations from the CDFW permitting fishing in the disputed waters, the Coast Guard captain left and Mr. Ryan continued to fish unmolested.  Dkt. 45, ¶ 5.

FENWICK & WEST LLP
ATTORNEYS AT LAW

1    S. Ct. 2117 (2016):

> When an agency changes its existing position, … it must at least display awareness
> that it is changing position and show that there are good reasons for the new policy.
> In explaining its changed position, an agency must also be cognizant that
> longstanding policies may have engendered serious reliance interests that must be
> taken into account. In such cases it is not that further justification is demanded by
> the mere fact of policy change; but that a reasoned explanation is needed for
> disregarding facts and circumstances that underlay or were engendered by the prior
> policy. It follows that an unexplained inconsistency in agency policy is a reason for
> holding an interpretation to be an arbitrary and capricious change from agency
> practice. An arbitrary and capricious regulation of this sort is itself unlawful and
> receives no *Chevron* deference.

*Id.* at 2126 (internal quotations and citations omitted). Here, Defendants never explained the reason

for their change in position, never did so in a way that considered the fishers's *decades* of reliance

on the prior statutory interpretation, and never justified the new position other than by reference

to a no longer valid conditional grant of jurisdiction, a repealed law, and a cancelled lease. It would

take quite a dark sense of humor to require deference to "agency expertise" on these facts.

### D.    The legislative jurisdiction of the United States is irrelevant.

Finally, Defendants repeat the argument that they can regulate commercial fishing in the

waters for the "additional reason" that the area is part of the "lands and waters within a park that

are under the legislative jurisdiction of the United States." Dkt. 182 at 21. For this proposition,

Defendants rely on their own regulation, 36 C.F.R. § 2.3(g). *Id.* But the Park Service is not

Congress. As this Court put it:

> If Defendants are arguing that the United States' constitutional authority to regulate
> the waters in question is somehow automatically self-effectuating, even absent a
> grant of legislative authority, the Court rejects that proposition. The fact that the
> *United States* can regulate these waters does not mean that *the N.P.S.* can. The
> Constitution makes the former proposition a possibility, but only Congress can
> make the latter one a reality.

Dkt. 127 at 6 n.1. The regulation by its own terms applies only to "lands and waters within a park

area," which in turn is expressly limited to areas within the Department's jurisdiction. 36 C.F.R. §

1.4 ("National Park System"). Defendants cannot regulate without a statutory grant of authority

from Congress.[14]   The Court should not deviate from its original, correct ruling.

---

[14] *United States v. Armstrong*, 186 F.3d 1055, 1057-63 (8th Cir. 1999), cited by Defendants, is

FENWICK & WEST LLP
ATTORNEYS AT LAW

### III.   THE   ORGANIC   ACT   DID   NOT   REPEAL   THE   GGNRA   ACT   EITHER EXPRESSLY OR BY IMPLICATION.

The 1976 Organic Act amendment generally authorized the Department to regulate boating and activity related to park waters. However, it did not repeal the acquisition requirement in the GGNRA Act either expressly or by implication. A statute addressing a precise subject "is not submerged by a later enacted statute covering a more generalized spectrum." *Radzanower v. Touche Ross & Co*., 426 U.S. 148, 153 (1976); *see also Morton v. Mancari*, 417 U.S. 535, 550-551 (1974).

> The reason and philosophy of the rule is, that when the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute in general terms, or treating the subject in a general manner, and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive previous provisions, unless it is absolutely necessary to give the latter act such a construction, in order that its words shall have any meaning at all.

*Radzanower*, 426 U.S. at 153 (quoting T. Sedgwick, The Interpretation and Construction of Statutory and Constitutional Law 98 (2d ed. 1874)); *see also James v. City of Costa Mesa*, 700 F.3d 394, 412 (9th Cir. 2012), *cert. denied*, 569 U.S. 994 (2013) ("[r]epeals by implication are disfavored; every effort must therefore be made to make both statutes operative within their realm, rather than declaring a clash").

