STUART G. GROSS (CSB No. 251019)
sgross@grosskleinlaw.com
GEORGE A. CROTON (CSB No. 323766)
gcroton@grosskleinlaw.com
TIMOTHY S. KLINE CSB No. 319227)
tk@grosskleinlaw.com
**GROSS & KLEIN LLP**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
Telephone: (415) 671-4628
Facsimile: (415) 480-6688

TODD R. GREGORIAN (CSB No. 236096)
tgregorian@fenwick.com
**FENWICK & WEST LLP**
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300
Facsimile: 415.281.1350

Attorneys for Plaintiff
SAN FRANCISCO HERRING ASSOCIATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SAN FRANCISCO HERRING ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT, in his official capacity as Secretary of the Interior; UNITED STATES NATIONAL PARK SERVICE; DAVID VELA, in his official capacity as Deputy Director of the National Park Service; and CICELY MULDOON, in her official capacity as General Superintendent of the Golden Gate National Recreation Area, of the Golden Gate National Recreation Area,<br><br>Defendants. | Case No.: 4:13-cv-01750-JST<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Date: December 9, 2020<br>Time: 2:00pm<br>Judge: Hon. Jon S. Tigar<br>Courtroom: 6, 2nd floor |

# TABLE OF CONTENTS

|  | | Page |
|---|---|---|
| INTRODUCTION | | 1 |
| ARGUMENT | | 1 |
| I. | DEFENDANTS CANNOT DISREGARD THE PLAIN LANGUAGE OF THE STATUTE BY CHARACTERIZING THE ACQUISITION PROVISION AS "BOILERPLATE." | 1 |
| II. | DEFENDANTS CANNOT DISREGARD THE PLAIN LANGUAGE OF THE STATUTE BY RELYING ON UNEXPRESSED LEGISLATIVE INTENT. | 3 |
| III. | DEENDANTS CANNOT AVOID THE STATUTE BY INVOKING THE GENERAL GRANT OF AUTHORITY IN THE ORGANIC ACT. | 4 |
| IV. | DEFENDANTS' INTERPRETATION OF THE STATUTE IS AN UNEXPLAINED CHANGE IN POSITION AND THUS ENTITLED TO NO DEFERENCE. | 6 |
| V. | DEFENDANTS HAVE NEVER ACQUIRED THE PROPERTY INTEREST IN THE WATERS REQUIRED BY THE GGNRA ACT. | 7 |
| CONCLUSION | | 8 |

FENWICK & WEST LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ................................... 7

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ............................................................ 7

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U. S. 1 (2000) ...................... 2

*Lamie v. U.S. Trustee*, 540 U.S. 526 (2004) ..................................................................................... 2

*Mobil Oil Corp. v. Higginbotham*, 436 U. S. 618 (1978) ................................................................ 4

*Related Indus., Inc. v. U.S.*, 2 Cl. Ct. 517 (1983) ............................................................................ 2

*Seila Law LLC v. Consumer Fin. Protection Bureau*, 140 S. Ct. 2183 (2020) ............................... 2

*United States v. Armstrong*, 186 F.3d 1055 (8th Cir. 1999) ........................................................... 3

*United States v. Brown*, 552 F.2d 817 (8th Cir. 1977) .................................................................... 3

*WildEarth Guardians v. National Park Service*, 703 F.3d 1178 (10th Cir. 2013) ..................... 5, 6

**Statutes**

16 U.S.C. § 160(f) .............................................................................................................................. 3

16 U.S.C. § 460bb-1 .......................................................................................................................... 1

16 U.S.C. § 460bb-2 .......................................................................................................................... 1

16 U.S.C. § 460bb-3 .......................................................................................................................... 1

1953 Cal. Stat. (Ch. 521) 1761 .......................................................................................................... 8

54 U.S.C. § 100102 ............................................................................................................................ 4

54 U.S.C. § 100501 ............................................................................................................................ 4

54 U.S.C. § 100751(b) ....................................................................................................................... 4

**Other Authorities**

S. Rep. No. 91–1513 (1970) .............................................................................................................. 3

**Regulations**

36 C.F.R. §§ 1.2(a) ............................................................................................................................ 5