Here, nothing in the text of the Organic Act could be construed as a repeal of the GGNRA Act or expressing a clear intent that it not apply. And, for its part, the Organic Act certainly need not be construed as voiding the GGNRA Act provisions at issue in order to have its own meaning and effect. *See Radzanower*, 426 U.S. at 153. To the contrary, the Organic Act stated that its own provisions give way when in conflict with provisions governing individual parks and recreation areas. *See* 16 U.S.C. § 1a-1 (merging parks into a single national park system, managed and regulated consistently "except as may have been or shall be directly and specifically provided by Congress") (repealed 2014), re-codified with modifications at 54 U.S.C. § 100101(b)(2); *see also* 54 U.S.C. § 100755 ("This section ... and the various authorities relating to the administration and

---

irrelevant, as it considered whether the State of Minnesota had "ceded jurisdiction" over certain waters, not whether the Park Service had acquired a sufficient interest in those waters to meet a statutory mandate.

FENWICK & WEST LLP
ATTORNEYS AT LAW

protection of System units ... shall, *to the extent that those provisions are not in conflict with any such specific provision*, be applicable to System units ..."); *Wildearth Guardians v. NPS*, 703 F.3d 1178, 1189 (10th Cir. 2013) (citing 16 U.S.C. § 1c(b)).[15]

Where, as here, the repealing effect of a statute is doubtful, the court must strictly construe it to effect its consistent operation with the earlier legislation. *Ass'n of Civilian Technicians, Silver Barons Chapter v. Fed. Labor Relations Auth.*, 200 F.3d 590, 592 (9th Cir. 2000). If faithfully applied, the GGNRA Act's acquisition prerequisite does not frustrate the Organic Act's purpose. The Organic Act has a manifestly broad scope. It applies throughout the National Park system to any activities on or relating to water. The GGNRA Act affects a single recreation area and its enforcement would have no effect on other parks. By contrast, allowing regulation of the San Francisco Bay waters under the Organic Act would make the GGNRA Act's acquisition provision inoperative as to waters. There is no implied repeal where, by finding the specific statute creates a minor exception to the later-enacted general one, both may be preserved. *See Ledezma-Galicia v. Holder*, 636 F.3d 1059, 1070 (9th Cir. 2010). Construing the GGNRA Act as an exception to the Organic Act would create only a "small puncture in a broad shield," and is thus the correct construction. *See id.* at 1071 (quoting *Donaldson v. U.S.*, 653 F.2d 414, 418 (9th Cir. 1981)).

The Court previously decided against Plaintiff on this issue. Dkt. 127. But if it is inclined to revisit this decision, Plaintiff offers the following arguments. First, as discussed above, the canon against repeals by implication directs that a specific statute applies over a later-enacted general one absent clear intent to the contrary. The *rationale* for the canon is that in enacting the specific statute, the legislature has more clearly "turned its mind" to the regulated subject. *See Radzanower*, 426 U.S. at 153. But the court *applies* this canon simply by asking which statute addresses the narrower subject matter, and whether the general statute reflects any clear intent that it should not apply. *See e.g., Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031, 1034 (9th Cir. 2008) (right to removal under Class Action Fairness Act did not repeal Securities Act's removal bar, as the latter

---

[15] The current Organic Act refers to "System units" rather than "parks." *See* 54 U.S.C. § 100102 ("The term 'System' means the National Park System. ... The term 'System unit' means one of the areas described in section 100501 of this title."); 54 U.S.C. § 100501 ("The System shall include any area of land and water administered by the Secretary, acting through the Director, for park, monument, historic, parkway, recreational, or other purposes").