# INTRODUCTION

When Congress established the Golden Gate National Recreation Area, it made the deliberate choice to create the park from specifically identified properties that it transferred to the Department in the statute as well as lands and waters the Department later acquired within the park's map boundaries. 16 U.S.C. § 460bb-3. No party disputes that the statute says what it says: that the Department (*i.e.*, Defendants) has administrative jurisdiction *only* over waters within the park boundaries in which it has acquired a property interest. The question is only whether there is either a reason that Defendants do not have to comply with the statute as written, or a basis to find that they have in fact complied. Because Defendants have not established any such basis, the Court should grant summary judgment for Plaintiff.[1]

# ARGUMENT

## I. DEFENDANTS CANNOT DISREGARD THE PLAIN LANGUAGE OF THE STATUTE BY CHARACTERIZING THE ACQUISITION PROVISION AS "BOILERPLATE."

When Congress set the recreation area's boundaries in Section 2, 16 U.S.C. § 460bb-1, it did *not* define the geographic scope of the Park Service's administrative jurisdiction. Rather, in setting the boundaries, Congress defined the geographic area in which the Department *could* acquire lands and waters for the recreation area, pursuant to the acquisition authority granted in Section 3. 16 U.S.C. § 460bb-2. Defendants would have the Court ignore the plain language of the Act because, they claim, Congress gave too "little thought to how [it] would fit with the terms of the statute" or because it neglected to enact specific instructions for addressing the surrounding San Francisco Bay waters. *See* Dkt. 187 at 6–7. The difficulty with this argument, and the reason the Court should reconsider its prior ruling and reject the argument, is that it violates well established principles of statutory construction.

"[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Hartford*

---

[1] Defendants acknowledge the Ninth Circuit's holding that plaintiff has pleaded a final agency action sufficient to sustain this action. *See* Dkt. 187 at 7 n.1. They also admit that plaintiff has provided the necessary evidence to establish to establish the Court's jurisdiction in this case. *Id.* Therefore, no further argument is necessary on these points.

OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT, ETC.          1          Case No.: 4:13-cv-01750-JST

*Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U. S. 1, 6 (2000); *see also Lamie v. U.S. Trustee*, 540 U.S. 526, 527 (2004). Defendants have argued that applying the statute would be difficult; that Congress did not specify a means for acquiring an interest in the San Francisco Bay; and that the legislative history and the statute itself both reflect that Congress did not devote significant time to this issue. None of those are permissible reasons to disregard the text of the law. Defendants have argued at most that applying the law as written would require an esoteric property transfer. Dkt. 187 at 4-5. They have *not* argued that applying the law as written would be impossible or absurd. *See id.* Thus, even admitting that the question is difficult, Supreme Court precedent makes clear that this Court must come down on the side of giving the statutory text its best effect.

The same result obtains notwithstanding Defendants' argument that the statutory text is "boilerplate." Again, the Supreme Court has held that this is not a justification to disregard the statute: "boilerplate is boilerplate for a reason—because it offers tried-and-true language to ensure a precise and predictable result." *Seila Law LLC v. Consumer Fin. Protection Bureau*, 140 S. Ct. 2183, 2209 (2020). The issue in *Selia* was whether the Court should dismiss a severability clause in the Dodd-Frank Act where petitioner characterized it as "non-operative 'boilerplate' because it 'applied to the entire . . . Act' and appear[ed] almost 600 pages before" the provision at issue. *See id.* The Court rejected the same argument that Defendants advance here—that boilerplate in a statute "means we cannot be certain that Congress really meant to apply" the language in question. *Id.* The boilerplate wording appeared "in a logical and prominent place… reinforcing the conclusion that" Congress intended it to have effect. *Id.* Here, the plain language of §§ 3 and 4 should command *greater* interpretive weight, not less.[2]

Defendants' cited authorities do not change this conclusion. Defendants argue that in the *Brown* and *Armstrong* cases, the statutory requirement that the Department acquire lands and

---

[2] The result is the same under *Related Indus., Inc. v. U.S.*, 2 Cl. Ct. 517, 522 (1983). Besides occurring over thirty years before *Seila*, the question in *Related Indus.* was whether Congress intended a special exemption for a particular agency that would not apply to federal agencies generally when it copied over language "similar to or identical" with that of a related provision. *See id.* at 521–22. The opinion does not support defendants' claim that the use of boilerplate in a statute suggests a lack of legislative consideration.