FENWICK & WEST LLP
ATTORNEYS AT LAW

applied to a narrower class of cases). Here, the Court did not ask those questions. Instead, it conducted its own assessment of whether "the mind" of the legislature had in fact "turned" to the subject that the text of the GGNRA Act expressly regulates. Dkt. 127 at 8. This led the Court to read the GGNRA Act's acquisition provision as not applicable to waters, contrary to its text.

Second, the Court noted that the acquisition provision in Section 3(a) also provides that "[a]ny lands, or interests therein, owned by the State of California or any political subdivision thereof, may be acquired only by donation," without reference to waters. Dkt. 127 at 10 (quoting 16 U.S.C. § 460bb-2(a)). But the fact that Congress chose to limit the donation requirement to lands while the surrounding provisions refer to both lands *and waters* tends instead to show a deliberate choice to provide different acquisition means for different types of property. On its face, the Act allows the Department to acquire water by means *other than by donation*; this does not show that the acquisition provision does not in fact apply to "waters."

Third, the GGNRA Act's acquisition requirement does not create an absurdity. It can clearly be given effect as to "waters, and interests therein."  Consider, for example, that the provision is not unique: Congress has on other occasions created similar provisions that apply to waters. *See* 16 U.S.C. § 410i; *see also* 16 U.S.C. §§ 459f-3, 460ii & ii-1, 698n, 715i. The statute setting the exterior boundary for Everglades National Park, for one, provides that:

> Land and water now in Federal ownership within said boundary shall continue to be administered as Everglades National Park; however, the land and water therein not in Federal ownership shall be administered as a part of the park only after being acquired as hereinafter provided.

*See* 16 U.S.C. § 410i. This statute further provides for an exchange of interests in both *land and water* by quitclaim deed between Florida and the federal government. 16 U.S.C. § 410o. Here, the fact that the GGNRA Act does not *specify* the interest to be acquired, or that Congress did not address the specific obstacles to acquisition that would arise in the case of San Francisco Bay, does not mean the Act should not be enforced according to its terms. The court must construe the statute to give effect to all its provisions if possible. *Aden*, 589 F. 3d at 1044.

Here, nothing prevented the Department from acquiring an interest in the Bay waters that would permit it to regulate consistent with California's public trust right. On this subject, there are

FENWICK & WEST LLP
ATTORNEYS AT LAW

two important points. First, there is a difference between the authority to administer the waters *generally* as part of the GGNRA and the authority to achieve the *specific* fishing prohibition at issue here. Certainly, there is some conveyance that could satisfy the former purpose without offending public trust rights, and thus give the GGNRA Act meaning and effect. Second, California and the federal government have a long history of collaboration with respect to these very waters.[16] California is also free to choose *between* trust uses, such as fishing *or* conservation. *Colberg, Inc. v. State ex rel. Dep't of Pub. Works*, 67 Cal. 2d 408, 420-22 (Cal. 1967); *Cty. of Orange v. Heim*, 30 Cal. App. 3d 694, 707 (1973) ("[I]t is the Legislature that administers the trust, and it is within the province of the Legislature to prefer one trust use over another"). The Department could obtain an interest in the waters (in the form of a lease or easement), that it could then administer consistent with California's choice of public trust goals. *See Cal. Fish, 166* Cal. at 597.[17] This could also satisfy the GGNRA Act. But whatever the vehicle, this was Congress's design. Congress could have obtained full title to waters in the Bay free and clear of California's public trust rights if it had so desired.[18] It rejected such proposals and chose one that emphasized greater State and local control.

Fourth, the phrase "lands, waters, and interests therein" is not "boilerplate" just because it appears multiple times in Title 16. In its uses of the phrase, Congress sought to regulate either specific waters within the national parks or parks containing significant bodies of water. *See, e.g.,* 16 U.S.C. § 90b (creating Ross Lake National Recreation Area, and Lake Chelan National Recreation Area); § 410ff (creating Channel Islands National Park "to protect… undisturbed tide pools providing species diversity"); § 410gg (creating Biscayne National Park for the "enjoyment of … terrestrial, marine, and amphibious life"); § 410hh-2 (Glacier Bay National Park); § 668dd (protection of fish resources and habitats). In each of these instances, use of the term "waters" in the phrase "lands, waters, and interests therein" had a specific purpose and was not superfluous.