REPLY ISO CROSS-MOTION FOR
SUMMARY JUDGMENT      2      Case No.: 4:13-cv-01750-JST

waters for Voyageurs National Park was unenforced boilerplate. *See* 16 U.S.C. § 160(f). But the establishment of that park required the State of Minnesota to donate 25,000 acres of state-owned property to the Secretary of the Interior, property that included the waters at issue. *See* S. Rep. No. 91–1513 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5965, 5967. The Eighth Circuit held that the Department had the necessary rights to administer the waters because "the state of Minnesota had ceded jurisdiction of the waters within [the park] to the United states," noting that "the state 'was an active participant in the creation of Voyageurs National Park.'" The decisions thus turned on Minnesota's willing transfer of authority consistent with the governing statute. The cases gave effect to the statutory text requiring acquisition; they did not disregard it as boilerplate. *See United States v. Brown*, 552 F.2d 817, 819 (8th Cir. 1977); *United States v. Armstrong*, 186 F.3d 1055, 1058 (8th Cir. 1999).

## II. DEFENDANTS CANNOT DISREGARD THE PLAIN LANGUAGE OF THE STATUTE BY RELYING ON UNEXPRESSED LEGISLATIVE INTENT.

Defendants suggest throughout their brief that the GGNRA Act reflects a specific intent to preserve the San Francisco Bay waters at issue as part of the park. *See, e.g.*, Dkt. 187 at 1, 10. However, they provide no evidence of any such intent beyond the drawn map boundaries and the statute itself. Defendants reference a House committee report that recites only: "Basically, the thrust of H.R. 16444 is to preserve and protect, for public use and enjoyment, the nationally significant land and water areas which border San Francisco and which form a continuous greenbelt from the Golden Gate Bridge to the Point Reyes National Seashore." Dkt. 39-5 at 2. That general goal is just as inconsequential as it is uncontroversial. No one disputes that Congress intended to preserve the property that constitutes the GGNRA, or that the disputed waters were part of the property that Congress designated for *potential* inclusion in the park. That simply does not answer the question of whether Congress intended a specific result for the disputed waters.

Lawyers arguing against a disfavored statutory interpretation are fond of pointing to what Congress hypothetically could have said but did not. And likewise, here, Congress understood the difference between ownership and federal legislative jurisdiction, and it also knew what area

FENWICK & WEST LLP
ATTORNEYS AT LAW

it designated for the park on the map. But unlike the usual argument, here Congress's alternatives are not mere hypothetical reconstructions. It expressly considered and rejected alternatives that included using eminent domain to secure state property within the map boundaries for the park. The best interpretation of Congress's intent here, then, is that it meant what it said.

Finally, the detailed provisions in the statute regarding various land inholdings also do not show any specific intent to provide for automatic inclusion of waters in spite of the literal text. At enactment, for example, the eastern portion of Fort Baker (*i.e.*, the portion abutting the disputed Bay waters at Yellow Bluff) remained under the control of the military and was not transferred for inclusion in the park. It would be odd to assume that Congress, having exempted east Fort Baker (docks and all) from the park and retained it for military use, intended to effect a direct transfer of its adjacent waters. The Supreme Court has noted that "[t]here is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted." *Mobil Oil Corp. v. Higginbotham*, 436 U. S. 618, 625 (1978). While Congress may have left a gap with respect to how the Department should acquire San Francisco Bay waters if it wished to include them in the park, that does not necessitate that the Court rewrite the statute.

## III. DEENDANTS CANNOT AVOID THE STATUTE BY INVOKING THE GENERAL GRANT OF AUTHORITY IN THE ORGANIC ACT.

The Court has thoroughly considered the parties' arguments concerning the Organic Act previously, but Defendants' brief raises several issues that require response.

First, irrespective of the GGNRA Act, the Organic Act does not authorize Defendants' assertion of administrative jurisdiction here. Defendants claim that the 1976 amendment authorized the Park Service to regulate "activities occurring in waters within the boundaries of park system units." Dkt. 187 at 11:3-4. But that is incorrect. The statute authorizes regulation of "water located *within System units*," not water located *within the boundaries* of System units. 54 U.S.C. § 100751(b). That distinction is consequential: a "System unit" is a designated "area of land and water *administered by the Secretary*." 54 U.S.C. § 100501; *see also* 54 U.S.C. § 100102. In other words, a System unit is defined by reference to the Department's administrative

jurisdiction. And here, the Department's administrative jurisdiction extends under the GGNRA Act not to the map boundaries themselves, but to the waters within the boundaries that the Department has acquired. The disputed waters were never acquired by the Department and so are not part of a "System unit" and, thus, their regulation is not authorized by the Organic Act. Defendants have rewritten the statute in their argument in order to avoid this problem.[3]