---

[16] As Defendants themselves acknowledge (Mot. at 9), the waters are already subject to concurrent legislative jurisdiction as well as cooperation with respect to many other matters. Mot. at 9.

[17] Indeed, the 1987 Lease, while specifically barring Defendants from prohibiting fishing in the waters of the leasehold, acknowledges in the same section that "waters [were] included within this lease," *see* AR 2064, and elsewhere requires that Defendants manage the leasehold so as "[t]o enhance public safety, use, and enjoyment of the lands and water of the subject land." AR 2063.

[18] *See United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 65 (1913) (condemning river waters); *see also United States v.32.42 Acres of Land*, 683 F.3d 1030, 1034 (9th Cir. 2012) (federal taking not subject to California's public trust rights).

FENWICK & WEST LLP
ATTORNEYS AT LAW

Finally, it is hardly surprising that the legislative history contains extensive discussion about disposition of federal properties within the park boundaries, while at the same time failing to instruct the Department as to how it should go about acquiring a property interest in the Bay's waters that would allow it to achieve its specific regulatory goal here. Given the sheer number of pre-existing federal properties present within the park and the disputes regarding their disposition (to say nothing of the multitude of other state, local, and private owners of property within the map boundaries of the park), that outcome is natural. Further, "[e]xtrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the *enacting Legislature's* understanding of otherwise ambiguous terms," not to vary the meaning of unambiguous terms. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1084 (9th Cir. 2014) (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005)). The GGNRA Act unambiguously refers to "waters," both in authorizing the Department to acquire them and the limiting the Department's authority to the waters it had acquired.

## IV.  PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT THAT IT CHALLENGES A FINAL AGENCY ACTION

The Court should rule that Plaintiff has challenged a final agency action. The herring fishers ordered to cease fishing and depart the waters have now testified to the precise facts that the Ninth Circuit held establish a final agency action. Defendants have disclosed no controverting evidence during the seven years this case has been pending. Instead, they told this Court that it could decide based on the administrative record alone, without discovery or even initial disclosures. And as recently as May 2020, they agreed the case was ripe for summary judgment on the statutory authority question. They did not disclose (to either the Court or the Plaintiff) that they believed there was still a potential jurisdictional defect that would prevent the Court from even reaching that question. This sandbagging is profoundly unfair, and on this record summary judgment is appropriate.

First, Plaintiff concedes that the Court will likely reach this issue, but it reserves the right to argue that Defendants have waived it. While the Ninth Circuit has previously stated that the APA's "final agency action" requirement is jurisdictional, other Circuits have concluded to the

FENWICK & WEST LLP
ATTORNEYS AT LAW

contrary, *Trudeau v. FTC*, 456 F.3d 178, 184 (D.C. Cir. 2006), therefore suggesting the requirement is waivable. *See Pebble Ltd. P'ship v. United States EPA*, 604 F. App'x 623, 626 (9th Cir. 2015) ("[O]ur court has never fully examined the jurisdictional status of § 704. In a case where it matters, we should take a fresh look at the issue without feeling bound by our prior, unreasoned determination.") (Watford, J., concurring); *see also* Charles, H. Koch & Richard Murphy, 4 Admin. L. & Prac. § 12:20 "Finality" (3d ed. 2018) ("The requirement of finality under the APA is not jurisdictional as the APA itself is not a jurisdiction-conferring statute.") (citing authorities).