Second, the Organic Act expressly provides that park-specific statutes control where they conflict with the Organic Act. *See* Dkt. 185 at 19-20. Defendants' only argument on this point is that the Court previously interpreted the GGNRA Act as creating no such conflict. That argument is fair as far as it goes. But Defendants additional argument for finding no conflict, that the GGNRA Act purportedly contains no "specific provision" requiring acquisition of waters lacks merit. The word "specific" in the Organic Act's provision regarding conflicts refers to statutory provisions specific *to a System unit*. It does not invite some further analysis of whether a statute is a "general park-specific provision" or a "specific park-specific provision" and Defendants' suggestion to the contrary is just absurd. Moreover, the GGNRA *does* contain a provision that by its text specifically requires the acquisition of waters before administering them.

Finally, to the extent the statutes present a bona fide conflict, the canon against repeals by implication would require the Court to apply the GGNRA Act. As discussed on opening, that doctrine requires the Court to apply the statutory provision addressed to the more specific subject matter (here, the park-specific GGNRA Act) and apply it as an exception to the general statute (here, the system-wide Organic Act), since doing so gives greatest effect to both. Defendants' argument to the contrary based on *WildEarth Guardians v. National Park Service*, 703 F.3d 1178 (10th Cir. 2013) is misplaced. That case considered an Organic Act provision, but one that the park-specific statute at issue had expressly incorporated by reference. That ultimately required the court to harmonize two provisions *in the same park-specific statute*, one which allowed the culling of detrimental animals and one which prohibited all hunting and killing of animals. The court ruled that the culling provision should be read as an exception to the blanket prohibition on

---

[3] The commercial fishing *regulation* purports to apply to the extent of the map boundaries (*see* 36 C.F.R. §§ 1.2(a)), but Defendants cannot so apply it outside of the jurisdiction granted them by Congress.

killing.

This holding does not support any of Defendants' arguments. It does not support the idea that a provision that applies to the entire park system is more specific that a provision that applies within a single park. *See* Dkt. 187 at 13:24-25. That is because, as just discussed, the question in *WildEarth Guardians* was how to apply two provisions in the same statute, neither of which applied beyond park at issue. Neither does *WildEarth Guardians* suggest that the Court can enforce abstract expressions of Congress's general goal of "preserving" waters over the statutory text that is directly on point. Indeed, Defendants' argument—that enforcing the GGNRA Act by its terms would "make it almost impossible" for it to regulate the waters it has not acquired—begs the entire question of this case, *i.e.*, whether the Court must enforce the express conditions Congress placed on Defendants' ability to regulate those waters.

## IV. DEFENDANTS' INTERPRETATION OF THE STATUTE IS AN UNEXPLAINED CHANGE IN POSITION AND THUS ENTITLED TO NO DEFERENCE.

Defendants insist that they have maintained a consistent position on the issues in the case that are entitled to deference. Dkt. 187 at 15-16. Their heated rhetoric aside, that is plainly not so. The "position" at issue is the argument that Defendants may enforce the commercial fishing regulation in the disputed waters irrespective of the text of the GGNRA Act that on its fact requires them to first acquire a property interest in those waters. That position was invented in order to defend this litigation. There is no evidence that either the Department or the Park Service ever took that position previously, and Defendants point to none. Before this litigation, the only justification Defendants offered for their authority to enforce the commercial fishing ban in the disputed waters relied expressly on the supposed federal property interests reflected in 1859 Act, the 1897 Act, and the 1987 Lease. That statement of agency position is consistent with *Plaintiff's* argument that Defendants must comply with the acquisition provisions in the GGNRA Act. It *conflicts irreconcilably* with the positions Defendants have advanced here and claim are entitled to deference, *i.e.*, that their authority does not depend on acquiring a property interest and instead arises either from U.S. legislative jurisdiction, from a reading of the GGNRA Act in which Congress expressly required acquisition of lands for the park but conferred administrative

jurisdiction to waters by drawing map boundaries, or because the Organic Act separately grants them administrative jurisdiction over the national park system.

Defendants try to obscure this defect by arguing that the agency "position" was always that they had authority, without specifying a source, to enforce the fishing ban in the disputed waters. But that argument does not work. *Chevron* concerns deference to the agency's interpretation of specific statutes or rules within its area of expertise and its offered reasons for them; it says nothing about deferring to an agency's desired result irrespective of changes in its reasoning. See *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984).

Defendants' argument is also factually inaccurate. Defendants quibble about what steps it took that are properly regarded as "enforcement" of the commercial fishing regulation consistent with their claim to administrative jurisdiction. Those aside, Defendants did not dispute that they took *no steps* to enforce the regulation in the disputed waters for at least *14 years*. *See* Dkt. 187 at 15:18-19. And the steps that Defendants point to around that time (AR134, AR142) reflect no firm agency position, but rather confusion about whether proposed enforcement would be "defensible." As discussed above, Defendants' only coherent announced position before their exclusion of fishers from herring spawning grounds in 2011, the one in their contested annual "notices" to fishers, relied on claims of federal property ownership. Defendants' made no genuine effort to address these facts, which make deference inappropriate. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (agency "must at least display awareness that it is changing position and show that there are good reasons for the new policy").[4]

## V. DEFENDANTS HAVE NEVER ACQUIRED THE PROPERTY INTEREST IN THE WATERS REQUIRED BY THE GGNRA ACT.

Applying the statue as written, the Department never acquired a property right that would establish the disputed waters as part of the park and subject to the commercial fishing regulation.

---

[4] Defendants claim to have asserted other "regulatory authority" over the waters is unsupported. AR1320-24 is an Environmental Impact Statement that discusses potential environmental impacts to the marine environment from development at Fort Baker. AR740-43 is a research permit for a study to take place *along the shoreline* of the park including surveying *on foot*. AR1652 is a dredging project with a potential impact on *submerged lands* around Alcatraz *leased from California*. All of these are terrestrial activities with at most an incidental use of or effect on the waters that reflect *no assertion whatsoever* of regulatory jurisdiction by Defendants over the waters themselves.

Dkt. 185 at 6-10. Defendants argue quite shockingly that the GGNRA Act itself made "all federal interests" in the disputed waters and subject to the administrative jurisdiction of the Park Service on enactment. Dkt. 187 at 10:9-16. That is plainly false. The statute has no such provision and Defendants cite only to a footnote in their own opening brief discussing the transfer of certain specific federal lands in the statute, as well as much later transfers by the army. Dkt. 182 at 7 n.5.[5]

Next, Defendants argue that the U.S. retains ownership of a portion of the submerged lands under the waters at issue. Defendants have already conceded that any such ownership is irrelevant: "NPS's authority to regulate navigable waters within the GGNRA does not depend on either federal ownership of the submerged lands within the GGNRA's boundary or on the general lawmaking authority provided by federal legislative jurisdiction." Dkt. 182 at 7:15-17. And that is correct, as every purported transfer from California to the U.S. of a property interest in the bottomlands was made subject to California's public trust right in the waters above. And as this Court is aware (*see* Dkt. 121 at 21-22), even if California's conditional transfer of title in the 1897 Act was never revoked, notwithstanding its express repeal in 1953 and California's reversionary interest in the transferred lands (*see* 1953 Cal. Stat. (Ch. 521) 1761 ("1953 Act")), those bottomlands only cover a portion of the disputed waters, and exclude, for example, the Yellow Bluff submerged lands transferred to the Sausalito School District in 1958, and the submerged lands at issue in the 1987 and 2009 leases. Any result that turns on ownership of the submerged lands would require this Court to adjudicate the specifics of such transfers.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's motion and deny Defendants' motion.

Dated: November 9, 2020

Respectfully submitted,

GROSS & KLEIN LLP

---

[5] Elsewhere, Defendants concede that the GGNRA Act omitted any explicit grant of jurisdiction because over the disputed waters but argue this was because "the federal government already had exclusive sovereign authority over" those waters. Dkt. 187 at 17-18. This appears to be yet another version of Defendants' argument that their administrative jurisdiction is coextensive with Congress's legislative authority.

By: /s/ Stuart G. Gross
Stuart G. Gross

Counsel for Plaintiff
SAN FRANCISCO HERRING ASSOCIATION

Dated: November 9, 2020

FENWICK & WEST LLP

By: /s/ Todd R. Gregorian
Todd R. Gregorian

Counsel for Plaintiff
SAN FRANCISCO HERRING ASSOCIATION