Here, the facts for finding a waiver are clear: Defendants have always argued that the case could and should proceed on the administrative record without discovery (Dkt. 24 [original CMC statement]), and told the Court that it could proceed to decide a summary judgment motion on the statutory authority question. Dkt. 178 [May CMC statement] at 5 ("*No additional discovery is necessary for the Court to take up motions for summary judgment on the question of statutory interpretation that it ruled on previously*"), 4 ("Defendants have answered and the administrative record previously filed does not need to be updated. Accordingly, the case is ready for resolution through summary judgment.") and 7 ("Defendants believe that this case is appropriately resolved through summary judgment."). That position is wholly inconsistent with the contention that there are unresolved fact disputes with respect to the final agency action requirement. And again, Defendants have disclosed no evidence regarding this defense. *See* Fed. R. Civ. P. 37(c) (party is not entitled to use undisclosed evidence). The Court could rule that, should the Ninth Circuit determine the final agency action requirement is waivable, Defendants knowingly relinquished that defense through their actions and representations to the Court.

Second, Plaintiff has established that it challenges a final agency action under 5 U.S.C. § 704, *i.e.*, an action that (1) marks the consummation of the agency's decision-making process, and (2) the action determines rights or obligations, or legal consequences flow from the action. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The Ninth Circuit held in this case that the allegations of the operative complaint, if proven, establish a final agency action. *San Francisco Herring Ass'n v. Dep't of the Interior* ("*SFHA*")*,* 946 F.3d 564, 582 (9th Cir. 2019). Plaintiff has submitted sworn declarations from its members that establish those allegations. *Compare* Deaver

Decl. ¶¶ 3-7; Sohrakoff Decl. ¶¶ 3-7; Koepf Decl. ¶¶ 3-7; Ryan Decl. ¶¶ 3-7; Papetti Decl. ¶¶ 3-7; *with SFHA*, 946 F.3d at 572-573.

- NPS wardens confronted Ernie Koepf in his fishing vessel in January 2013, while he surveyed spawning herring and prepared to set his nets. The wardens ordered Mr. Koepf to set his nets outside of the GGNRA boundaries. Koepf Decl. ¶ 5.

- CDFW wardens (acting for Defendants) confronted Domenic Papetti around the same date. Mr. Papetti had already set his nets when the wardens ordered him to remove them. Papetti Decl. ¶ 5

- CDFW wardens also confronted Matt Ryan, Dennis Deaver, and Nick Sohrakoff while they surveyed spawning, and informed each that they could not set their nets. Ryan Decl. ¶ 5; Deaver Decl. ¶ 5; Sohrakoff Decl. ¶ 5.

The fishers each knew of Defendants' stated intent to prosecute criminally anyone who commercially fished for herring in the waters. Decl. ¶ 6; Sohrakoff Decl. ¶ 6; Koepf Decl. ¶ 6; Ryan Decl. ¶ 6; Papetti Decl. ¶ 6. And each obeyed the order he received to avoid that prosecution. *Id.* The Circuit held that the facts regarding Mr. Koepf "are alone enough to sustain this action." *SFHA*, 946 F.3d at 577. Moreover, the "informational" notices establish Defendants' intent to enforce the commercial fishing ban and the fact that they had enlisted CDFW to assist them (AR 13, 16-17), showing that CDFW acted at Defendants' behest in ordering the others out of the water. *SFHA*, 946 F.3d at 576. The Court should enter summary judgment.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant its cross-motion for summary judgment and deny Defendants' motion for summary judgment.

August 10, 2020

Respectfully submitted,

GROSS & KLEIN LLP

By: ___*Stuart G. Gross*___
        Stuart G. Gross

Counsel for Plaintiff
SAN FRANCISCO HERRING
ASSOCIATION

FENWICK & WEST LLP
ATTORNEYS AT LAW

1

2   August 10, 2020

                                 FENWICK & WEST LLP

3

                                 By:    *Todd R. Gregorian*
                                            Todd R. Gregorian

4

5                                    Counsel for Plaintiff
                                   SAN FRANCISCO HERRING
                                   ASSOCIATION

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW